1  Richard G. Himelrick (004738)
2  J. James Christian (023614)
   **TIFFANY & BOSCO, P.A.**
3  Seventh Floor Camelback Esplanade II
   2525 East Camelback Road
4  Phoenix, AZ 85016
5  Telephone: (602) 255-6000
   Facsimile:  (602) 255-0103
6  E-mail: rgh@tblaw.com; jjc@tblaw.com

7  Lionel Z. Glancy (admitted *pro hac vice*)
8  Leanne E. Heine (admitted *pro hac vice*)
   Elaine Chang (admitted *pro hac vice*)
9  **GLANCY BINKOW & GOLDBERG LLP**
10 1925 Century Park East, Suite 2100
   Los Angeles, California 90067
11 Telephone: (310) 201-9150
   Facsimile: (310) 201-9160
12        -and-
13 Robin Bronzaft Howald (admitted *pro hac vice*)
   **GLANCY BINKOW & GOLDBERG LLP**
14 122 East 42nd Street, Suite 2920
   New York, New York 10168
15 Telephone:  (212) 682-5340
   Facsimile:   (212) 884-0988
16

17 [Additional counsel appear on signature page]

18 *Attorneys for Plaintiff Hongwei Li*

19
20            UNITED STATES DISTRICT COURT
             DISTRICT OF ARIZONA

| | |
|---|---|
| 21  Derick Larson, | Lead Case No. CV-14-01043-GMS |
| 22              Plaintiff, | Consolidated with: No: CV-14-1077-PHX-GMS |
| 23  v. | CLASS ACTION |
| 24  Insys Therapeutics Incorporated, et al., | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF** |
| 25              Defendants. | **THE FEDERAL SECURITIES LAWS** |
| 26 | **JURY TRIAL DEMANDED** |
| 27 | |

28 *[Captions Continue on Next Page]*

1

Hongwei Li,

2

                         Lead Plaintiff,

v.

3

4

Insys Therapeutics Incorporated, et al.,

5

                         Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
Lead Case No. CV-14-01043-GMS

294458.1 INSYS

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW.................................................. 1

II.     JURISDICTION AND VENUE.............................................................................. 15

III.    BACKGROUND ALLEGATIONS ........................................................................ 20

        A.      The Legal Framework Within Which Insys Operates................................. 22

                1.      FDA Approval and Regulation of Prescription Drugs.................... 22

                2.      Anti-Kickback Provisions .................................................................. 25

                3.      Open Payments Program.................................................................... 26

                4.      TIRF REMS Access and Education Program ................................. 26

                5.      Data Collected from the TIRF REMS Access Program ................. 34

                6.      Adverse Incident Reporting to the FDA .......................................... 35

        B.      Insys's Insidious Role in Obtaining Public and Private Payment to
                Subsidize Subsys's High Costs ....................................................................... 36

        C.      Insys's Unqualified Sales Team ..................................................................... 39

        D.      "Start Them High, and Hope They Don't Die"........................................... 41

        E.      Subpoenas And Prior Proceedings Against Insys ....................................... 47

                1.      The *Qui Tam* Action........................................................................... 47

                2.      The December 12, 2013 Subpoena .................................................... 54

                3.      The Awerbuch Criminal Complaint.................................................. 55

                4.      The September 8, 2014 Subpoena...................................................... 57

        F.      Confidential Witness Statements About the Company's Sales and
                Marketing Practices....................................................................................... 57

IV.     HAVING ESTABLISHED ITSELF IN THE MARKET, INSYS GOES
        PUBLIC.................................................................................................................... 76

---

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.      MATERIAL MISREPRESENTATIONS AND OMISSIONS DURING THE CLASS PERIOD ................................................................................. 77

VI.     THE TRUTH BEGINS TO EMERGE................................................................. 104

VII.    ADDITIONAL SCIENTER ALLEGATIONS .................................................... 114

VIII.   CLASS ACTION ALLEGATIONS..................................................................... 117

IX.     LOSS CAUSATION ........................................................................................... 119

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)........................................................................ 120

XI.     NO SAFE HARBOR........................................................................................... 121

XII.    COUNTS ............................................................................................................. 121

XIII.   PRAYER FOR RELIEF ...................................................................................... 127

Lead Plaintiff Hongwei Li ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Insys Therapeutics, Inc. ("Insys" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Insys and/or its management; (c) review of analyst reports, news articles and other publicly available information concerning Insys and/or its products; (d) review of information provided by the United States Food and Drug Administration ("FDA") under the Freedom of Information Act ("FOIA"); (e) review of pertinent court filings; and (f) interviews of individuals with knowledge of the events described herein.

## I.  NATURE OF THE ACTION AND OVERVIEW

1.  This is a class action on behalf of purchasers of Insys's common stock between November 12, 2013, and May 14, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  Insys is a specialty pharmaceutical company that develops and commercializes supportive care products. The Company currently markets two products – Subsys, a proprietary sublingual fentanyl spray approved to treat breakthrough cancer pain in opioid-tolerant patients, and Dronabinol SG Capsule, a generic equivalent to Marinol, an approved second-line treatment for chemotherapy-induced nausea and vomiting and anorexia associated with weight loss in patients with AIDS.  The vast majority of Insys's revenues in 2013 and 2014 were derived from sales of the former.

3.  This case arises from material misrepresentations in and omissions from Insys's public statements concerning the sales and marketing of Subsys, an extremely potent and potentially lethal drug which is heavily regulated by the FDA. The gravamen of the action is that while Insys repeatedly told investors that the Company had achieved its

spectacular success through the hard work of a motivated sales force and Subsys's unique ability to provide immediate relief to cancer sufferers who, despite being heavily medicated by opiates, still experience "breakthrough cancer pain," the real story, as alleged herein, is one of off-label sales to non-cancer patients, encouragement to doctors to disregard FDA-mandated dosing, violation of patient privacy rights, fraudulent Medicare and private insurance claims, kickbacks to doctors, and nepotism.

4.      Sadly, Subsys's meteoric rise to market domination appears to have been driven by a desire to profit from the nationwide epidemic of pain-killer addiction and abuse. During the class period, a handful of insiders sold over $34 million worth of stock – almost all of which was sold at or near Insys's all-time peak price – while in possession of non-public information concerning Insys's unlawful sales tactics.  Insys's founder and Executive Chairman of the Board, John N. Kapoor, Ph.D., holds a majority of Insys's shares.  Due to the extraordinary success of Subsys, a Forbes article proclaimed: "Pharmaceuticals Developer John Kapoor Is New Billionaire."

5.      Subsys is a very potent drug which is required to be dispensed with a so-called "black box warning."  Literally, the FDA requires the package inserts for certain prescription drugs to contain a special warning inside a black box, in bold letters, under the word "WARNING."  21 C.F.R. §201.57(a)(4).  These warnings are required in any one of three circumstances.[1]  All three conditions apply to Subsys.

---

[1] *See* Final Guidance "Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products," at 11 (Oct. 11, 2011)((1) "There is an adverse reaction so serious in proportion to the potential benefit from the drug (e.g., a fatal, life-threatening or permanently disabling adverse reaction) that it be considered in assessing the risks and benefits of using the drug;" (2) "There is a serious adverse reaction that can be prevented or reduced in frequency and severity by appropriate use of the drug (e.g., patient selection, careful monitoring, avoiding certain concomitant therapy, addition of another drug or managing patients in a specific manner, avoiding use in a specific clinical situation);" or (3) "FDA approved the drug with restrictions to ensure safe use because … the drug can be safely used only if distribution or use is restricted…").

6.     As set forth on the FDA's website,[2] in addition to the full prescribing information on the package insert, Subsys's black box warning reads as follows:

---

**WARNING: RISK OF RESPIRATORY DEPRESSION, MEDICATION ERRORS, ABUSE POTENTIAL**
*See full prescribing information for complete boxed warning.*

- **Due to the risk of fatal respiratory depression, SUBSYS is contraindicated in opioid non-tolerant patients (1) and in management of acute or postoperative pain, including headache/migraines. (4)**
- **Keep out of reach of children. (5.3)**
- **Use with CYP3A4 inhibitors may cause fatal respiratory depression. (7)**
- **When prescribing, do not convert patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to SUBSYS. ( 5.1)**
- **When dispensing, do not substitute with any other fentanyl products. (5.1)**
- **Contains fentanyl, a Schedule II controlled substance with abuse liability similar to other opioid analgesics. (9.1)**
- **SUBSYS is available only through a restricted program called the TIRF REMS Access program. Outpatients, healthcare professionals who prescribe to outpatients, pharmacies, and distributors are required to enroll in the program. (5.10)**

---

7.     As explained in the last warning, Subsys is one of a handful of medications for which prescription and use are tightly regulated and monitored by the FDA's "TIRF REMS Access Program."  ("TIRF REMS" stands for Transmucosal Immediate Release Fentanyl Risk Evaluation and Mitigation Strategy.)  Since its adoption as a single, shared system on December 28, 2011, every prescriber, distributor, and dispenser of a TIRF drug must be registered with the program; doctors and patients must execute a "Patient-Prescriber Agreement Form" attesting to the patient's qualification for TIRF use.

8.     Starting in March 2012, all prescriptions entered into the TIRF REMS Access Program were logged on a real-time basis by the program's administrator, RelayHealth and McKesson Specialty Health.   Other providers of pharmaceutical statistical data, *e.g.*, Symphony Health, IMS Health, and Wolters Kluwer Health, also generated prescription data for TIRF drugs. As a result, both the pharmaceutical companies in the program and industry analysts monitored all sales trends on a weekly basis. In fact, during the two class period conference calls, when asked to comment on recent trends, Insys's Chief Executive Officer,

---

[2] *See* http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/202788s000lbl.pdf

Michael Babich ("CEO Babich") indicated that Insys's figures were different from and more accurate than the information obtained by analysts from the other data providers.

9.     Subsys was the sixth TIRF medication to be marketed commercially.  By the time Subsys entered the market in late March 2012, one of the earlier drugs to market, Actiq, had already been sold in generic form since 2006.  According to Insys CEO Babich, TIRF sales peaked at nearly twice the size of the current market during the last decade.  Given the fact that Subsys was entering a mature, static market, absolutely critical to Insys's success was its ability to convince physicians and their patients to switch from another TIRF drug to Subsys.  This was not going to be an easy task, as Insys was a small company with virtually no track record while Subsys's competitors were being sold and marketed by international pharmaceutical companies, *e.g.*, Teva Pharmaceuticals now markets both Actiq and Fentora; Archimedes Pharma (until 2013) marketed Lazanda (sold under the name PecFent in Europe).

10.     Subsys is also an extremely expensive product.  Even with a discount, 30 single-use doses of the lowest strength (100 mcg) currently sell for more than $900;[3] more concentrated doses sell at increasingly-higher prices.  In fact, the company's website advertises a "Subsys Savings Program" that offers repeat users a $500 discount on each new prescription.  With prescriptions running into the thousands of dollars, widespread adoption by Medicare, Medicaid, private insurance companies and national formularies was essential to Subsys's ability to attain a foothold in the TIRF market.

11.     Given the many impediments to success faced by Insys – Subsys's extremely narrow customer base, having to construct a sales and marketing force from the ground up, being a latecomer to a significantly-contracted market dominated by larger drug companies, having to comply with both FDA's stringent "black box" sales and marketing restrictions

---

[3]  This figure was obtained from GoodRx.com on October 25, 2014 (http://www.goodrx.com/subsys#/?filter-location=&coords=&label=Subsys&form= package& strength=30+spray+bottles+of+100mcg&quantity=1.0&qty-custom=).

and TIRF REMS Access Program requirements, *and* needing to obtain the approval of public and private sources of reimbursement to subsidize the drug's very high price-tag – Subsys succeeded beyond the market's wildest expectations.

12.     Although sales were initially slow, Subsys sales took off in the fall of 2012.  In less than a year, Insys was already a force to be contended with in the TIRF market.  "In February 2013, Subsys was the second-most prescribed branded [TIRF] product with 16.1% market share on a prescription basis according to Source Healthcare Analytics."[4]  With increasing market share, revenues skyrocketed:  Subsys's total net revenues for fiscal year ("FY") 2012 were $8.55 million; in the first quarter of 2013 ("Q1'13"), alone, Subsys sales contributed $9.7 million in net revenue.  For FY 2013, Subsys's net revenues were nearly *ten times* the impressive figure attained in Q1'13 –  a whopping $95.8 million.  By November 2013, Subsys had become the most-prescribed branded TIRF, with nearly one-third of the market.[5]

13.     Near the middle of this blockbuster year, the Company undertook an initial public offering ("IPO") of stock, selling 4,000,000 shares on May 2, 2013.  One month earlier, Insys planned to offer its shares in the $16-18 range, but instead priced the IPO at only $8.00 per share.  Despite this drastic reduction in the offering price, the IPO allowed Insys to pay off its line of credit and become debt free. As a result of Insys's enormous success with Subsys in 2013, and its relatively-modest IPO price, on December 27, 2013, CNBC heralded Insys as the year's best IPO.

14.     Insys and CEO Babich have repeatedly attributed much of the spectacular success of Subsys to Insys's unique sales force model, which combines a very low base salary with significant bonuses for strong sales.   At a recent Wells Fargo Securities healthcare conference, CEO Babich explained that in contravention of pharmaceutical

---

[4] Insys Form 424B4, filed May 2, 2013, at 1.

[5] Insys presentation, Jan. 16, 2014, at slide 6 (*See* http://www.insysrx.com/wp-content/uploads/2014/01/INSYS012014.pdf).

industry practice, instead of paying an annual base salary in the $80,000 - $90,000 range with a bonus potential of $30,000 - $40,000, Insys pays its specialty sales representatives only a $40,000 annual base – a mere $10,000 per quarter – but that the average *quarterly* bonus was a whopping $18,000.[6]  Although analysts have openly questioned whether this highly-unusual structure could lead to improper sales techniques, CEO Babich has steadfastly rejected the notion and instead insisted that the Company's structure was in place because it was a cost-effective way for Insys to grow its sales force.

15.     Insys's SEC filings and public statements throughout the class period all affirm that patients must begin Subsys treatment at a 100 mcg dose, there is no off-label selling of Subsys, and that indications other than breakthrough cancer pain, *e.g.*, pre-operative settings, pediatric and burn patients uses, were only being explored with the FDA for *future* testing within "controlled settings" so that Subsys could eventually be approved for additional indications.  However, an employee's *qui tam* action filed (under seal) in late 2012, alleged that Executive Chairman Kapoor and senior management pressured the sales force to sell Subsys off-label, and to push physicians to write scripts for 400 mcg or higher dosage strength (claiming the two lower dosage strengths were ineffective), and that this direction was embarked upon towards the fall of 2012, after management had concluded that Subsys's initial sales were somewhat disappointing.  Not only were oncologists lower targets on the

---

[6] Salary surveys for the pharmaceutical industry conducted over the past five years demonstrate that Insys's compensation structure is far outside the mainstream:  In 2010, Towers Watson reported that nearly 90% of all specialty sales representatives surveyed received 70%-80% of their compensation in base pay and 20%-30% in bonuses. No companies reported paying more than 35% in bonus, let alone an inverted ratio of nearly 2:1, bonus-to-base salary. *See* Exh. A hereto.  An April 2014 survey conducted by MedReps.com showed that specialty pharmaceutical representatives earned $127,656, 72% in base and 28% in bonus – exactly in line with CEO Babich's description of the industry norm.  From 2011 (incorrectly labelled as 2012) through 2014, the average ratio of base pay to bonus among those surveyed averaged approximately 3:1. *See* Exh. B hereto (the MedReps.com salary survey is available at http:// www.medreps.com/medical-sales-careers/2014-pharmaceutical-sales-salary-report).

list of doctors to be called upon, but if pain management doctors asked why they should prescribe Subsys to non-cancer patients, the sales force was coached to explain that evidence showed there was no difference between "breakthrough pain" and "breakthrough cancer pain."   Such a representation is completely contrary to Subsys's black box warning, which states that the drug is contraindicated "in management of acute or postoperative pain, including headache/migraines."  *See* ¶6, *supra*.

16.    The *qui tam* complaint alleged the contents of emails which demonstrate that CEO Babich, VP of Sales Alec Burlakoff, and Executive Chairman Kapoor issued or were aware of instructions to the sales force to press doctors to quickly titrate patients up beyond the FDA-mandated initial dose of 100 mcg to an "effective" dose of 400 mcg, and that scripts for 100 mcg and 200 mcg doses were so strongly discouraged that the sales force would have to explain why they had been written at all.

17.    Finally, the *qui tam* complaint alleged that kickbacks to doctors to induce the writing of Subsys scripts were regularly paid, for example, in the form of "speaker fees." However, the speeches could be given to as few as one other person, and on consecutive days, rather than once or twice a year, *e.g.,* at a medical conference.  Management made it quite clear to the sales representatives that as long as doctors were writing Subsys scripts, they could be paid "speaker fees;" doctors who failed to do so would be dropped from the speaker program.  Including various other incentive payments, doctors could earn tens of thousands of dollars from Insys by writing scripts for Subsys.[7] The *qui tam* action is discussed further herein.

---

[7] On December 13, 2013, a local news station in Corpus Christi, Texas, reported that the Texas Medical Board temporarily stopped Dr. Judson J. Somerville, from dispensing pain medication – on a day when an estimated 45 patients had been waiting at his office to receive pain medication.  The Board's investigation stemmed from charges that, *inter alia*, "Dr. Somerville was pre-signing prescriptions before they were even filled out by his staff, and some prescriptions were for controlled substances."  Although Subsys was not mentioned by name, a recent disclosure under the Affordable Care Act's Sunshine Act provision (*see* ¶¶ 58-59, *infra*) revealed that a Dr. Judson J. Somerville received a whopping $64,315.32 from Insys in the period from August 2013 through December 2013, excluding the value of any food and beverage payments. Lead Plaintiff is informed and believes, and based thereon

18.     Perhaps because the government did not choose to intervene in the *qui tam* action in the fall of 2012, defendants increased the intensity of their improper sales and marketing tactics.  For example, workers in the Prior Authorization Department dedicated to assisting patients obtain prior authorization from insurers' pharmacy benefit managers ("PBMs") were: (a) trained to pretend they worked in doctors' offices (because only doctors' staff could contact PBMs for pre-authorizations); (b) lie about medications the patient had already taken to obtain pain relief; (c) ask for authorization for a three-month supply even if the doctor had only written the prescription for a one-month supply; and (d) asked to train sales representatives to promote Subsys for "breakthrough pain" as opposed to "breakthrough cancer pain."  As a result, the Company's management was aware that only about 10% of prescriptions approved through the Prior Authorization Department were for cancer patients; the majority were written for peripheral neuropathy, lower back pain and sciatica.

19.     CEO Babich monitored the work of the Prior Authorization Department on a regular basis.  Not only did he approve of the members of the department pretending to be employees of doctors' offices, but when the department eventually moved into a larger office space, he provided its workers with a new phone system to mask the origin of their calls.  This was necessary because some PBMs became suspicious that someone claiming to work for a doctor in Michigan, for instance, would be calling from a number with an Arizona area code.  Not only did CEO Babich treat employees to lunch when they were successful in obtaining prescription approval for higher-strength doses, but he paid them handsomely.  An employee in the Prior Authorization Department earned $17 per hour; however, the employees in the department would share a $25 bonus for each prescription written.  After

alleges, that the investigation involved, at least in part, the improper dispensing of Subsys.  Although the address for Dr. Somerville provided under the Sunshine Act was in Laredo, Texas, an Internet search indicated that an anesthesiologist named Judson J. Somerville ran pain clinics in both locations.

AMENDED CLASS ACTION COMPLAINT
Lead Case No. CV-14-01043-GMS
8

bonuses, a net paycheck for a two-week period could be as high as $2,200 – more than double the employee's base pay.

20.     After the filing of the *qui tam* action, the Office of the Inspector General ("OIG") of the U.S. Department of Health and Human Services ("HHS") and the federal Drug Enforcement Agency ("DEA"), apparently had Insys and Subsys prescribers on its radar over the next year.  On December 12, 2013, after the market close, the Company issued a press release announcing that it had received a subpoena from the Office of Inspector General of the Department of Health and Human Services in connection with an investigation of potential violations involving HHS programs.  According to analysts who spoke with management, the subpoena requested a broad array of documents be produced by year end, including correspondence and marketing plans, concerning Insys's sales and marketing practices relating to Subsys.

21.     On this news, shares of the Company's stock declined $4.70 per share, nearly 16%, to close at $25.37[8] per share on December 13, 2013, on unusually heavy trading volume.[9]

22.     On January 13, 2014, Insys issued a press release laying out its product pipeline and plans for 2014, including the filing of one new drug application and at least three investigational new drug applications, hoping to take advantage of sublingual spray delivery, as well as seeking to expand the FDA-approved indications for Subsys.  Three days later, on January 16, 2014, CEO Babich and Chief Financial Officer Darryl Baker ("CFO Baker") made a presentation at the 32nd Annual J.P. Morgan Health Conference.  On all of

---

[8] On March 28, 2014, after the close of trading, Insys effected a 3-for-2 forward stock split. Unless otherwise indicated, all daily stock prices are presented in split-adjusted prices, while all daily trading volume is presented as the actual number of shares traded.

[9] Shortly after this announcement, an investor filed a securities fraud action against Insys. The Company issued a press release on Friday, February 21, 2014, reporting the dismissal of the action.  Insys's shares surged more than 10% in response, from a closing price of $40.71 on February 20th, to a close of $44.48 on Monday, February 24, 2014.

this news, Insys's shares rose 24.4%, from a closing price of $28.83 on Friday, January 10, 2014, to a closing price of $35.87 on Friday, January 17, 2014.  During this same week, CFO Baker sold 30,000 shares of Insys for proceeds of $1.4 million.

23.     On March 4, 2014, Insys not only announced extraordinary earnings for both Q4'13 and FY'13 which exceeded analysts' expectations, but that the Board of Directors had approved a 3-for-2 stock split to take effect on March 28, 2014, for holders of record as of March 17, 2014.  On all of this news, Insys's shares rose nearly $10.00 in a single day, from a closing price of $45.66 on March 3, 2014, to a closing price of $55.58 on March 4, 2014, on very heavy trading volume.  During trading that day, Insys shares reached their class-period high of $57.91.

24.     The next day, March 5, 2014, CEO Babich cashed in, executing a combination of trades, at a number of different prices, for a net profit of $21.1 million dollars.  That same day, Insys's Chief Medical Officer, Larry Dillaha, also capitalized on Insys's record high pricing. Also through a combination of trades at various prices, Dr. Dillaha turned a one-day net profit of $10.7 million.

25.     On April 1, 2014, less than a month after Dr. Dillaha cashed in on Insys's meteoric stock price rise, Insys abruptly announced Dr. Dillaha's departure from the Company, effective June 11, 2014, "to pursue other employment interests."  The next day, New Haven Pharmaceuticals, Inc., a privately-held company, announced that Dr. Dillaha had come aboard, assuming the newly-created position of Executive Vice President Operations. New Haven Pharmaceutical's CEO, Patrick Fourteau, serves on the Insys Board of Directors. On April 2, 2014, following a conversation with management, one analyst downplayed Dr. Dillaha's departure, indicating that he was not responsible for the bulk of the new drugs in the pipeline and was instead focused upon "label expansion opportunities for Subsys."

26.     On May 8, 2014, a local Michigan news source published an article stating that Dr. Gavin Awerbuch, a Michigan neurologist, was under federal investigation and accused of defrauding Medicare for, *inter alia*, allegedly prescribing $6.9 million (through February

6, 2014) worth of Subsys to Medicare beneficiaries, writing a staggering 1,283 prescriptions in less than two years.[10] According to the article, the doctor was responsible for over 20% of total nationwide Subsys prescriptions written for Medicare beneficiaries.  A former Insys employee who worked at the corporate headquarters indicated that long before the news of Dr. Awerbuch's arrest broke, in late February or early March 2014, the Company's management and senior employees had already began discussing – on a regular basis – Dr. Awerbuch's script writing and the possible impact on the Company of its sudden cessation.

27.     On the news of the criminal investigation of Dr. Awerbuch, shares of the Company's stock declined $6.63, over 17%, to close at $32.68 per share on May 9, 2014, on unusually heavy trading volume.  On Monday, May 12, 2014, Insys shares opened nearly three dollars lower and continued to slide.   Shortly before the market closed, at approximately 3:30 p.m., the Company issued a press release to stop the bleeding, entitled "Insys Therapeutics Issues Clarifying Statement."  The press release underscored that Subsys sales were heavily regulated by the FDA, with doctors and patients having to execute agreements before participating in the TIRF REMS Access Program which was "designed to ensure informed risk-benefit decisions before initiating treatment and appropriate use of TIRF medicines … [and] to mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors with the use of TIRF medicines."  Insys further assured investors that: "Insys does not sell directly to physicians. Insys only sells Subsys through DEA approved wholesalers who monitor and track prescribing activity for this TIRF class of drugs and all opioids. Insys remains committed to our compliance

---

[10]  Insys began marketing Subsys on March 26, 2012; the indictment references Dr. Awerbuch's prescriptions through February 6, 2014.  ***The number of Subsys prescriptions written by Dr. Awerbuch for Medicare patients, alone, averages nearly two*** (1.88, to be exact) ***per day for every day, including weekends, that Subsys had been on the market***. This is a remarkable number of prescriptions, especially in light of the fact that Dr. Awerbuch is a neurologist who does not specialize in the treatment of cancer patients.

program and protocols in place that are designed to ensure our sales and marketing practices comply with applicable laws."

28.     By issuing this statement, Insys tried to assure investors that Subsys's success was based upon treating breakthrough cancer pain and, in any event, Dr. Awerbuch was responsible for less than 5% of Subsys sales.  Insys also tried to downplay the relationship between itself and the doctors who most often prescribe Subsys by stating both that it does not sell directly to doctors and that patients could not obtain Subsys without both the patients and their doctors complying with the TIRF REMS Access Program rules.  However, a former Insys employee indicated that VP of Sales Burlakoff entered into an arrangement with Dr. Awerbuch to kick back a percentage of sales commissions to the doctor, with the percentage rising for higher-strength doses.  Even with the money being funneled to Dr. Awerbuch, the sales representative handling his account earned hundreds of thousands of dollars a year in commissions.  Despite defendants' "clarification" efforts, Insys shares closed at $27.63, down another $5.05 on extremely heavy trading.

29.     On May 13, 2014, Insys issued its Q1'14 earnings report and held a conference call with analysts to discuss the Company's results. Although net revenue from Subsys sales reached $40.7 million for the quarter and $41.6 million for Insys overall, this figure was below consensus estimates.  Defendants attributed the slight miss to a change in the Company's revenue recognition policy (to recognition upon sale to wholesaler) and to wholesaler downsizing of inventories.[11]  However, citing defendants' ability to monitor Subsys sales in real-time based upon information provided by the TIRF REMS administrator, CEO Babich stated with "confidence" that revenues would be above $52 million in Q2'14.  (Net revenues for Q2'14 were, in fact, $55.7 million.).

---

[11]  This is entirely plausible, as the price of Subsys increased 11% in January 2014. Wholesalers often purchase additional inventory just ahead of a price increase.

30.     During the question and answer portion of the call, CEO Babich delivered a more strongly-worded response to the criminal charges against Dr. Awerbuch than did the Company's earlier "clarifying" press release, stating: "Insys's involvement in terms of anything related to Medicare fraud that is alleged from this physician is zero."  While it is true that the government did not bring charges against Insys at that time, based upon the information provided by former Insys employees, it is patently untrue that Insys's involvement with Dr. Awerbuch's alleged Medicare fraud is "zero;" moreover, the criminal complaint sets forth Medicare Part D claims for Insys for patients who did not have cancer. *See* Exh. C at ¶¶54-59, 61-63. Given the strong forecast for Q2'14 sales, the reasonable explanation that Q1'14 figures missed consensus due to downsizing of inventories combined with a change in revenue recognition, and a strong denial of wrongdoing with respect to Dr. Awerbuch, Insys's share price did not suffer, falling only 33 cents at the market close on May 13, 2014.

31.     The very next day, however, THE NEW YORK TIMES printed a blistering article about Insys on page B1 of its Business section, chronicling Insys's improper sales and marketing tactics for Subsys.  The article, entitled "Doubts Raised About Off-Label Use of Subsys, a Strong Pain Killer," by Katie Thomas, stated, in relevant part (with emphasis supplied):

> Almost overnight, a powerful new painkiller has become a $100 million business and a hot Wall Street story.
>
> But nearly as quickly, questions are emerging about how the drug is being sold, and to whom.
>
> The drug, Subsys, is a form of fentanyl, a narcotic that is often used when painkillers like morphine fail to provide relief. The product was approved in 2012 for a relatively small number of people — cancer patients — but has since become an outsize moneymaker for the obscure company that makes it, ***Insys Therapeutics***. In the last year, the company's sales have soared and its share price has jumped nearly 270 percent.

*Behind that business success is an unusual marketing machine that may have pushed Subsys far beyond the use envisioned by the Food and Drug Administration. The F.D.A. approved Subsys only for cancer patients who are already using round-the-clock painkillers, and warned that it should be prescribed only by oncologists and pain specialists. But just 1 percent of prescriptions are written by oncologists, according to data provided by Symphony Health, which analyzes drug trends. About half of the prescriptions were written by pain specialists, and a wide range of doctors prescribed the rest, including general practice physicians, neurologists and even dentists and podiatrists.*

*Interviews with several former Insys sales representatives suggest the company, based in Chandler, Ariz., has aggressively marketed the painkiller, including to physicians who did not treat many cancer patients and by paying its sales force higher commissions for selling higher doses of the drug.*

\*     \*     \*     \*

Drug-safety experts said the range of medical professionals who appeared to be prescribing Subsys was troubling, particularly given concerns about the widespread use — and abuse — of narcotic painkillers. In December, Insys disclosed that it had received a subpoena from the federal health department's Office of the Inspector General for documents related to its sales and marketing practices. The company has said it is cooperating with the investigation.

\*     \*     \*     \*

"You're essentially spreading the accessibility to a very potent, rapid-onset narcotic to a large number of people, and a number of them may get addicted," said Dr. Sidney M. Wolfe, founder and senior adviser to the Public Citizen Health Research Group, a consumer organization.

Oral fentanyl products like Subsys have a history of being broadly prescribed. In 2008, the drug company Cephalon pleaded guilty to a criminal charge and paid $425 million in fines for inappropriate marketing of its products, including Actiq, a fentanyl lollipop, which federal officials said was being promoted for a range of unapproved uses, including treatment of migraines.

\*     \*     \*     \*

Dr. Margaret A. Hamburg, the F.D.A. commissioner, said the agency did not regulate how doctors practice medicine. Still, she acknowledged that the widespread prescribing of oral fentanyl products for off-label uses was

troubling, especially given the agency's efforts to restrict the use of fentanyl and other opioids in the face of painkiller abuse. In the case of products like Subsys, prescribers must undergo training about the drug's risks, pass a test and register in a national database. Patients must sign an agreement with their doctor before being prescribed the drug.

"It is frustrating, and we are in a process of continually assessing how our approaches are unfolding in the real world," Dr. Hamburg said.

32.     On this news, investors realized that Dr. Awerbuch was not merely an aberration and instead might be the tip of the iceberg and that the HHS investigation may reveal additional improper conduct by Insys.  On May 14, 2014, Insys stock tumbled $4.29 a share, to close at $23.01 on extremely heavy trading.

33.     Although its share price has recently rebounded due to positive news with respect to prospective new drugs in Insys's pipeline, after the market close on Friday, September 12, 2014, Insys announced the existence of yet another federal investigation:

On September 8, 2014, Insys Therapeutics, Inc. received a subpoena issued pursuant to the Health Insurance Portability and Accountability Act of 1996, as amended [HIPAA], from the U.S. Attorney's Office for the District of Massachusetts. The subpoena requests documents regarding Subsys, including Insys' sales and marketing practices related to this product.

As set forth herein, witnesses explained how patient privacy under HIPAA was violated by, *inter alia,* Insys employees who were granted access to patients' medical records for the purpose of getting physicians to prescribe Subsys to their patients.

34.     Class period investors were damaged as a result of defendants' misstatements and omissions, and those who continue to hold their Insys shares may be further damaged should the various investigations prove that Insys violated FDA regulations and/or made false claims for reimbursement from the various governmental entities and Insys were ordered to pay restitution and/or fines.

## II.     JURISDICTION AND VENUE

35.     The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated

thereunder by the SEC (17 C.F.R. § 240.10b-5).

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

37.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Insys's principal executive offices are located within this Judicial District.

38.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

39.     Lead Plaintiff Hongwei Li, as set forth in a previously-filed certification, incorporated by reference herein, purchased Insys common stock during the class period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

40.     Defendant Insys Therapeutics, Inc. is a Delaware corporation that trades on the NASDAQ Stock Market ("NASDAQ") with its principal executive offices located at 444 South Ellis Street, Chandler, Arizona 85224.

41.     Defendant Michael L. Babich was, at all relevant times, the Chief Executive Officer and a director of Insys.  CEO Babich has also served as President of the Company since November 2010, a position he was appointed to at age 33. CEO Babich's salary for 2013 was approximately $425,000.  On November 22, 2013, the Board established his target monetary bonus for 2013 at 125% of base salary; Insys reported paying CEO Babich $600,000 in bonus for 2013 (as well as awarding him stock options).  Although this is quite handsome compensation, it pales in comparison to CEO Babich's one-day profit, of more

than *$21 million*, reaped from a series of trades executed on March 5, 2014, near Insys's class-period-high stock price.

42.     From March 2007 until November 2010, CEO Babich served as the Chief Operating Officer and a director of Insys Pharma, Inc., a wholly-owned subsidiary of the Company.   Prior to 2007, CEO Babich, who holds a B.A. and M.B.A., worked at EJ Financial Enterprises, Inc., a venture capital firm founded by Insys's majority shareholder, Dr. Kapoor, in 1990; EJ Financial specializes in early stage and startup investments primarily in the healthcare sector. CEO Babich has spent most of his career working for Dr. Kapoor.  Prior to 2001, CEO Babich worked for several years at Northern Trust Corporation managing mid- to large-cap portfolios for high net worth individuals.

43.     During the class period, CEO Babich participated in the issuance of, was quoted in, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including the Form 8-K (and Exh. 99.1 thereto) and Form 10-Q, filed November 12, 2013; the Form 8-K filed December 13, 2013 (and Exh. 99 thereto); the Form 8-K filed March 4, 2014 (and Exhibit 99.1 thereto); the Form 10-K, filed March 5, 2014;  the Form 8-K filed on May 13, 2014 (and Exhibit 99.1 thereto) and the Form 10-Q filed on May 14, 2014.  CEO Babich also participated in the issuance of Insys's press release dated May 12, 2014. CEO Babich certified the accuracy of Insys's SEC filings as required under the Sarbanes-Oxley Act of 2002 ("SOX"). CEO Babich executed the Registration Statement filed on May 2, 2013, which was incorporated by reference in various class period statements.

44.     In addition, during the class period, CEO Babich participated in Insys's quarterly earnings conference calls, wherein he made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others. These calls took place on November 12, 2013, March 4, 2014, and May 13, 2014.  CEO Babich was also interviewed by CNBC on December 27, 2013.

45.     Defendant Darryl S. Baker was, at all relevant times, Chief Financial Officer of Insys since October 2012.  CFO Baker's starting salary of approximately $173,000 per year was increased on November 22, 2013, to $260,000, and his bonus target for 2013 and 2014 was set at up to 50% of base salary, to be paid as determined at the discretion of CEO Babich.  (In 2013, CFO Baker earned $202,917 in salary and $135,000 in bonus.) From 1997 to 2012, CFO Baker served as CFO and Corporate Controller for various publicly-traded and entrepreneurial companies, including iGo, a developer of power management solutions and accessories for mobile electronic devices, Integrated Information Systems, a provider of secure integrated information technology solutions, and SkyMall, a specialty retailer.  Prior to 1997, CFO Baker was an audit manager for Ernst & Young LLP.  CFO Baker holds a B.S. in Accountancy from the Marriott School of Management at Brigham Young University, is a Certified Public Accountant in the states of California and Arizona, and is a Chartered Global Management Accountant.  In mid-January 2014, a week in which Insys delivered positive news to the market about its pipeline of new drugs – and saw its stock price rise accordingly – CFO Baker exercised options to buy and sell 30,000 shares of Insys.  Both before and after this flurry of activity, CFO Baker held only 3,125 shares.

46.     During the class period, CFO Baker participated in the issuance of, was quoted in, signed, and/or certified as accurate the Insys's public statements and periodic filings with the SEC, including the Form 8-K (and Exh. 99.1 thereto) and Form 10-Q, filed November 12, 2013; the Form 8-K filed December 13, 2013 (and Exh. 99 thereto); the Form 8-K filed March 4, 2014 (and Exh. 99.1 thereto); the Form 10-K, filed March 5, 2014; the Form 8-K filed on May 13, 2014 (and Exh. 99.1 thereto) and the Form 10-Q filed on May 14, 2014. CFO Baker also participated in the issuance of Insys's press release dated May 12, 2014. CFO Baker certified the accuracy of Insys's SEC filings as required under SOX.  CFO Baker executed the Registration Statement filed on May 2, 2013, which was incorporated by reference in various class period statements.

47.     In addition, during the class period, CFO Baker participated in Insys's quarterly earnings conference calls wherein he made material misrepresentations, omitted material information, or failed to correct the material misstatements or omissions of others. These calls took place on November 12, 2013, March 4, 2014, and May 13, 2014.

48.     Defendant John N. Kapoor, Ph.D. ("Executive Chairman Kapoor" or "Dr. Kapoor") is the Executive Chairman of the Board of Directors of Insys.  Dr. Kapoor founded Insys in 1990 and was its primary source of funding for most of the past 25 years. According to the 2013 Form 10-K, because he beneficially owns or controls 72% of Insys's stock Executive Chairman Kapoor "can individually control [Insys's] direction and policies." Based upon his dominant stock ownership, position as Executive Chairman, and his active role in shaping the marketing of Subsys, as alleged herein, Executive Chairman Kapoor is a "control person" of Insys.  Executive Chairman Kapoor executed Insys's Form 10-K, filed with the SEC on March 4, 2014.  Executive Chairman Kapoor executed the Registration Statement filed on May 2, 2013, which was incorporated by reference in various class period statements.

49.     Defendant Larry M. Dillaha, M.D. ("CMO Dillaha" or "Dr. Dillaha") became the Chief Medical Officer of Insys in April 2010 and executed a separation agreement on March 28, 2014.  Upon his resignation from Insys on June 11, 2014, Dr. Dillaha entered into a one-year consulting agreement in exchange for, *inter alia*, accelerated vesting of stock options and compensation of $303,334.

50.     Defendants Babich, Baker, and Kapoor are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Insys' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or

AMENDED CLASS ACTION COMPLAINT
Lead Case No. CV-14-01043-GMS
19

cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## III.    BACKGROUND ALLEGATIONS

51.    Insys was founded by Dr. Kapoor in 1990.  The Company was incorporated as Oncomed Inc. in Delaware in June 1990, and subsequently changed its name to NeoPharm, Inc. On October 29, 2010, the Company entered into an Agreement and Plan of Merger with Insys Therapeutics, Inc., a Delaware corporation, and ITNI Merger Sub Inc., the Company's wholly-owned subsidiary and a Delaware corporation.  On November 8, 2010, pursuant to the Agreement and Plan of Merger, ITNI Merger Sub Inc. merged with and into Insys Therapeutics, Inc., and Insys Therapeutics, Inc. survived as a wholly-owned subsidiary. Following the merger with NeoPharm, the Company's wholly-owned subsidiary, Insys Therapeutics, Inc., changed its name to Insys Pharma, Inc. and the Company changed its name to Insys Therapeutics, Inc.

52.    Subsys is the Company's proprietary,  single-use product that delivers fentanyl for transmucosal absorption underneath the tongue.   Subsys is an immediate-release formulation of fentanyl, packaged for patient use in a single-dose spray device. Fentanyl is a prescription opioid pain reliever and is a Schedule II controlled substance.  Schedule II drugs have a high potential for abuse and thus may lead to severe dependence, but also have a currently accepted medical use in the United States.  Thus the sale and use, in addition to the manufacture, shipment and storage, are all highly regulated.  Furthermore, a prescription for any Schedule II drug, including Subsys and other fentanyl drugs, must be signed by a

physician, physically presented to a pharmacist to be filled, and may not be refilled without a new prescription.

53.     TIRF medicines, including Subsys, are solely indicated for use to manage breakthrough pain in adults with cancer who routinely take other opioid pain medications around-the-clock.  Breakthrough cancer pain is pain that comes on suddenly and is not alleviated by a cancer patient's normal pain-management plan.  According to its label, Subsys is: "an opioid agonist *indicated for the management of breakthrough pain in cancer patients* 18 years of age or older who are *already receiving and who are tolerant to opioid therapy* for their underlying persistent cancer pain.  Patients must remain on around-the-clock opioids when taking [Subsys]." Below this indication on the label is a clearly-marked warning section: "Warning: Risk of Respiratory Depression, Medication Errors, Abuse Potential," which warns that fatal respiratory depression has occurred in patients treated with TIRF medicines such as Subsys, including following use in opioid non-tolerant patients and *improper dosing*."  Directly below this warning, the label continues: "Subsys is *contraindicated in the management of acute or postoperative pain, including headache/migraine* . . . and in opioid non-tolerant patients." In the section entitled "Indication and Usage," the label states that "*Subsys is intended to be used only in the care of cancer patients* and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." (All emphasis supplied.)

54.     Insys commercially launched Subsys in March 2012 after FDA approval in January 2012.[12]  At the time Subsys was approved, CMO Dillaha stated: "Insys was founded as a specialty pharmaceutical company with a mission to develop products that meet unmet clinical needs, and to contribute to the improvement of supportive care for cancer patients. Being a single-dose sublingual spray, we believe Subsys' unique and convenient delivery

---

[12] The NDA Approval Letter from the Food and Drug Administration, Department of Health and Human Services, to Insys Therapeutics, Inc., dated Jan. 4, 2012, is available at http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2012/202788s000ltr.pdf.

system will offer an important treatment option for appropriate patients." Lauding those who recognized "the need for products providing benefits to their patients whom suffer from breakthrough cancer pain," CEO Babich continued: "We intend to continue to grow our commercial organization and launch this product under the recently approved TIRF REMS Access Program when it is launched later this quarter."  Clearly, Insys executives were acutely aware of the target patient population for Subsys.  They were also aware of myriad statutes and regulations enacted to ensure that lethal drugs, such as Subsys, be used only as FDA-indicated.

### A.    The Legal Framework Within Which Insys Operates

#### 1.    FDA Approval and Regulation of Prescription Drugs

55.    The FDA is the HHS agency responsible for protecting the public health by assuring the safety, efficacy, and security of, among others, human use of pharmaceutical drugs such as Subsys.  The FDA process by which Subsys was approved for sale is explained in detail in the September 2012 *qui tam* action:

> 27.    The Food and Drug Administration ("FDA") regulates human use of pharmaceutical drugs such as Subsys.  Companies seeking to introduce new drugs for human use into interstate commerce must comply with FDA statutes and regulations, such as the Federal Food, Drug, and Cosmetic Act ("FDCA"). 21 U.S.C. § 301 *et seq*. Notably, the FDCA prohibits companies from distributing in interstate commerce any drugs that the FDA has not approved as safe and effective. 21 U.S.C. § 355(a), and (b).
>
> 28.    … [T]o gain approval of a drug by the FDA, the company must first submit and receive approval of a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355. The company is ***required to include in its NDA all intended uses proposed for a new drug's labeling and to prove that the new drug is safe and effective for those uses***. 21 U.S.C. § 355(b). To prove that the drug is safe and effective, the company must provide the FDA with data from scientifically sound clinical trials. The FDA will refuse approval of a new drug unless, on the basis of all information reviewed, it is demonstrated that a drug can safely accomplish its purported effect under the conditions proposed, and that the method of manufacture and distribution will properly preserve the drug for this purpose. 21 U.S.C. § 355(d).

(The substance of the *qui tam* action is discussed in ¶¶ 110-131, *infra*.)  Thus, drugs are cleared or approved on the basis of their intended use.

56.     The FDA-approved use must be included in the product's labeling.  Promoting off-label uses of a drug will render the product "misbranded," which is expressly prohibited by FDA regulations.  As explained in the *qui tam* complaint:

> 29.     When the FDA reviews an NDA and approves a drug for interstate distribution, that approval is only effective for the intended uses that were proposed in the NDA and described on the drug's approved label. ***Any use for a drug that was not proposed in the NDA and approved for the label by the FDA is referred to as "unapproved" or "off-label."*** 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000). Although physicians traditionally may prescribe a drug for an off-label use so long as the drug has been FDA-approved for some use, pharmaceutical companies are strictly prohibited from marketing a drug for an off-label use.

> 30.     ***When a company markets a drug off-label, the drug becomes a new drug for that purpose and is considered "misbranded"*** in violation of 21 U.S.C. § 331, 21 U.S.C. § 352(f), 21 C.F.R. § 310.3 (h)(4) and (5), 65 Fed. Reg. 14286, 14286 (Mar. 16, 2000) ("[A]n approved new drug that is marketed for a 'new use' is also 'misbranded' under the FDCA, because the labeling of such a drug would not include 'adequate directions for use.'"). Section 352 of title 21 of the United States Code lists situations in which a drug is illegally misbranded, including but not limited to situations where: (1) the drug's labeling is "false or misleading in any particular;" (2) the drug's labeling does not bear adequate direction for use; or (3) the drug's labeling does not bear "adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users . . . ." *See* 21 U.S.C. § 352(a) and (f).

> 31.     The term "labeling" encompasses the actual label attached to the drug's immediate container, as well as all "other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 C.F.R. § 321(m). The term has been construed to include a variety of drug company promotional materials, including booklets, pamphlets, and literature that is textually related to the product, even when disseminated without the presence of the drug. *See Kordel v. United States*, 335 U.S. 345, 349 (1948); *V.E. Irons, Inc. v. United States*, 244 F.2d 34, 39

(1st Cir. 1957). In determining if a drug's labeling or advertising is misleading and thus misbranded, one must examine "(among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article" as described by the labeling or advertising or the customary or usual use of the article. 21 U.S.C. § 321(n).

32.     … [F]or a drug's labeling to include "adequate directions for use," the directions must allow a layman to use the drug safely and for its "intended use." *See* 21 C.F.R. § 201.5. The "intended use" of a drug refers to "the objective intent of the person legally responsible for the labeling of drugs." *See* 21 C.F.R. § 201.128. "The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article," and "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id*. ***Thus, if a manufacturer promotes a drug for a use for which the label does not provide adequate directions for use or is otherwise false and misleading, misbranding has occurred***, regardless of Medicaid's or Medicare's reimbursement of the drug for this use.

33.     Over the years, the FDA has issued regulatory guidances to aid manufacturers in distinguishing between these illegal marketing strategies and legitimate non-promotional dissemination of information on off-label uses, by setting forth factors to determine whether a manufacturer's dissemination of information is actually promotional. These guidances make it clear that pharmaceutical manufacturers cannot use reprints, reference texts or Continuing Medical Education ("CME") programs as tools to promote off-label uses. *See* Guidance to Industry on Dissemination of Reprints of Certain Published, Original Data, 61 Fed. Reg. 52800 (Oct. 8, 1996); Guidance for Industry Funded Dissemination of Reference Texts, 61 Fed. Reg. 52800 (Oct. 8, 1996); Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64074 (Dec. 3, 1997); Guidance for the Industry: Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices, 74 Fed. Reg. 1694-01 (Jan. 13, 2009). ***None of these guidances have changed the FDA's long-standing prohibition against marketing and promoting approved drugs for off-label uses.***

(All emphasis supplied).

## 2.   Anti-Kickback Provisions

57.       In addition to FDA regulations, when marketing Subsys, defendants are also restricted by federal anti-kickback laws.  These provisions prohibit, *inter alia*, offering, paying, or soliciting remuneration to induce the purchasing or ordering, or arranging for the purchase or ordering of any healthcare item, such as a drug, reimbursable under any federally finances healthcare programs, such as Medicare and Medicaid.  The *qui tam* action explains this statute in detail:

73.    The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Medicare Anti-Kickback Statute ("Anti-Kickback Statute"), 42 U.S.C. § 1320a-7b(b), make it ***illegal for an individual knowingly and willfully to offer or pay remuneration in cash or in kind to induce a physician to order a good or service*** that is reimbursed by a federal healthcare program.  *See* 42 U.S.C. § 1320a-7b(b)(2). "Remuneration" is broadly defined to include anything of value offered or paid in return for purchasing, ordering, or recommending the purchase or order of any item reimbursable by a federal healthcare program.  *See* Department of Health and Human Services, Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23734, 23737 (May 5, 2003). Pursuant to the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false or fraudulent claim for purposes of the FCA. See P.L. 111-148, § 6402, codified at 42 U.S.C. § 1320a-7b(g).

74.    The purpose of the Anti-Kickback Statute is to prohibit such remuneration in order to secure proper medical treatment and referrals and ***to limit unnecessary treatment, services, or goods that are based not on the needs of the patient but on improper incentives given to others***, thereby limiting the patient's right to choose proper medical care and services.  *See* Medicare and Medicaid Programs; Fraud and Abuse OIG Anti-Kickback Provisions, 54 Fed. Reg. 3088, 3089 (proposed Jan. 23, 1989) (codified at 42 C.F.R. pt. 1001) ("[I]t is necessary for the fiscal integrity of the Medicare and Medicaid programs to assure that physicians exercise sound, objective medical judgment when controlling admittance [of new drugs and medical devices] to . . ." the medical marketplace.).

75.    Paying kickbacks taints an entire prescription, regardless of the medical propriety of its use. The kickback inherently interferes with the doctor-patient relationship and creates a conflict of interest, potentially putting the patient's health at risk. Any defendant convicted under the statute is automatically barred from participating in federal and federally-funded healthcare programs.

(Emphasis supplied).  Insys's 2013 Form 10-K, at 20, further explains that "The Anti-Kickback Statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers . . . on the other."

### 3. Open Payments Program

58.    The Open Payments program is authorized by the Physician Payment Sunshine Act, Section 6002 of the Patient Protection and Affordable Care Act ("ACA").  Intended to discourage conflicts of interest that may affect a physicians' clinical judgment, the Open Payments program makes data on payments and gifts made to physicians and teaching hospitals by medical device and pharmaceutical companies publicly available on a searchable federal database.   According to the Open Payments site, "applicable manufacturers and applicable group purchasing organizations (GPOs) [are] to report certain payments and other transfers of value given to physicians and teaching hospitals, and any ownership or investment interest physicians, or their immediate family members, have in their company. This information must be reported every year."  Insys qualifies as an applicable manufacturer, and is subject to the Open Payments reporting regulations.

59.    On September 30, 2014 the Centers for Medicare & Medicaid Services ("CMS") released the first set of physician payment data for the periods August through December 2013.  However, 33-40% of the data was withheld due to data inconsistencies and the government intends to re-release the data in full by June 2015.  Physician concerns over the Open Payments data release, *inter alia*, has caused some pharmaceutical companies to dramatically scale back on their doctor speaker programs.

### 4. TIRF REMS Access and Education Program

60.    Due to the high potential for abuse and risk of a fatal overdose, Subsys, and all other FDA-approved TIRF drugs, are only available through the FDA-mandated TIRF REMS Access Program.  The FDA can require a drug manufacturer, after approval, to submit a Risk Evaluation Mitigation Strategy for any drug "to ensure that the benefits of the

drug outweigh the risks of the drug" under 21 U.S.C. § 355-1, part of the FDA Amendments Act of 2007.

61.     On December 28, 2011, the FDA established a single REMS for all of the six brand-name TIRF medicines – Abstral, Actiq, Fentora, Lazanda, Onsolis, and (soon thereafter) Subsys  – or approved generic equivalents of these products).

62.     The TIRF REMS Access Program was launched in March 2012 to provide patient access to TIRF medications while also:

> mitigat[ing] the risk of misuse, abuse, addiction, overdose, and/or serious complications due to medication errors by:  (1) Prescribing and dispensing TIRF medicines only to appropriate patients, which includes use only in opioid-tolerant patients; (2) Preventing inappropriate conversion between TIRF medicines; (3) Preventing accidental exposure to children and others for whom it was not prescribed; and (4) Educating prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose of TIRF medicines.[13]

63.     The TIRF REMS Access Program is arranged to ensure informed risk-benefit decisions before initiating treatment, and to ensure proper use of TIRF medicines while a patient is in treatment.   The TIRF REMS Access Program requires all prescribers, pharmacies, wholesalers and distributors to all enroll in the program before prescribing, purchasing, or dispensing TIRF medicines.  Furthermore, before a patient can be prescribed a TIRF medicine, he or she must sign an agreement form.  Each of these requirements must be renewed and recompleted every two years.

64.     Before enrolling in the program, both prescribers and pharmacies must complete a TIRF REMS Education Program and correctly answer questions concerning the proper indications and dosing for TIRFs.   This Education Program relays key safety information essential for minimizing TIRF medicines' associated risks to prescribers and pharmacies.  The Education Program makes clear that TIRF medicines are only indicated for

---

[13] About, TIRF REMS ACCESS, https://www.tirfremsaccess.com/TirfUI/rems/about.action (last visited Sept. 28, 2014).

the management of breakthrough cancer pain in adult patients with cancer "**who are already receiving and who are tolerant to opioid therapy for underlying persistent cancer pain**."[14] Because of the risk of occurrence of life-threatening respiratory depression or death for opioid non-tolerant patients, TIRF medicines have strict contraindications (*see* ¶¶ 6, 53).

65.     The TIRF REMS Education Program also addresses dosage of TIRF medicines.  This section of the educational material starts with a warning: "**Patients beginning treatment with a TIRF medicine MUST begin with titration from the lowest dose available for that specific product, even if they have taken another TIRF medicine.**"[15]  The program warns that TIRF medicines are not equivalent to other fentanyl products (*e.g.*, transdermal patches), including other TIRF medicines, and therefore, when switching from one TIRF medicine to another, it is not appropriate to match the former dosage microgram to microgram and must be titrated according to the new TIRF medicine's labeled dosing instructions.  For Subsys, the initial dose a prescriber should subscribe is "always 100 mcg,"[16] unless the patient is being converted from Actiq, in which case the initial Subsys dosage is 100 mcg (if current Actiq dosage is 200 or 400 mcg), 200 mcg (if current Actiq dosage is 600 or 800 mcg), or 400 mcg (if current Actiq dosage is 1200 or 1600 mcg).[17]  Furthermore, once a successful dosage of a TIRF medicine has been found, that dose should continue to be prescribed for each subsequent breakthrough cancer pain episode.

---

[14]  "Transmucosal Immediate Release Fentanyl (TIRF) Products Risk Evaluation and Mitigation Strategy (REMS): Education Program for Prescribers and Pharmacists", TIRF REMS ACCESS, at 3 (https://www.tirfremsaccess.com/TirfUI/rems/pdf/education-and-ka.pdf) (emphasis in original).

[15] *Id.* at 5 (emphasis in original).

[16] *Id.* at 8.

[17] This precise dosing is found in "SUBSYS® Prescribing Information," at 2, rev'd 7/13 (https://www.tirfremsaccess.com/TirfUI/rems/pdf/subsys-prescribing-information.pdf).

66.     To prescribe TIRF medicines for outpatient use, prescribers must enroll in the TIRF REMS Access Program.  To be eligible to enroll, prescribers must have: reviewed both the educational materials provided in the TIRF REMS Education Program and the "Full Prescribing Information" for the TIRF medicines; successfully complete the TIRF REMS's "Knowledge Assessment;" and return a completed enrollment form.

67.     The TIRF REMS Prescriber Enrollment Form requires prescribers to state that they will "comply with the programs requirements."[18]  The Enrollment Form also requires physicians to acknowledge, *inter alia*, that they:

(a)     have reviewed the TIRF REMS Education Program, including the Full Prescribing Information for each TIRF medicine, and have completed the Knowledge Assessment;

(b)     "understand the responsible use conditions for TIRF medicines and the risks and benefits of chronic opioid therapy;"

(c)     "understand that TIRF medicines can be abused and that this risk should be considered when prescribing or dispensing TIRF medicines in situations where . . . concerned about an increased risk of misuse, abuse, or overdose, whether accidental or intentional;"

(d)     "understand that TIRF medicines are indicated only for the management of breakthrough pain in patients with cancer, who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain;"

(e)     "understand that TIRF medicines are contraindicated for use in opioid non-tolerant patients, and know that fatal overdose can occur at any dose;"

(f)     "understand that TIRF medicines **must not be used to treat any contraindicated conditions** described in the Full Prescribing Information, such as acute or postoperative pain, including headache/migraine;"

---

[18] Prescriber Enrollment Form (https://www.tirfremsaccess.com/TirfUI/rems/pdf/ prescriber-enrollment-form.pdf).

(g)     "understand that **converting patients from one TIRF medicine to a different TIRF medicine must not be done on a microgram-per-microgram basis** . . . [and] understand that TIRF medicines are not interchangeable with each other . . . unless conversion is done in accordance with labeled product-specific conversion recommendations;"

(h)     "understand that the **initial starting dose for TIRF medicines for all patients is the lowest dose,** unless individual product labels provide product-specific conversion recommendations, and [] understand that patients must be titrated individually;"

(i)     "complete and sign a TIRF REMS Access Patient-Prescriber Agreement [] with <u>each</u> new patient before writing the patient's first prescription for a TIRF medicine;" and

(j)      "***agree to assess the patient for appropriateness of the dose of the TIRF medicine,*** and for signs of misuse and abuse" at all follow-up visits with a patient.[19]

68.     To purchase and dispense TIRF medicines, a pharmacy must enroll in the TIRF REMS Access Program.  To be eligible to enroll, a pharmacy must have an authorized pharmacist review the TIRF REMS Education Program and successfully complete the Knowledge Assessment and enrollment form.  Outpatient pharmacies are also required to ensure that the prescriber and pharmacy is enrolled and active in the TIRF REMS Access Program, and the patient has not been inactivated by the program.

69.     The TIRF REMS Pharmacy Enrollment Forms requires prescribers to state that they will "comply with the programs requirements."[20]  The Enrollment Form also requires pharmacists also acknowledge, *inter alia*, that they:

---

[19] *Id.* (emphasis supplied).

[20] *See* TIRF REMS Access Program Independent Outpatient Pharmacy Enrollment Form (https://www.tirfremsaccess.com/TirfUI/rems/pdf/outpatient-pharmacy-enrollment-form.

(a)      have reviewed the TIRF REMS Education Program, including the Full Prescribing Information for each TIRF medicine, and have completed the Knowledge Assessment;

(b)      "understand the risks and benefits associated with TIRF medicines and the requirements of the TIRF REMS Access program for pharmacies;"

(c)      ensure that all pharmacy staff patient staff participating in dispensing TIRF medicines or inpatient pharmacists "are educated on the risks associated with TIRF medicines and the requirements of the TIRF REMS Access program;"

(d)      "understand that **converting patients from one TIRF medicine to a different TIRF medicine must not be done on a microgram-per-microgram basis** . . . [and] understand that TIRF medicines are not interchangeable with each other . . . unless conversion is done in accordance with labeled product-specific conversion recommendations;"

(e)      "understand the responsible use conditions for TIRF medicines and the risks and benefits of chronic opioid therapy;"

(f)      "understand that the **initial starting dose for TIRF medicines for <u>all</u> patients is the lowest dose,** unless individual product labels provide product-specific conversion recommendations, and [] understand that patients must be titrated individually;" and

(g)      "understand that TIRF medicines can only be obtained from wholesalers/distributors that are enrolled in the TIRF REMS Access program."[21]

70.      Before distributing TIRF medicines to pharmacies, wholesalers and distributors must enroll in the TIRF REMS Access Program and complete the enrollment form.  The

pdf30);   TIRF REMS Access Program Chain Outpatient Pharmacy Enrollment Form (https://www.tirfremsaccess.com/TirfUI/rems/pdf/corporate-pharmacy-enrollment-form.pdf); TIRF   REMS   Access   Program   Inpatient   Pharmacy   Enrollment   Form (https://www.tirfremsaccess.com/TirfUI/rems/pdf/inpatient-pharmacy-enrollment-form.pdf).

[21] *Id.* (emphasis supplied).

TIRF REMS Wholesaler/Distributor Enrollment Form requires wholesalers and distributors to state that they will "comply with the following programs requirements:"

(a)    "ensure that relevant staff are trained on the TIRF REMS Access program procedures and will follow the requirements of the TIRF REMS Access program;"

(b)    "ensure that TIRF medicines are only distributed to pharmacies whose enrollment has been verified in the TIRF REMS Access program;"

(c)    "provide complete unblinded and unblocked data . . . to the TIRF REMS Access program, including information on shipments to enrolled pharmacies;" and

(d)    "cooperate with periodic audits or non-compliance investigations to ensure that TIRF medicines are distributed in accordance with the program requirements."[22]

71.    For a patient to receive a prescription for a TIRF medicine, both the prescriber and the patient must complete a "Patient-Prescriber Agreement Form." This form requires prescribers to acknowledge, *inter alia*, that they:

(a)    "understand that TIRF medicines are indicated ***only*** for the ***management of breakthrough pain in patients with cancer*** who are already receiving, and who are tolerant to, around-the-clock opioid therapy for their underlying persistent pain;"

(b)    "understand that TIRF medicines are contraindicated for use in opioid non-tolerant patients and know that fatal overdose can occur at any dose;"

(c)    "provided to, and reviewed with, [their] patient[s] or their caregiver the Medication Guide for the TIRF medicine [they] intend to prescribe;"

---

[22]    TIRF REMS Access Program Wholesaler/Distributor Enrollment Form (https://www.tirfremsaccess.com/TirfUI/rems/pdf/distributor-enrollment-form.pdf).

(d)    "understand that if [they] change [their] patient[s] to a different TIRF medicine, the **initial dose** of that TIRF medicine for all patients is the **lowest dose**, unless individual product labels provide product-specific conversion recommendations;"

(e)    "counseled [their] patient[s] or their caregiver about the risks, benefits, and appropriate use of the TIRF medicine, including communication of the following safety messages:

(i)    If you stop taking your around-the-clock pain medicine, you must stop taking your TIRF medicine.

(ii)    NEVER share your TIRF medicine.

(iii)    Giving a TIRF medicine to someone for whom it has not been prescribed can result in a fatal overdose.

(iv)    TIRF medicines can be fatal to a child; used and unused dosage units must be safely stored out of the reach of children living in or likely to visit the home and disposed of in accordance with the specific disposal instructions detailed in the product's Medication Guide."[23]

72.    Additionally, this form requires the patients being prescribed a TIRF medicine, or a patient's legally authorized representative to acknowledge, *inter alia*, that they:

(a)    have received from their prescriber a "copy of the Medication Guide for the TIRF medicine . . . prescribed," and have reviewed the Medication guide with their prescriber;

(b)    "understand that TIRF medicines should only be taken by patients who are regularly using another opioid, around-the-clock, for constant pain," and if "not taking around-the-clock opioid pain medicine," the prescriber and patient have discussed the risks of only taking TIRF medicines;

---

[23] *See* TIRF REMS Access Program Patient-Prescriber Agreement Form (https://www.tirfremsaccess.com/TirfUI/rems/pdf/ppaf-form.pdf).

(c)     "understand how [to] take this TIRF medicine, including how much [they] can take, and how often [they] can take it;"

(d)     "understand that any TIRF medicine can cause serious side effects, including life-threatening breathing problems which can lead to death, especially if [the patients] do not take [their] TIRF medicine exactly as [their] prescriber has directed;"

(e)     "agree to contact [their] prescriber if [their] TIRF medicine does not relieve [their]  pain" and agree "not change the dose of [their] TIRF medicine [themselves] or take it more often than [their] prescriber has directed;"

(f)     agree to "store [their] TIRF medicine in a safe place away from children and teenagers because accidental use by a child, or anyone for whom it was not prescribed, is a medical emergency and can cause death;"

(g)     "understand that selling or giving away [their] TIRF medicine is against the law;" and

(h)     "have reviewed the 'Patient Privacy Notice for the TIRF REMS Access Program' [] and [] agree to its terms and conditions which allow [their] healthcare providers to share [their] health information, . . . to the makers of TIRF medicines (TIRF sponsors) and their agents and contractors, for the limited purpose of managing the TIRF REMS Access Program."[24]

## 5.     Data Collected from the TIRF REMS Access Program

73.     Once prescribers, pharmacies, wholesalers/distributors and patients are enrolled in the TIRF REMS Access Program, the personal information provided on this form is collected, used, and disclosed.  This information may be used to verify enrollment in the program, to assess compliance with the program, and to analyze trends.  For example, the TIRF REMS Access Program keeps an updated list of all enrolled in the program.

---

[24] *Id.*

Additionally, the TIRF REMS Access Program keeps track of actual prescriptions data for the TIRF medicines in the program in real time, which allows for precise monitoring of the prescription and usage of TIRF drugs.

74.     According to defendants, the FDA receives quarterly reports on the prescription and usage of TIRF medicines.  Thus the FDA is able to monitor the writing habits of every TIRF REMS enrolled prescriber, and the usage habits of every TIRF REMS enrolled patient.  However, TIRF manufacturers, including Insys, also receive access to some of the REMS data collected.  According to defendants, Insys uses the list of prescriber information to form its call list in promoting Subsys.  In addition to the quarterly reports, defendants receive real time data from the TIRF REMS Access Program relating to "scripts," and, for example, in the Q3'13 earnings call, referred to the TIRF REMS data as a more accurate source of information for the number of "scripts" written during the class period than other commercial sources.

### 6.     Adverse Incident Reporting to the FDA

75.     Fentanyl is a powerful drug that can cause serious side effects, including death. For this reason, the TIRF REMS Access Program advises all "stakeholders" to "[p]romptly report suspected adverse events associated with the use of a TIRF medicine including misuse, abuse, and overdose directly to the TIRF REMS Access program . . . [and/or] to the FDA MedWatch Reporting System."[25]  In response to a FOIA request, counsel obtained information indicating that between August 13, 2011, and August 12, 2014, there were a total of 13,196 cases and 48,323 incidents, with 2,356 deaths reported through the FDA Adverse Event Reporting System ("FAERS") in which one of the drugs reported contained fentanyl as an active ingredient  - not necessarily Subsys.[26]

---

[25]     TIRF     REMS     Access     Frequently     Asked     Questions     (FAQs) (https://www.tirfremsaccess.com/TirfUI/rems/pdf/faq.pdf).

[26] The FDA only collects FAERS reports and does not delete duplicates.  Thus, multiple sources may report a single incident.  Also, each case may report multiple adverse events and lists all drugs a patient was using at the time of incident or event.

76. The number of Subsys-specific reports to FAERS from July 9, 2012, through August 26, 2014,[27] was 119 adverse events. Because each case may have one or more adverse events, if measured by the number of cases, 45 of 79 (57%) appear to have resulted in death. The time period covered by these statistics is approximately 29 months, from March 26, 2012, to August 26, 2014. During that time period, there were three deaths every two months and one adverse incident per week relating to Subsys use. In light of the fact that FAERS reporting was not mandated and physicians may have been reticent to report a death from off-label use, adverse events relating to Subsys use may be underreported.

**B.    Insys's Insidious Role in Obtaining Public and Private Payment to Subsidize Subsys's High Costs**

77. Not only can Subsys be dangerous or deadly when used outside its label's narrow indication, but it is also extremely expensive. To help offset this extraordinarily high cost and induce patients to take or switch over to Subsys, Insys offers a "Patient Co-Pay Savings Program." The Subsys website (www.subsysspray.com) for patients/caregivers describes the Savings program as similar to a coupon – offering a "free product, and up to $500 off each additional prescription of SUBSYS fentanyl sublingual spray" for commercially-insured or cash-paying patients. Without such a coupon, the price of a single 30 spray pack of Subsys is extraordinary – according to GoodRx.com, an online drug price aggregator, the most common price per 30 spray unit package as of October 22, 2014, is:

| Strength (mcg) | Price Per 30 Unit Package |
|---|---|
| 100 | $906.73 |
| 200 | $1,276.32 |
| 400 | $1,805.72 |
| 600 | $2,343.11 |

---

[27] Even though the FAERS database for fentanyl drugs goes back a number of years, the first Subsys adverse event was reported on July 9, 2012, several months after Subsys's commercial launch in late March 2012.

| 800 | $2,885.26 |
| 1200 | $2,398.77 |
| 1600 | $3,163.77 |

78.     Furthermore, as explained in Insys's 2013 10-K, both private and public health insurance providers do not automatically cover every single drug that may be prescribed to an insured, but instead, choose which drugs to pay for, and also establish levels of reimbursement for prescriptions.  Many private health insurers base their reimbursement levels for prescriptions on the level in which government insurance programs, such as Medicare and Medicaid, provide reimbursement.  Insys's 2013 Form 10-K also explains that both government and private insurers have been "increasingly attempting to limit or regulate the price of medical products and services . . . ."

79.     Thus, based on the levels of reimbursement for prescriptions, many insurers have established different "tiers" of medication, and sometimes only provide reimbursement, or partial reimbursement, for one branded formulary in a class of similar products, such as TIRF medications.[28]  Insys's 2013 Form 10-K explains that Subsys is classified as a "Tier 3" medication under the vast majority of commercial health insurance plans; such insurers first require their insured to try generic medications and demonstrate they are not effective before they will provide reimbursement for branded medications, such as Subsys.

80.     Nevertheless, the Form 10-K assures investors that Insys would provide assistance to ensure that Subsys would gain traction with patients, providers and insurers:

> We believe that physicians and payors will develop greater familiarity with both the differentiated features of Subsys and the process to achieve patient access to the product from continued and broader usage of Subsys by their patients. We offer patients a free trial of Subsys to allow for titration to their effective dose and bridge the prior authorization process.

---

[28]  For example, during the Q1'14 earnings call with analysts and investors, Defendants touted that "Subsys is the only branded TIRF product on the UnitedHealthcare formulary." Possibly in response to the negative press in May 2014, several months later, Express Scripts removed Subsys from its formulary for 2015.  (Source:  GoodRx.com)

81.     Although, as CEO Babich confirmed during the Q1'14 earnings call, it Insys's "promise to patients is that they will receive Subsys until their managed care provider approves it," defendants did not disclose how it worked to "bridge" the process to successfully obtain coverage for all patients for whom a script is written.

82.     The Subsys website for patients explains that the Insys Reimbursement center will help a patient gain coverage of his/her Subsys prescription by the patient's insurance company at no cost to the patient or prescriber.  The Subsys website for healthcare providers only slightly elaborates on Insys's prior authorization support: "A dedicated team of [Prior Authorization] Specialists will assist with logistics throughout the [Prior Authorization] process – all the way up to and including external review.  The INSYS Reimbursement Center will navigate time-consuming administration aspects of the [Prior Authorization] process."   Healthcare providers must "opt-in" to the prior authorization program to participate by signing HIPAA-compliant forms for their patients, and "are responsible for providing any medical necessity justifications."

83.     During the Q1'14 earnings call, CEO Babich downplayed Insys's efforts to obtain insurer authorization, instead crediting Subsys's market domination on its superior ability to alleviate breakthrough cancer pain: "With the successful launch of Subsys, we have proven that it's possible to take a generic market and convert it back into a branded market if the product has the clinical benefits."  Lead Plaintiff is informed and believes, and based thereon alleges, that defendants' goal in providing significant prior authorization support to patients was to ensure patient dependence and addiction to Subsys, requiring them to increase dosage strength over time – a very lucrative proposition for Insys.

84.     CW6, as discussed in ¶¶ 184-196, *infra*, further corroborates this less than altruistic goal.  Hired as a Prior Authorization ("PA") specialist in the Insys Reimbursement Center ("IRC"), CW6's job was to ensure patients were reimbursed for taking Subsys.  Although the Subsys website states that if prior approval is required from a third-party payor, "[t]he heathcare provider either completes the appropriate forms and/or calls the [third-party

payor] to seek approval," CW6 stated that he/she was trained to impersonate someone from a prescriber's office when speaking to a PBM to obtain approval of a Subsys prescription, because PBMs could only speak to physicians or their staff for prior authorizations. According to CW6, he/she was instructed to lie to a PBM about a patient's prior history of medications, if need be, and to tell the PBM that a prescription was written for a three-month supply when only a one-month supply was prescribed.

85.    According to CW6, the PA team saw all of the patients' diagnoses, which were also presented to CEO Babich.  CW6 stated that only about 10% of the prescriptions were for a cancer diagnosis, and that the majority of prescriptions were for patients with peripheral neuropathy caused by diabetes, lower back pain, and sciatica.

86.    Additionally, CW6 stated that the PA team helped train sales representatives to sell Subsys beyond its approved indications. For example, CW6 stated that the sales representatives were trained to focus on "breakthrough pain" with prescribers – rather than "breakthrough cancer pain."  (As set forth below, other former employees affirm that this was the pitch senior management wanted the sales force to make to doctors.)

**C.    Insys's Unqualified Sales Team**

87.    Insys has a unique compensation system for its salesforce that is different from most pharmaceutical companies. Until recently, the Company has been publicly vague about its commission compensation structure. According to Insys' March 5, 2014 Annual Report, Insys described its sales model as:

> …an incentive-based sales model similar to that employed at Sciele Pharma and other companies previously led by members of our board, including our founder, Executive Chairman and principal stockholder. Under this model, we maintain a low-cost commercial organization that is smaller than many of our competitors…[]

88.    Several former employees (whose accounts are alleged more fully below) (CW2 and CW4) confirmed that Insys paid its specialty sales representatives an extremely

low base-salary of approximately $40,000 a year plus commissions based on prescriptions written.  According to CW2, because the profit margins for Subsys are significantly higher at stronger dosage levels, Insys incentivized its salespeople to sell higher doses of the product. According to CW4, Insys paid an incentive compensation that changed every quarter, but was typically 5-10% of the retail price of the drug prescribed.  Therefore, as a review of the table in ¶ 77 plainly shows, eight scripts written for 100 mcg was not as valuable as having two scripts written for 1600 mcg.  According to CW4, while the typical base salary in the industry was higher than that paid by Insys, the Company's top sales representative earned up to $250,000 per quarter in commissions even though he serviced only one physician  – Dr. Gavin Awerbuch.

89.    The confidential witnesses also confirmed that the majority of the sales representatives, as many as 80-90% according to CW2, had little to no experience in pharmaceutical sales.  Indeed, CW1 stated that he/she was one of the few hired who had industry experience, to bring a measure of legitimacy to the sales team.  CW1 was a Regional Trainer and described the sales representatives as young and naïve, and stated that the training of sales representatives did not focus on the important fact that Subsys is a severely-restricted opioid.  Indeed, CW2 did not even learn the basic yet critical fact that Subsys prescribers had to be enrolled in the TIRF REMS Access Program until later in his/her employment.

90.    Additionally, CW1, CW2, and CW4 all noted that most of Insys's sales representatives were extremely attractive women.

91.    At the Needham Life Sciences Conference on April 8, 2014, the CEO Babich went so far as to portray Insys's inexperienced sales force as a positive contributor to Subsys's success, stating, in relevant part:

> We also have a unique commercial model which I believe lends itself well to our success. The majority of our sales reps have no prior pharmaceutical experience. We think that is very important from the perspective of they are out there delivering a message.

92.     What the Company did not disclose was that by hiring young, inexperienced salespeople, most of who had no prior pharmaceutical sales background, defendants were able to mold them to deliver the Company's "message" – to wit, breakthrough pain is the same as breakthrough cancer pain – without the sales representatives realizing that Insys's sales and marketing practices were illegal and unethical.

93.     Each of the confidential sales representative witnesses confirmed that there was nothing improper about the Company's "official" corporate training materials, but once they were in smaller groups or one-on-one, they were instructed to promote Subsys off-label and in dosage strengths higher than permitted by the FDA.

94.     The confidential sales representative witnesses described the Company's sales environment as very high pressure, which intensified with the high turnover.  According to CW1, Insys fired 25% of its salesforce within his/her first month.  Additionally, CW2 and CW4 stated that VP of Sales Burlakoff threatened to fire anyone who could not get at least one script per day written.

**D.     "Start Them High, and Hope They Don't Die"**

95.     As previously mentioned, before prescribers and pharmacists can enroll in the TIRF REMS Access Program to subscribe TIRF medicines, they must complete an educational program, which includes a section on proper dosage of TIRF medications.  The TIRF REMS Access Program clearly lays out the proper dosage for TIRF medications, explicitly stating that whether or not a patient is switching from another TIRF medicine, titration must begin from the lowest dosage available.  *See* ¶¶ 67(h), 69(f),  and 71(d).  For Subsys, this initial dosage is 100 mcg, unless the patient is converting from Actiq or its equivalent generic, in which a patient may begin with *up to* 400 mcg (depending upon the patient's current Actiq dose level).  *Id.*

96.     Subsys's own label further imparts the importance of this titration schedule.[29] Because each patient's experience and tolerance of pain is unique, according to the label, doctors should individually titrate Subsys to a dose that provides adequate pain relief while minimizing the drug's serious side effects.  The initial dose of Subsys to treat breakthrough cancer pain is "*always* 100 mcg,"[30] and that when prescribing Subsys, "***do not switch patients on a mcg per mcg basis from any other oral transmucosal fentanyl product to Subsys*** as Subsys is not equivalent on a mcg per mcg basis with any other fentanyl product."[31]  The only exception listed in the label is patients being converted from Actiq, in which case, "prescribers ***must*** use" the following initial dosing recommendations: if the current Actiq dosage is 200 or 400 mcg, then the initial Subsys dose is 100 mcg; if the Actiq dosage is 600 or 800 mcg, then the initial Subsys dose is 200 mcg; and if the current Actiq dosage is 1200 or 1600 mcg, then the initial Subsys dose is 400 mcg.[32]

97.     The label also provides a step-by-step guide to titrating the dose of Subsys. The patient should take a 100 mcg dose when experiencing a breakthrough cancer pain episode. If not relieved within 30 minutes, the patient may take only one additional dose of the same strength for that episode.  The patient must then wait four hours before treating another episode of breakthrough cancer pain.  If a 100 mcg dose is not adequate to relieve the breakthrough cancer pain, a prescriber may then prescribe 200 mcg of Subsys.   The subsequent dosages in the titration cycle are 400 mcg, 600 mcg, 800 mcg, 1200 mcg, and 1600 mcg.

98.     In accordance with TIRF REMS requirements and the FDA approved label for Subsys, Insys officially states that physicians are advised "to begin patients at the lowest

---

[29] The current Subsys label, containing full prescribing information, was revised in July 2013. (http://subsysspray.com/assets/subsys/client_files/files/PrescribingInfo.pdf).

[30] *Id.* at 2 (emphasis in original).

[31] *Id.* (emphasis in original).

[32] *Id.* (emphasis supplied).

dose available for the applicable TIRF product, which for Subsys is 100 mcg." 2013 Form 10-K at 24.  This was confirmed by confidential witnesses – in official sales trainings, sales representatives were trained to discuss the label's indications and to recommend proper titration with prescribers.

99.     Yet, as the dosage of Subsys increases, so too does the Company's gross margins.  *See* 2013 Form 10-K at 63 (gross margin for Subsys was "approximately 90%" in FY'13).   For example, at the May 8, 2014, Deutsche Bank Healthcare Conference, Defendant Babich stated: "In addition, as patients stay on the drug longer, they have a tendency to move up in dose making description [sic] more valuable as the patient stays on the drug at their end stage."

100.     This is exemplified by analyst Wells Fargo Securities's financial models, in which it calculated the weighted average price per unit of Subsys using IMS data and Insys's own reports in its May 14, 2014, report.  The price increase per Subsys unit, based on the same analyst's price estimates as of April 9, 2014, the date Insys increased the price for the 1200 and 1600 mcg strengths of Subsys, shows how valuable higher-strength dosages are to Insys:

| Strength (mcg) | Q1 2014 Weighted Average Price Per Unit | Q2 2014 Est. Weighted Average Price Per Unit | % Change |
|---|---|---|---|
| 100 | $30.73 | $31.00 | 0.9% |
| 200 | $38.81 | $39.15 | 0.9% |
| 400 | $56.33 | $56.83 | 0.9% |
| 600 | $73.14 | $73.79 | 0.9% |
| 800 | $90.10 | $90.90 | 0.9% |
| 1200 | $124.10 | $145.34 | 17.1% |
| 1600 | $158.37 | $179.60 | 13.4% |

101.     These figures confirm CW2's explanation that eight scripts written at 100 mcg was less valuable to the Company than two scripts written at 1600 mcg.

102.     Despite the increased risks of serious side effects, confidential witnesses confirmed defendants' focus on getting the sales force to convince physicians to write prescriptions for stronger dosage levels.  CW1 explained that to increase profits, Executive Chairman Kapoor yelled at sales representatives to get prescribers to very quickly titrate to higher doses.  This confidential witness also stated that his/her regional sales manager and another regional sales manager both expressed that Dr. Kapoor wanted prescribers to start their patients on higher dosages than permitted both by Subsys's label and TIRF REMS Access Program rules.

103.     Former employees also explained that their field training with respect to prescription strength was markedly different from their formal sales training.  CW1 described his/her field training, *i.e.*, actually speaking with prescribers, with VP of Sales Burlakoff.  According to CW1, Burlakoff apparently recommended to prescribers to start patients at 400 mcg of Subsys, and to titrate patients to 800 mcg-1600 mcg as quickly as possible.  CW3 also stated that Burlakoff and his/her regional sales manager directed him/her to tell prescribers that a patient converting from another fentanyl product to Subsys should not start titration at 100 mcg because the drug may fail to suppress pain and cause the patient pain crises.

104.     Contrary to both Subsys's label and TIRF REMS Access Program rules, CW1 stated that Burlakoff advised prescribers, and instructed sales representatives to advise prescribers, to start patients already taking Actiq or Fentora at up to 800 mcg of Subsys. According to CW1, management also encouraged their sales representatives to specifically target patients taking dosages of Actiq at 1200 mcg or 1600 mcg, and to convert these patients to Subsys's 1600 mcg dosage quickly.  Similarly, according to CW2, VP of Sales Burlakoff told Insys's sales representatives to start patients at doses higher than 100 mcg,

stating that "everyone knows it doesn't work at that level."  Based on these orders, CW2 stated that another salesman coined the term "Start them high and hope they don't die."

105.    The *qui tam* complaint underscored that the greed motivating the improper dosing message to doctors came from management and was not simply the result of low-paid sales representatives seeking to earn more money.  The relator specifically alleged that he received an email from Burlakoff, then a Regional Sales Manager, stating that should the Company find out that a script was written for 100 mcg or 200 mcg, the sales representative would be notified via email and would then be required to follow up with the physician and to report back to Insys with the details of the conversation within 24 hours.

106.    Defendants were very successful in getting their sales force to press for scripts to be written for very strong doses of Subsys.   On May 14, 2014, Wells Fargo Securities published an analyst report for Insys with a financial model that set forth the prescription distribution for Subsys in 2012, 2013, and Q1 2014, as measured by dosage strength, before estimating this same distribution for future quarters and years:

| Strength (mcg) | Rx Distribution FY 2012 | Rx Distribution FY 2013 | Rx Distribution Q1 2014 |
|---|---|---|---|
| 100 | 25.9% | 9.9% | 9.4% |
| 200 | 24.3% | 24.6% | 23.5% |
| 400 | 21.7% | 25.2% | 25.0% |
| 600 | 10.6% | 13.8% | 13.5% |
| 800 | 13.2% | 15.9% | 16.9% |
| 1200 | 1.8% | 5.1% | 5.4% |
| 1600 | 2.5% | 5.6% | 6.2% |

107.    Despite the fact that Subsys's side effects are so severe and potentially lethal that both the FDA-approved Subsys label and the TIRF REMS Access Program rules expressly require all patients (except for certain Actiq users) to initiate Subsys use at the 100

mcg dosage, as starkly demonstrated by the above table, there is a steep drop in percentage of overall Subsys prescriptions written at the 100 mcg dosage level after the Company crafted its new message in the fall of 2012.  During the first eight months of sales, as expected, the 100 mcg dose was the one most often prescribed.  However, by 2013, fewer than 10% of all Subsys prescriptions were actually written at the FDA-mandated initial dosage level.  The table also shows significant increases in the percentage of overall Subsys prescriptions accounted for by the three highest-strength doses.

108.    Although Insys's Q1'14 Form 10-Q does state that:

the proportion of prescriptions written for repeat Subsys patients has continued to increase since July 2012 from 50% of prescriptions to approximately 80% of prescriptions as of March 2014. Generally, repeat Subsys patients receive significantly higher doses of Subsys on average than first-time patients as patients are titrated from a starter dose of Subsys to their effective dose in accordance with the TIRF REMS protocol,

the progression of some repeat patients to higher dosage strengths cannot explain the extraordinary drop in percentage for the FDA-approved and mandated starting dose of Subsys.  If Subsys is as effective as claimed by defendants in providing more immediate relief to patients than other TIRFs *and* defendants were properly instructing physicians to start patients at 100 mcg *and* defendants were steadily gaining market share by switching more and more TIRF patients to new Subsys prescriptions (almost all of which must start at the 100 mcg strength dose), then the percentage of 100 mcg prescriptions for Subsys in 2013 and Q1'14 should not have been a fraction of the size of the number of 200 mcg to 800 mcg prescriptions written.  Most alarmingly, in 2013 and Q1'14, there were more prescriptions written at the 1200 mcg and 1600 mcg levels (combined) than at the proper initial dose of 100 mcg.

109.    The figures in the analyst's chart only make sense if defendants' real focus was to make their profits from chronic pain-drug users – who can tolerate successively higher, more lucrative dosage strengths and would continually refill prescriptions – rather than from

cancer patients who have a shorter life expectancy.  CW1 confirmed that management instructed sales representatives to focus their efforts on pain management doctors rather than oncologists because chronic pain patients were considered "the holy grail."  According to CW2, when he/she asked his/her regional sales manager to obtain permission for CW2 to go speak to doctors at a highly-regarded cancer treatment and research center in the United States, the regional sales manager refused, encouraging CW2 to focus his/her efforts elsewhere.

### E.      Subpoenas And Prior Proceedings Against Insys

#### 1.      The *Qui Tam* Action

110.    On September 28, 2012, a *qui tam* complaint was filed under seal pursuant to Federal and various States' False Claims Act against Dr. Kapoor, the Company, and its related corporate entities.  On information and belief, after the federal government decline to intervene, the case was dismissed on July 10, 2013, and the *qui tam* complaint was unsealed but the original exhibits filed with the complaint remain sealed.  Although the *qui tam* complaint was eventually unsealed, it is unclear if Insys or any other parties were aware of the complaint because the case was dismissed.  Lead Plaintiff was only able to find the *qui tam* complaint through targeted docket searches.[33]

---

[33] Although there is quite a bit of misinformation and gossip on the site, shortly before the first subpoena was issued to Insys, a thread on the Café Pharma.com message board for Insys was started without content and simply stated "The whistleblower is coming…"  Responsive posts included: a statement by a sales representative for a competitor TIRF that the Office of the Inspector General and the Drug Enforcement Administration had been interviewing some doctors serviced by the representative about "Subsys selling practices," a suggestion that almost all prescribing doctors were paid "speaker fees" by Insys, and that a single doctor in Michigan was "driving the business."  In light of the interest of the OIG and the DEA, and the reference to a whistleblower, in counsel's experience, it was quite possible that a *qui tam* action had been filed.  (Counsel has no reason to believe, however, that the Relator is the whistleblower referenced on CaféPharma.com or that there is necessarily one particular whistleblower.)

111.     According to the *qui tam* complaint, the Relator was employed as a Specialty Sales Professional at Insys beginning around February 2012 and was employed at least through September 28, 2012, when the action was filed.   The *qui tam* complaint explains the background of the Company, Subsys, and the heavy FDA restrictions governing the sale and usage of Subsys.   The *qui tam* complaint alleged that Insys illegally marketed Subsys by giving illegal kickbacks to physicians in exchange for prescribing Subsys, promoting the off-label usage of Subsys, and improperly encouraging physicians to prescribe Subsys at higher starter or conversion dosages than permitted under the TIRF REMS Access Program. Relator alleged that he/she and the other sales representatives were instructed to follow improper sales and marketing practices activities under the direction and control of Insys management, including CEO Babich and Dr. Kapoor.

112.     The *qui tam* complaint alleged that Relator was one of forty-five sales representatives initially hired to market the newly approved Subsys to about 1,500 doctors nationwide.  Most of the sales representatives were new to pharmaceutical sales and many were recent college graduates.

113.     The *qui tam* complaint further alleged that in March 2012, when Subsys was first being launched Relator learned about a doctor speaker program from his/her Regional Sales Manager Tony Bryant ("Bryant").   Although Bryant told Relator and the other sales representatives in the region to recruit doctors to be Subsys speakers, the speaker program was not emphasized.

114.     The *qui tam* complaint further alleged that when Subsys first launched, management had directed sales representatives to inform doctors that Subsys could be used for the treatment of any kind of pain in cancer patients, not just breakthrough cancer pain. Therefore, according to the *qui tam* complaint, if a cancer patient suffered from a leg injury in a car accident, a doctor could use Subsys to treat the leg pain.   However, Subsys's label clearly states that Subsys is indicated for the management of "breakthrough cancer pain" and warns in bold lettering: "Due to the risk of respiratory depressions, ***Subsys is***

294458.1 INSYS

*contraindicated in the management of acute or postoperative pain* including headache/migraine and in opioid non-tolerant patients." (Emphasis supplied.)

115.    The *qui tam* complaint alleged that by June 2012, Subsys sales were not taking off as expected and management made significant personnel changes, firing about 25% of the sales representatives.  More importantly, Vice President of Sales, Shawn Simon, and Tony Bryant left the Company.  Soon thereafter, it was announced that Alec Burlakoff (a/k/a Alex Burlakoff), a former regional sales manager at competitor Cephalon (which manufacturers Actiq)[34] would replace Bryant as the new Southeast Regional Sales Manager. The Relator alleged that as soon as Burlakoff joined Insys, the Company's sales and marketing practices for Subsys became significantly more aggressive in promoting the drug off-label, providing kickbacks to doctors, and pushing higher prescription strengths.

116.    The Relator alleged that the Company had its sales force use a physician target list or "call plan" with the names of physicians for each representative to promote the off-label message, the vast majority of who (at least in the Southeast region) were pain management doctors, although a few oncologists were listed as low priority targets.

117.    The Relator alleged that Insys used decile rankings and prescribing habits to tailor its off-label promotion strategy to specific doctors, and the doctors were ranked or in a category based on how likely the doctor was to prescribe Subsys.   According to the *qui tam* complaint, sales representatives use an electronic call note system to track their calls to target doctors, but that system was intentionally changed from free form to multiple choice so that the content of sales conversations could not documented.

118.    According to the *qui tam* complaint, Insys's speaker program was nothing more than a thinly disguised kickback system.   Insys sought "coachable" doctors willing to praise Subsys to other doctors in exchange for honoraria, ranging from $800 to $1,200 per speaking engagement.   Insys's payments to these doctors greatly exceeded the typical

---

[34] As explained above, Cephalon paid a $425 million fine for marketing Actiq and several other drugs off label. *See* http://www.fda.gov/ICECI/CriminalInvestigations/ucm260715.htm

industry honoraria for doctor speaker programs, particularly as presentations were usually dinners with very few attendees, often only the speaker and one other person.

119.    Attached as Exh. D hereto is a spreadsheet containing a list of payments from Insys to various physicians during the five-month period from August 2013 through December 2013 recently obtained under the ACA's Sunshine Act.  Although food and beverages comprised the largest number of payments, the total dollar value of payments identified as "Food and Beverage" was only $200,502.12.  The most significant amounts of money, to wit, $750 or more, were paid to 170 doctors for "Compensation for services other than consulting, including serving as faculty or as a speaker at a venue other than a continuing education program," "honoraria," and "consulting fees."  From the records Lead Plaintiff was able to access, Insys appears to have paid a total of $2,157,162.49 to these doctors in just a single five-month period.  Payments to the 170 doctors, identified as speaker fees, consulting fees, honoraria, or travel and lodging, are set forth in Exh. D.  Some doctors were paid tens of thousands of dollars.  Of course, net revenues for Subsys sales for the second half of 2013 were $67.6 million.  As CEO Babich explained during the Q1'14 conference call, only 120 physicians write 30% of all TIRF prescriptions. Defendants appeared to have targeted these doctors and rewarded them generously for writing Subsys prescriptions.

120.    The allegations in the *qui tam* complaint confirm the information obtained under the ACA's Sunshine Act:  Physicians were selected as speakers as a reward for prescribing Subsys.  According to the *qui tam* complaint, in June 2012, then Regional Sales Manager Burlakoff told the sales representatives under his direction that "speaker programs would be the key to their success" and that "the purpose of the speaker programs was to get money in the doctor's pocket."

121.    Relator alleged that on August 16, 2012, Burlakoff texted Relator to have his/her doctor-speaker write "more and more subsys (sic) to justify these programs…" When Relator asked Burlakoff whether to continue with previously scheduled dinners,

Burlakoff permitted them but said that the doctor "needs to find 1 pt [patient] a day ... Please do not book any additional programs until we see return on investment."  According to the *qui tam* complaint, this text message conversation was attached to the *qui tam* complaint as Exhibit 3.  (The complaint was eventually unsealed but its exhibits were not.)

122.     According to the *qui tam* complaint, Burlakoff again texted Relator on August 16, 2012, with respect to the same doctor, warning that "he seriously needs to start writing or it is going to make us look bad. I would definitely make this the last program 'for now' until you see his numbers increase significantly..(sic)  He should have written much more after our dinner program." Stressing the *quid pro quo* nature of the speaker program, then Regional Sales Manager Burlakoff also texted:  "You have to have that uncomfortable conversation that holds him accountable," and "Per 'Dr. Kapur' subsys (sic) speakers should support and show belief in this product.  If not – the speaker needs to be removed." The *qui tam* complaint alleged that printouts of these text messages were also among the pages attached to the *qui tam* complaint as Exhibit 3.

123.     According to the Relator, on August 30, 2012, Burlakoff texted all of the sales representatives under his direction.  He asked: "Are our speakers doing their part????  We must hold our speakers accountable, programs are going to begin to get cancelled quickly." The *qui tam* complaint alleges that this is among the printouts of text messages attached to the *qui tam* complaint as Exhibit 4.

124.     According to the *qui tam* complaint, in August 2012, Burlakoff also took Relator on the field to observe his sales technique in action.   While meeting with a pain management doctor in Houston, Texas, when the doctor asked Relator and Burlakoff about Subsys's indication, Burlakoff, responded "You can write Subsys for off-label use. I can't talk to you about indications with you, but you can write off label."  When the doctor replied that "insurance companies care about indication," Burlakoff responded that "insurance companies do not care about indication and that eighty percent of Subsys prescriptions are off-label."

125.    On September 12, 2012, Burlakoff was promoted to Vice President of Sales and in his new role, Burlakoff continued to push the message that doctors should be writing one prescription a day in order to remain a Subsys speaker.

126.    The *qui tam* complaint further alleged that although the FDA required patients begin on the lowest dosage of 100 mcg of Subsys and titrate upwards to a dose that sufficiently relieved the patient of breakthrough cancer pain, by September 2012, defendants determined that then-current sales of Subsys at the 100 mcg dose were not sufficiently profitable to make Insys into a blockbuster drug.   By early September 2012, the Company began to push an "effective dose" message for Subsys.

127.    According to the *qui tam* complaint, on September 13, 2012, all Insys sales representatives received an email from Matthew Napoletano, former Vice President of Marketing at Insys, and CEO Babich, that management was changing the Subsys dosage message. In the email, CEO Babich and Napoletano instructed sales representatives to inform their physicians that they should write prescriptions for thirty units of Subsys, so that the patient can be titrated more quickly to the "effective dose" and that sales representatives would receive a new "Effective Dose" brochure at a national sales meeting in Phoenix on September 19, 2012.  The email stated that the brochure would show "how 6 units of 100 mcg can titrate a patient to 400 mcgs, and how 6 units of 200 mcg can titrate a patient to 800 mcgs. . . .a great selling tool for you to drive home the importance of finding an effective dose."  The *qui tam* complaint alleges that the printout  of the entire email was attached to the *qui tam* complaint as Exhibit 5.

128.    Also on September 13, 2012, newly promoted as Vice President of Sales, Burlakoff sent an e-mail to all of the Southeast Region sales representatives, copying CEO Babich, Executive Chairman Kapoor, and then VP of Marketing Napoletano, informing the sales representatives that "every time you receive a message from Xun [Sean Yu] indicating that you had a prescription written for less than 400 mcg …you must follow up with the physician within 24 hours and provide specific details to the conversation."   Burlakoff also

stated in the email that "100 mcg and 200mcg (sic) of Subsys does NOT work. We would be better off having the doctor write a prescription for one of our competitors rather than write for 100mcg(sic) or200mcg(sic) of Subsys.  At least then – we would theoretically still have a chance of proving our drug to be efficacious if and when we sell the doctor on 'effective dosing'."   Finally, Burlakoff  warned in the sales representatives that "anyone whom [sic] ignores these instructions is subject to immediate negative consequences…."   The *qui tam* complaint alleges that the printout of the entire email was attached to the *qui tam* complaint as Exhibit 6.

129.   Relator next alleges that on September 17, 2012, all the sales representatives in the country received an email from VP of Sales Burlakoff,  with copies sent to CEO Babich and then VP of Marketing Napoletano, explaining that sales representatives would now be receiving an e-mail every time a prescriber in his/her territory wrote a Subsys prescription at 100 mcg or 200 mcg.    Burlakoff also stated in the email that sales representatives would have 24 hours to report back to management "on WHY the low dose was used and HOW the doctor plans to titrate the patient to effective dose."  Burlakoff further stated that sales representatives "must educate [their] physicians how to ensure their patients find the 'EFFECTIVE DOSE', (sic) I will go as far as to say that we are truly better off dissuading a physician to prescribe Subsys for 100 and 200 mcg until we have had ample time to review how (sic) clinical trial data with them via the Rauck study.  After all, you only get once (sic) chance to make a first impression, is this the lack (sic) impression we want to make for our superior product?"  The *qui tam* complaint alleges that the printout of the entire email was attached to the *qui tam* complaint as Exhibit 5.

130.   Relator next alleges that on September 19, 2012, Insys held a national meeting for all of its sales representatives in Phoenix, Arizona, near Insys's headquarters.  Members of Insys management, including CEO Babich, were present at the meeting. During the meeting, Brook Smets, a sales representative for Insys's West Region, asked Insys management how the representatives should approach doctors regarding the fact that 80% of

Subsys prescriptions are off-label.   A member of the Company's management responded that representatives should explain to their doctors that the evidence showed that "breakthrough pain is the same as breakthrough cancer pain."

131.   According to the *qui tam* complaint, during the September 19, 2012, national sales meeting CEO Babich also informed all of the sales representatives that "they should be telling their doctors that while they [the sales representatives] had to tell the doctor to start patients at 100 mcg, they had heard from other doctors that the doctor could start a patient taking 800 mcg of Actiq on 400 mcg of Subsys."  (The FDA-mandated transitional dosage strength for 800 mcg of Actiq is 200 mcg of Subsys.)

### 2.   The December 12, 2013 Subpoena

132.   On December 12, 2013, after the market close, the Company issued a press release entitled, "Insys Therapeutics Receives Subpoena From Office of Inspector General." Therein, the Company, in relevant part, stated:

> Insys Therapeutics, Inc. (Nasdaq: INSY) announced today that it has received a subpoena from the Office of Inspector General of the Department of Health and Human Services ("HHS") in connection with an investigation of potential violations involving HHS programs. The subpoena requests documents regarding Subsys®, including Insys' sales and marketing practices relating to this product. Insys intends to cooperate with the investigation.

133.   On December 13, 2013, JMP Securities published an analyst report entitled "Insys to Cooperate with HHS Subpoena."   According to the analyst report, the analyst "spoke with management who confirmed that the company does conduct regular audits of sales and marketing practices. While we acknowledge that this news adds uncertainty, we remain confident that the company takes necessary measures to ensure compliance in its business practices."

134.   Wells Fargo Securities noted: "We spoke with company management and our understanding is that the subpoena is broad in scope. OIG has requested a wide range of documents (including correspondence, marketing plans, and all other documentation),

relating to all aspects of Subsys sales and marketing practices. OIG has not made any specific allegations. However we think it's reasonable to infer that the authorities could be looking for signs of off-label promotion."

### 3. The Awerbuch Criminal Complaint

135. On May 2, 2014, a sealed criminal complaint and affidavit was filed in the Eastern District of Michigan against Dr. Gavin Ira Awerbuch ("Awerbuch" or "Dr. Awerbuch") captioned *United States of America v. Awerbuch*, Case No. 2:14-MJ-30216 (the "Awerbuch Complaint").

136. Dr. Awerbuch is a neurologist based in Saginaw, Michigan. On May 6, 2014, Awerbuch was arraigned in federal court in Detroit, Michigan, and the Awerbuch Complaint was ordered unsealed.

137. According to the Awerbuch Complaint, Dr. Awerbuch allegedly wrote prescriptions for controlled substances, particularly Subsys, "outside the scope of legitimate medical practice and for no legitimate medical purpose" and filed false claims to Medicare and private insurers. Awerbuch Complaint at 5-6, 13. Additionally, the Awerbuch Complaint alleged that Dr. Awerbuch billed Medicare and private insurers for certain diagnostic procedures, specifically nerve conduction studies ("NCS") and needle electromyographies ("EMGs"), which were not actually provided as billed. *Id*. at 6.

138. According to the Awerbuch Complaint, Medicare paid approximately $6,969,100 for Subsys prescribed by Dr. Awerbuch from January 1, 2009 through February 6, 2014.[35] *Id*. at 13. According to the Awerbuch Complaint, Dr. Awerbuch wrote approximately 1,283 prescriptions for Subsys for Medicare beneficiaries, making him by far the top prescriber of Subsys for Medicare beneficiaries nationwide during this time frame. *Id*. As noted above, Subsys was first marketed for sale on March 26, 2012. Including

---

[35] Insys launched Subsys in March of 2012. The Awerbuch Complaint broadly alleged a longer time period because Awerbuch's alleged fraudulent billing for various other services occurred prior to 2012.

weekend days, there are 683 days from March 26, 2012, to (and including) February 6, 2014. Consequently, Dr. Awerbuch, a neurologist, wrote an average of nearly 1.88 Subsys prescriptions *every single day* for almost two years.  According to the Awerbuch Complaint, Dr. Awerbuch wrote six times more Medicare prescriptions for Subsys than the second highest prescriber, who wrote only 203 prescriptions during this time period.  *Id*.

139.    According to the Awerbuch Complaint, Awerbuch was "responsible for approximately 20.3% of the Subsys prescribed to Medicare beneficiaries nationwide" from January 2009 through January 2014.  *Id*. at 36.

140.    According to the Awerbuch Complaint, on January 25, 2013, an undercover officer, described as patient "UC5," visited Dr. Awerbuch asking for Oxycontin, instead of the Vicodin the UC5 had been using.  *Id*. at 20.  (Several of UC5's previous visits to Dr. Awerbuch prior to January 25, 2013, were also described therein.  *See generally id*.)  UC5 reported his/her pain that day as a "3" on a scale of 1 to 10, with pain spiking to a "4" at times.  *Id*. at 20.  According to the Awerbuch Complaint, Dr. Awerbuch told UC5 there was a new drug available called Subsys that UC5 could use when the pain was bad and offered to provide UC5 a coupon so that the first thirty doses of Subsys would be free.  *Id*.  According to the Awerbuch Complaint, UC5 had never been diagnosed with cancer nor did UC5 represent that UC5 had ever been diagnosed with cancer or report severe pain.  *Id*.

141.    According to the Awerbuch Complaint, patient "D.G." began seeing Dr. Awerbuch due a back injury in 2008 or 2009.  *Id*. at 24.  As with UC5, Dr. Awerbuch told D.G. that Subsys was something new to manage pain, and D.G. took Subsys at the same time as fentanyl patches even though D.G. had never been diagnosed with cancer.  *Id*. at 25. According to the Awerbuch Complaint, D.G.'s spouse stated that D.G. became addicted to pain medications since he first began seeing Dr. Awerbuch and had to spend eight days in detox, followed by two days in rehabilitation in February 2014.  *Id*. at 24.

142.    The Awerbuch Complaint described additional patients of Dr. Awerbuch who had never been diagnosed with cancer, but were prescribed Subsys to treat various sources of pain, including back injury and chronic headaches.  *Id*. at 26-32.

### 4.    The September 8, 2014 Subpoena

143.    On September 12, 2014, the Company filed a Form 8-K revealing that four days earlier, the Company had received a subpoena issued pursuant to the Health Insurance Portability and Accountability Act of 1996, from the U.S. Attorney's Office for the District of Massachusetts.  According to the Company, the subpoena requested documents regarding Subsys and the Company's sales and marketing practices related to Subsys.

### F.    Confidential Witness Statements About the Company's Sales and Marketing Practices

144.    As discussed at various points herein, investigative interviews with a number of former employees of Insys have confirmed allegations made in the *qui tam* complaint, posted online at CaféPharma.com, and reported in THE NEW YORK TIMES.

145.    Confidential Witness 1 ("CW1") was employed at Insys as a Specialty Sales Professional from early 2012 to August 2012.  CW1 reported to Regional Sales Manager Tony Bryant until approximately July 2012; thereafter, Bryant was replaced by Alec (Alex) Burlakoff.

146.    CW1 had worked at other pharmaceutical companies prior to and after working for Insys, but not in the pain management field.  According to CW1, Insys used unethical methods to get scripts written and Burlakoff did things CW1 had never seen before in the industry.  CW1 was a regional trainer for his/her region, and stated that salespeople were not trained that Subsys was a severely-restricted opioid. Although Insys sales representatives were taught that the drug's indication was for breakthrough cancer pain, they could agree with the doctor that the drug was good for any pain spike.

147.    According to CW1, most sales people were young and naïve, with little or no experience in the pharmaceutical industry, so they were not aware of proper industry

practices when they joined Insys.  CW1 also opined that most of the sales representatives were extremely attractive women, and that he/she was hired to make the sales force appear to be more legitimate.

148.    According to CW1, Insys management's goal was to target pain drug addicts because a patient with cancer pain was probably not going to live much longer, so these patients were a small market.  CW1 said chronic pain patients were the "holy grail" because they would constantly refill their prescriptions.  Thus, patients with chronic pain or who would abuse the drug were much more lucrative customers.

149.    CW1 explained that while some of the Subsys prescribers had typical doctors' offices, other doctors' offices were quite different – mere locations where doctors with out-of-state license plates drove to, essentially, as drug dealers in town just to write prescriptions.[36]

150.    CW1 stated that the initial approach for sales representatives when Subsys first launched was to start patients at low dosages and titrate upwards to the "effective dose." However, as did the Relator, CW1 believed that the Company soon determined that the return on investment from this approach was not fast enough. According to CW1, Executive Chairman Kapoor was yelling at sales people to have the prescribers titrate up quicker. According to CW1, two different Regional Sales Managers told him/her that the message from the top was to have representatives to start patients on higher dosage levels. Additionally, as did the Relator, CW1 recalled conference calls and emails discussing the new dosage and conversions methods.

---

[36] This description fits Dr. Somerville's office in Corpus Christi, Texas, as described by a patient's daughter when the Texas Medical Board shut down the doctor's operations: "Now he sits here along with 45 other patients up there that he's (Somerville) got stuffed in his office. And none of them are going to get their medications today. No prescriptions, medications to make their pain go away." (*See* http://www.kristv.com/news/local-doctor-stopped-from-giving-out-meds.) Dr. Somerville's payments from Insys, more than $64,000 over five months (*see* Exh. D), show that they were made to two addresses in Laredo, Texas, where Dr. Somerville's other clinic is located. Laredo is 140 miles from Corpus Christi.

151.     According to CW1, Burlakoff took CW1 on field visits to observe Burlakoff talk to prescribers.  According to CW1, Burlakoff recommended to prescribers that new patients should start at 400 mcg of Subsys, and that prescribers should get patients to 800 mcg or 1600 mcg as quickly as possible.  According to CW1, for patients already taking Actiq or Fentora, Burlakoff advised prescribers and instructed sales representatives to advise starting patients as high as 800 mcg of Subsys.[37]  According to CW1, management wanted sales people to find patients using 1200 mcg or 1600 mcg of Actiq and convert them to 1600 mcg of Subsys as quickly as possible.

152.     According to CW1, some Subsys sales representatives would sit in their largest prescriber's office to help process prior authorizations and encourage the doctors to prescribe higher doses.[38]  According to CW1, Dr. Xiulu Ruan's ("Dr. Ruan") former Insys sales representative, before he/she was replaced by Joe Rowan, was very effective doing this.

153.     According to CW1, after Burlakoff arrived, the doctor speaker program became a kickback program for writing scripts.  According to CW1, Insys frequently hosted speaker programs which paid doctors an honorarium to speak about Subsys.  According to CW1, other drug companies generally hosted such dinner events with 10-50 attendees maybe twice a year.  According to CW1, after July 2012, Insys began hosting dinner programs with so few attendees (often just the doctor and one other attendee) on consecutive days that it was very suspect.  CW1's recollections confirm the Relator's allegations that the speaker program became a "poorly disguised kickback" vehicle.

---

[37] As discussed in ¶ 65, TIRF REMS regulations permit Subsys-Actiq conversion but the dosage is limited.  Even patients taking the highest dosage strengths of 1200 mcg or 1600 mcg of Actiq can only begin at a 400 mcg dose of Subsys, and the conversion is lower for Actiq users of lower dosage strengths.  There is no conversion permitted for patients switching from Fentora to Subsys.

[38] As explained by CW7, *infra*, this practice appears to have developed into the "ABL" program, where Insys paid a salary or partial salary to medical offices' employees who would perform similar functions.

AMENDED CLASS ACTION COMPLAINT
Lead Case No. CV-14-01043-GMS
59

154.     According to CW1, Dr. Ruan in Mobile, Alabama promised CEO Babich at a speaker event that if Babich hired Joe Rowan as a sales representative, Dr. Ruan would become the top prescriber of Subsys.  According to CW1, Rowan was hired and assigned to Dr. Ruan, who did indeed become a top prescriber of Subsys for certain periods.  According to CW1, Dr. Ruan's partner, Dr. Couch, was also a top Subsys prescriber and the two doctors had ownership interest in a pharmacy that dispensed Subsys.  (Exh. D reveals Insys paid  Dr. Patrick Couch $21,978.20 from August 2013 through December 2013, excluding the value of any food and beverage payments.)

155.     CW1 knew of another Insys sales representative who was fired and quickly replaced by the son of prescriber, a "Dr. Rosenberg" in the New York/New Jersey Area.

156.     Confidential Witness 2 ("CW2") was employed at Insys as a Specialty Sales Professional from approximately March 2012 to late 2012 and CW2 reported to Regional Sales Manager Tony Bryant until approximately July 2012, when Bryant was replaced by Alec Burlakoff.  After Burlakoff was promoted to VP of Sales, CW2 reported to Regional Sales Manager Joe Rowan.

157.     According to CW2, there was nothing about his/her initial training and materials that seemed improper.  However, just as CW1 recalled that the initial training omitted the fact that Subsys is severely restricted, CW2 indicated that the initial training did not cover the TIRF REMS Access Program or the severe FDA restrictions on Subsys usage, and that CW2 learned this sometime later during his/her employment.  According to CW2, he/she had no previous pharmaceutical sales experience, nor did about 80-90% of the other sales people.

158.     After Burlakoff became his/her Regional Sales Manager, CW2 became concerned about changes in sales practices such as blatant off-label promotion, which CW2 observed when, like CW1, Burlakoff took CW2 on field training to observe him in action.

159.    CW2 was so concerned about Burlakoff's field training that he/she contacted former sales manager Bryant to tell him what had happened.  According to CW2, Bryant told CW2 that he/she could not do that.

160.    Burlakoff wanted CW2 to collect patients' names and dates of birth with the rationalization that it was because the patients were getting their initial 60 doses of Subsys for free and Insys wanted to make sure the patients were actually receiving it.  According to CW2, Insys had provided up to nine months of Subsys free while a patient was being processed for insurance.  CW2 also stated that while he/she did not do so, he/she heard that some sales representatives reviewed patient medical records at the doctor's offices to see if they were taking other fentanyl products and could switch to Subsys.  (This appears to be a violation of patient privacy protections afforded by HIPAA.)

161.    According to CW2, the focus of sales was on profitability, and there would be contests to see who would get the most scripts and have the highest profitability.  (CW2 explained that because higher dosage strengths cost more, eight scripts for 100 mcg were worth less than two scripts for 1600 mcg.)  According to CW3, a confidential witness described below, the "SalesAll" email list also sent the sales representatives frequent updates about top sales representatives and their large commissions earned.

162.    Insys's compensation structure started at a base salary of approximately $40,000 per year, with additional commission based on scripts.  When CW2 first started at Insys, he/she did not recall any quotas or sales targets communicated.  However, when Burlakoff arrived, the pressure to sell increased.  Like CW1, CW2 recalled that Burlakoff told the sales representatives to start patients at doses higher than 100 mcg. Based on Burlakoff's orders, CW2 remembered that another salesman coined the slogan "Start them high and hope they don't die."

163.    According to CW2, treating cancer patients was not a real goal and that management expected off-label selling.  When CW2 asked his/her Regional Sales Manager Joe Rowan for an access pass to speak to doctors at a highly regarded cancer treatment and

research center in the United States, Rowan did not provide a pass and said not to focus efforts there.  As did CW1,  CW2 understood this conversation to mean that cancer patients were not a profitable segment.  According to CW2, Rowan only covered one doctor – identified by CW1 and CW3 as Dr. Ruan – and Rowan made $25,000 per quarter in commission servicing that doctor.

164.    Confidential Witness 3 ("CW3") was employed at Insys as a Specialty Sales Professional from early spring of 2012 to approximately March 2013.  CW3 reported to Regional Sales Manager Tony Bryant until approximately July 2012, when Bryant was replaced by Alec Burlakoff.  After Burlakoff was promoted to VP of Sales, CW3 reported to Joe Rowan.

165.    Prior to working at Insys, CW3 had no prior experience in the pharmaceutical industry.  According to CW3, corporate training covered HIPAA rules and proper sales protocols but selling off-label was the unofficial policy, especially when Burlakoff was hired.  According to CW3, the message in group settings was that they should not sell off-label, but during field training or one-on-one, CW3 was told how selling was really done.  CW3 noted that Tony Bryant was the only manager who did not direct him/her to sell off-label.  According to CW3, former VP of Sales Shawn Simon, Alec Burlakoff, and Joe Rowan each informed CW3 that it was important to suggest to prescribers that Subsys was suitable for any pain.  According to CW3, the sales representatives were directed to use the message that "pain is pain."  CW3 recalled frequently being told to tell prescribers that he/she heard from other doctors that they could start a patient already taking Actiq on higher dosages than those approved by the FDA.  According to CW3, Burlakoff and Rowan directed CW3 to tell prescribers that if they started a patient who was converting from another fentanyl product to Subsys at 100 mcg, the drug might fail to suppress pain and cause the patient to have a pain crisis.

166.    CW3 recalled receiving emails addressed to the "SalesAll" list which included information about the large bonuses various Subsys sales representatives were being paid.

167.    CW3 stated, as did CW1 and CW2, that the "speaker program" for doctors was funded based on results.  Thus, only a doctor who continued to write Subsys scripts would be allocated speaker program funds.

168.    Regarding nepotism, CW3 corroborated CW1's understanding that after Joe Rowan was hired, he became Dr. Ruan's new sales representative (and that Drs. Ruan and Couch owned and operated their own pharmacy, C&R Pharmacy, in Mobile, Alabama). CW3 also recalled that the son of prescriber named "Dr. Rosenberg," located in the New York/New Jersey area, was hired by Insys to be a sales representative.  CW3 believed that Dr. Rosenberg had participated in the Subsys speaker program.

169.    Confidential Witness 4 ("CW4") was employed at Insys from late 2013 through May 2014 as a Sales Operations Analyst and Marketing Liaison at Insys headquarters.  Prior to working at Insys, CW4 had never worked in the pharmaceutical industry.  CW4 reported to Senior Director of Operations, Xun (a/k/a Sean) Yu, and to VP of Sales Alec Burlakoff.  According to CW4, his/her duties at Insys included looking at gross net sales for the Company and updating patient and physician profiles in the Company's database.  According to CW4, the Company's internal database used information from the TIRF REMS database and a third party database provided by Wolters Kluwer (now provided by Symphony Health Solutions).  CW4 also ran weekly and daily sales reports for Executive Chairman Kapoor and the Board of Directors that reflected gross sales, net sales, and free products. Additionally, CW4 ran daily reports for VP of Sales Burlakoff on individual sales representatives, showing how many prescriptions had been written each day by the physicians covered by that representative.

170.    According to CW4, sales representatives were paid an annual base salary around $40,000, which was much lower than the normal industry base salary, but that Insys had an incentive compensation plan that changed every quarter, but typically rewarded sales representatives with quarterly commissions of about 5-10% of the retail price of drugs prescribed.

171.     According to CW4, Insys executives were keenly aware that Subsys sales were heavily dependent on a select number of physicians, such that Insys's top ten prescribers were generating the substantial portion of Subsys revenues.  Not only were there lists showing every prescriber, as well as the "top ten" and "top twenty" prescribers, but every prescriber was ranked within deciles based on his/her prescribing history in the last three months.  According to CW4, all Insys sales department employees, salespeople, and CEO Babich were on a "SalesAll" email distribution list that sent daily messages, such as these lists, to salespeople in the field.  CW4 stated that salespeople were also provided the names of every patient who had received a Subsys prescription with the prescriber's name[39] and the date of the prescriber's most recent Subsys script.[40]

172.     According to CW4, Insys executives knew that the top sales rep for Subsys was Brett Szymanski, who was earning up to $250,000 *per quarter* covering only one physician – Dr. Gavin Awerbuch.

173.     Several months before criminal charges were filed against Dr. Awerbuch, CW4 recalled that in late February and early March of 2014, many Insys executives, including Sales Manager, Rich Simon, Marketing Director, Mark Hein, and VP of Sales Burlakoff, were concerned about the investigation of Dr. Awerbuch.  CW4 was asked to prepare charts

---

[39] If the prescriber did not give consent to disclose his/her name, the name was withheld from the email list, but the sales representative for that prescriber would know the identity.

[40] The daily reports CW4 prepared for VP of Sales Burlakoff contained the information that corroborates the claims of the Relator and the accounts of various sales representatives herein concerning the pressure on the sales representatives coming from VP of Sales Burlakoff and Executive Chairman Kapoor, and the basis for much of the information in SalesAll emails on which CEO Babich was copied.  Thus, by tracking daily prescriptions written for each sales representative and physician covered, for example, Sean Yu had the ability to immediately send inquiries to sales representatives questioning why physicians wrote scripts for only 100 mcg or 200 mcg (as described in the Relator's complaint, *see* ¶ 128).  Similarly, this information enabled the Company to provide those in the "SalesAll" email list with frequent updates about top sales representatives and their large commissions earned (as described by CW3, *see* ¶ 166).

showing a possible 10% drop in revenue if Dr. Awerbuch could not write prescriptions. According to CW4, while present in a meeting with Hein and another employee, Hein discussed Dr. Awerbuch's troubles in detail, and said that other doctors were "wanting out" because they were concerned about enforcement agency pressure.[41]

174.    According to CW4, Executive Chairman Kapoor (often via conference call), VP of Sales Burlakoff, Director of Sales Richard Simon, then VP of Marketing Matt Napoletano, VP of Managed Markets Michael Gurry ("Gurry"), and Sean Yu had daily morning meetings and CW4 could overhear some of the discussions.  According to CW4, in late February and March of 2014, he/she overheard Insys senior management discussing Dr. Awerbuch during these daily morning meetings.

175.    Corroborating the sales representatives' reports of nepotism, CW4 also stated that he/she had overheard VP of Sales Burlakoff speaking about two instances where Insys hired sales representatives at the request of Subsys prescribers.  According to CW4, one concerned a Midwestern physician and the other a nurse of a Subsys prescriber.   According to CW4, the nurse who was hired had promised to make that physician the number one Subsys prescriber.

176.    CW4 also commented that 90% of the salesforce were attractive women that looked like models.

177.    Confidential Witness 5 ("CW5") was a Regional Sales Manager for Insys from late 2011 through the summer of 2012.  CW5 reported to the VP of Sales, who reported to CEO Babich.   As a Regional Sales Manager, CW5 managed a regional team of sales representatives at the time Subsys first launched its sales and marketing.  CW5 participated

---

[41] Physician concerns were also raised in a Café Pharma.com post by a sales representative for a competitor.  Long before Dr. Awerbuch's arrest, the poster indicated that the doctors the representative covered had stated the OIG and DEA were asking questions about Insys's sales practices for Subsys.

in meetings with Insys executives, including Executive Chairman Kapoor and CEO Babich, and the other Regional Sales Managers.

178.   According to CW5, in March 2012, Insys had a Subsys launch meeting for all members of the sales team in Phoenix.  On the second day of the meeting, ironically while the sales representatives attended a lecture on compliance, Executive Chairman Kapoor convened a special meeting with CEO Babich, then VP of Sales Shawn Simon, then VP of Marketing, Matt Napoletano, then Director of Managed Markets Jim Papazis, and all of the Regional Sales Managers (at the time: Mike Hemenway, Tony Bryant, Lisa Schechter, Frank Serra, and Darin Fila).  During the meeting, Executive Chairman Kapoor stated that he did not like the way that training was going, that the way the product was being sold was wrong, and that the sales training had to be focused only on the onset of action which was less than fifteen minutes.  CW5 expressed concern to the group, saying he/she had "a little problem" with this approach because the speed of the drug was a secondary endpoint and there had been no mention of the primary endpoint (which was efficacy).[42]  Executive Chairman Kapoor responded, "I don't give a damn about the primary endpoint, this is how we are going to sell it."  According to CW5, the other Regional Sales Managers said nothing but after the meeting they privately thanked CW5 for speaking up.  Publicly, no one ever agreed with CW5 when he/she raised ethical concerns.

179.   According to CW5, the Board of Directors were aware of and involved with Subsys sales efforts.  CW5 stated that when CEO Babich and (then) VP of Sales Simon would meet with the regional sales managers, CEO Babich said that the messages came "straight down from the Board [of Directors]."  For example, according to CW5, CEO

---

[42] According to a website that tracks FDA approval of new drugs:  "The primary endpoint was the summed pain intensity difference from baseline to 30 minutes after dosing … Subsys produced a statistically significantly greater reduction in pain intensity compared to placebo as measured by the Summed Pain Intensity Differences scale (SPID) at 30 minutes."  *See* https://www.centerwatch.com/drug-information/fda-approved-drugs/drug/1179/subsys-fentanyl-sublingual-spray.

Babich and Simon told the regional sales managers that the Board of Directors wanted to target sales efforts at the high prescribing doctors of Actiq and Fentora and to have sales representatives call on those doctors from two to five times a week.[43]   According to CW5, the members of the Board of Directors and the sales team had a list of physicians who were prescribing Actiq and Fentora, and the Board members were tracking the number of calls made by the sales representatives and who was being called.

180.    According to CW5, shortly after the Subsys launch, CEO Babich spoke directly to CW5 and expressed concern because sales were not taking off as expected.  CEO Babich asked CW5 for a report showing all of the patients who were at the lowest dosage of 100 mcg with the name of the prescribing doctor.  CW5 stated that CEO Babich wanted the report sent to the sales representatives with the message "we need to target these people" to increase their dosage.[44]   According to CW5, he/she explained to CEO Babich that it took time to get a new drug into the market and that it was normal to take a few months before any sales started coming in.

181.    When CW5 resigned from the Company, a replacement had already been lined up.  After leaving, CW5 maintained strong ties to certain members of the sales team, including other Regional Sales Managers and former sales representatives in CW5's territory such that CW5 was aware of changes that occurred at Insys immediately after he/she left.

182.    According to CW5, in late July or early August of 2012, CEO Babich and Executive Chairman Kapoor called an emergency meeting in Phoenix with then VP of Sales Simon, and all of the Regional Sales Managers.  CW5 was told the meeting was very tense, and Executive Chairman Kapoor and CEO Babich directed the regional sales managers to

---

[43] In light of the fact that Subsys was a late entry into a crowded market, such a strategy clearly made sense.

[44] As the confidential witnesses confirmed, unlike his predecessor, once Burlakoff became Regional Sales Director and then VP of Sales, he was on the same page as CEO Babich – urging the sales force to get physicians to start patients at a dosage strength higher than the FDA-mandated 100 mcg.  *See* ¶¶150-151, 162, 165.

fire specific people.  According to CW5, the meeting discussed Subsys and techniques for increasing sales.  Shortly after this meeting both Mike Hemenway and Lisa Schechter were also fired.

183.    CW5 stated that he/she had trained his sales representatives to sell ethically, but that other regional sales managers did not.  After CW5 left Insys, some of the sales representatives with which he/she remained in contact were concerned about the change in Insys's sales and marketing practices.  One of his/her former sales representatives told CW5 that Burlakoff was training sales representatives to promote the product illegally.  Additionally, CW5 was told that Burlakoff instructed the sales representatives to park themselves at the doctors' offices to get scripts written.

184.    Confidential Witness 6 ("CW6") was a Prior Authorization ("PA") Specialist in the Insys Reimbursement Center from early 2013 to May 2013.  CW6 and a few others reported directly to the Manager of Reimbursement Services, Elizabeth "Liz" Gurrieri ("Gurrieri").  Gurrieri reported to VP of Managed Markets Gurry.  According to CW6, he/she earned $17 per hour; however, the employees in the PA department would share a $25 bonus for each prescription written.  After bonuses, his/her net paycheck for a two-week period could be as high as $2,200.

185.    According to CW6, his/her job as a PA specialist was to qualify patients to receive Subsys.  Specifically, CW6 said he/she would call the PBMs (pharmacy benefits managers) who worked at third-party companies like SilverScript and Medico to get Subsys prescriptions approved for the patients.  According to CW6, when approval was granted, CW6 would inform the prescribing doctor's office. According to CW6, training of the PA Team was conducted by VP of Marketing Napoletano and then Associate Product Manager Lindsey Clancy, with occasional input from CEO Babich.  According to CW6, Napoletano provided him/her with a disk that described peripheral neuropathy and Gurrieri provided a "cheat sheet" to the team for each company, such as Medico or Blue Cross/Blue Shield, containing a list drugs and diagnoses that had worked in the past to gain authorization. CW6

explained that the cheat sheet was important because some diagnoses, such as peripheral neuropathy, did not work for all PBMs, requiring him/her to call the prescriber to ask for the diagnoses to be changed. According to CW6, the PA Team regularly updated these lists based on meetings where they shared successful prior authorization experiences.

186.    According to CW6, on the first day of training, Gurrieri coached CW6 to impersonate someone from a doctor's office. According to CW6, Gurrieri trained CW6 to represent to the PBMs that CW6 worked at and was calling from a doctor's office, not Insys. Gurrieri told CW6 this was necessary because only doctor's office employees could call the PBMs for prior authorizations. CW6 indicated that CEO Babich would stop by and check in with the PA Team to see how prescriptions were getting approved and that Babich was told the PA Team was being trained to tell pharmacy benefits manager that they were calling from the doctor's office.

187.    CW6 explained that the PA Team was trained and directed to conduct various techniques to gain approval. According to CW6, when the PBM called to ask what Subsys was being prescribed for and if the patient had tried other medications due to "step-therapy"[45] policies, the PA Team was instructed to lie about the other drugs the patient had taken; the PA Team was given the cheat sheet lists of other drugs, as described in ¶ 185, *infra*, and they were trained to tell the PBM that the patient had taken drugs from that list, even though the patient had not taken the drugs.

188.    CW6 stated that the PA Team was "helping" the prescriber by handling all of the paperwork involved in getting prior authorization from the insurance company, paperwork that would normally have to be done by the doctor's staff. Sometimes the

---

[45] "Step-therapy" or "step edit" is a process that insurance companies use to reduce prescription drug coverage costs. For certain medications, step therapy is used to ensure that pre-determined lower cost medications or generic alternatives have been used before a more expensive medication is authorized for coverage. If step therapy is not used, the insurance company may decline authorization and require a patient to pay for all or part of the medication out-of-pocket. *See e.g.*, http://www.bcbsm.com/index/health-insurance-help/faqs/plan-types/pharmacy/what-is-step-therapy.html.

1   insurance companies would call doctors' offices to determine that the Insys employee was a

2   valid employee of the doctor's office.  According to CW6, many prescribers had informed

3   their staff to affirm that the Insys employees were indeed employees of the doctor's office.

4        189.   CW6 also stated that the PA Team was directed to tell PBMs that a

5   prescription had been written for a three-month supply even when the prescription specified

6   a one-month supply.

7        190.   CW6 said that CEO Babich was actively engaged in assisting the PA Team to

8   obtain approvals.   For example, some PBMs became suspicious that their caller IDs

9   displayed that the PA Team member was calling from an Arizona area code but claimed to

10  be calling from a doctor's office located in another state.   CW6 stated that when the PA

11  Team informed CEO Babich of this problem, CEO Babich said he would arrange for the PA

12  Team to get a phone system that would mask the outgoing phone number.  On or about

13  February 28, 2013, when the PA Team moved into new offices across the street from Insys

14  headquarters, a new phone system had been installed which masked their numbers from

15  appearing on caller ID.  According to CW6, the PA Team was so favored by CEO Babich

16  that they would frequently ask him for office accessories and decorations, such as new

17  drapes, that they did not need, just to see if they could obtain them  – and they often did.

18       191.   According to CW6, every Wednesday, Gurry and Gurrieri would lead a PA

19  Team meeting, and CEO Babich would often visit on Thursdays to get an update.  Although

20  formal meeting notes were not taken, CEO Babich would talk to the team and they would

21  discuss methods that successfully worked to obtain authorizations.  Sometimes a PA Team

22  member would explain to CEO Babich what techniques were used to get a difficult

23  authorization and CEO Babich would be both pleased and surprised that certain patients

24  were approved.  According to CW6, in such cases, and with high dosage approvals, CEO

25  Babich would often reward the team with lunch.

26       192.   According to CW6, prior to February 28, 2013, the PA Team was in the main

27  corporate office and CEO Babich stopped by two or three times a week.  According to CW6,

28

after the team moved into the office across the street, CEO Babich would visit a few times a month.

193.    According to CW6, CEO Babich and the PA Team knew that Subsys usage was primarily off-label because the PA Team was given the patient's information with the diagnosis and the list of the drugs that the patient had already taken.  According to CW6, the percentage breakdown of different diagnoses had been calculated and Gurry and Gurrieri had presented this information to the PA Team and CEO Babich.  According to CW6, the majority of prescriptions were written for peripheral neuropathy caused by diabetes, lower back pain, and sciatica, in that order.  According to CW6, only 10% of the prescriptions reflected cancer as a diagnosis, and it was such a rare occurrence that every time the PA Team saw cancer as a patient's diagnosis, they would get "stoked."

194.    According to CW6, the PA Team was involved in the training of the sales representatives so that the sales representatives knew what to tell prescribers regarding which diagnoses would get authorized so that the physician did not exclude off-label use.  For example, CW6 said that the sales representatives were taught to say things such as "Subsys works great on this diagnoses (like lower back pain), too."   According to CW6, during the training then-VP of Marketing Napoletano instructed the sales representatives to use the term "breakthrough pain" instead of "breakthrough cancer pain" with the physicians.

195.    According to CW6, in April 2013, CW6 was involved in training at a sales conference in Scottsdale, Arizona.  According to CW6, the training included break-out sessions, consisting of a Regional Sales Manager, approximately five sales representatives, and one prior authorization specialist.  According to CW6, after about 15 minutes with one prior authorization specialist, the attendees would rotate to another prior authorization specialist because each specialist had a different technique.  At this sales conference, CW6 became friendly with Brett Szymanski, the sales representative at Insys who covered Dr. Awerbuch.

196.     Because of CW6's friendship with Szymanski, CW6 learned that VP of Sales Burlakoff had dinner with Dr. Awerbuch and offered him incentives for prescribing Subsys. Although CW6 did not know the exact nature of the incentives, CW6 was told that Dr. Awerbuch received a percentage commission based on the number of Subsys prescriptions written and the strength of the dosage.  According to Exh. D, Insys paid Dr. Gavin Awerbuch total of $53,085.24 in the period from August 2013 through December 2013, excluding the value of any food and beverage payments.

197.     Confidential Witness 7 ("CW7") was employed at Insys from early 2014 through the summer of 2014.  CW7 was working at the headquarters of a multi-office pain management clinic when he/she was approached by Sunrise Lee about a job opportunity. CW7 met with Lee and VP of Sales Alec Burlakoff, and Burlakoff explained that the position was for an Area Business Liaison ("ABL") but that Insys primarily wanted to hire CW7 for his/her contacts.  When CW7 expressed a desire to remain with his/her current employer, Burlakoff said that they would keep it a secret that CW7 worked for Insys. During the meeting, Burlakoff offered CW7 an annual salary of $35,000, a monthly car allowance of $1,000, and a quarterly bonus of $6,500.  The compensation from Insys was independent and additional to CW7's salary from the pain management clinic.  CW7 accepted the offer and reported to Regional Sales Manager Rick Horrocks ("Horrocks"). Horrocks reported to Sunrise Lee and Lee reported to VP of Sales Burlakoff.

198.     According to CW7, in February 2014, very shortly after accepting the position at Insys, CW7 was flown to a National Sales Meeting in Phoenix.  According to CW7, of the 15 or 20 other people being trained on how to sell Subsys, three were ABLs and the rest of the group were sales representatives.  According to CW7, the training was held separately from the sales meeting and was conducted by Insys managers.  According to CW7, the three days of training included about ten different speakers and they visited the Insys Reimbursement Center ("IRC") which handled prior authorizations.

199.    According to CW7, they were instructed during the training to say "breakthrough pain" to prescribers without mention of cancer pain, and that a 100 mcg dose of Subsys did not work for any patient because "they would not feel it" at that dosage strength.  CW7 also stated that they were told to focus on doctors who were part of pain management groups, and that if the doctor was not present, they were to wait for the doctor at the back door.

200.    According to CW7, on the first day of the national training, there were role-playing exercises that taught the group how to sell Subsys.  On this first day, sales representative Warren Day ("Day") bragged about his sales skills and about his relationship with one of his doctors.  According to CW7, Day claimed to have his own office and a key to the building inside the office of pain management specialist Dr. John Milnor.[46]  According to CW7, Day said he would assist the doctor with personal care because the doctor had health issues; and that Day was moving Dr. Milnor into Day's home to take care of the doctor and help the doctor go to work.  According to CW7, Day said he wheeled the doctor around in his wheelchair, helped him put on his socks, and made sure Dr. Milnor took his Subsys, because the doctor himself used Subsys.  According to CW7, Insys had recruited an employee of Dr. Milnor to become an ABL, but that employee quit Insys shortly after being hired.

201.    According to CW7, it was very clear that Horrocks wanted CW7 to promote Subsys off-label.  When CW7 asked Horrocks how to titrate down a patient's dosage, Horrocks said that he did not know anything about the product and he only wanted to know about CW7's sales numbers.  According to CW7, Horrocks insisted that CW7 get one new prescription a day.

202.    According to CW7, he/she saw reports that showed that only 5 out of 800 Subsys patients a month were cancer patients, and the rest of the diagnoses related to other

---

[46] Dr. John Pervis Milnor III in Memphis, Tennessee, received $3,366.12 from Insys from August 2013 through December 2013, including a $2,500 "consulting fee."  *See* Exh D.

kinds of pain such as back pain and peripheral neuropathy.  CW7 corroborates CW6's discussion that very few patients who took Subsys had a pain diagnoses related to cancer.

203.    According to CW7, Insys sales representatives reviewed patient information and sometimes took patient information home with them.  Additionally, sales representatives would go to doctors' offices and pull the charts of any patient who was taking narcotics to see if they could be switched to Subsys.  CW7 stated that he/she worked closely with one sales representative, and one of CW7's responsibilities was to introduce that representative to people at CW7's medical clinic.

204.    Over time, CW7's role as an ABL expanded and he/she became increasingly more involved in sales.  CW7 said that he/she and the sales representative would go into hospital rooms with patients and assist nurses by teaching the patients how to titrate up to an effective dose, to wit, patients would take one dose every five minutes until the pain was gone.[47]  In the two times CW7 was involved in titrating patients, CW7 started patients at 100 mcg doses.  However, the sales representative would sometimes start a patient at 200 mcg because insurance would cover it.  Once the patient's dose was correct, the patient would receive a new prescription at the higher dose for a longer period. CW7 said that sometimes you would start a patient at 400 mcg or 600 mcg.[48]  CW7 said the higher doses were necessary because the patients were on other drugs, and the goal was to get them off all other opioids so that a patient would only need Subsys three or four times a day and would not feel drugged all the time.   (Although wanting patients to live without feeling doped up all day may be an admirable goal, Subsys was approved as a supplement to 24/7 opioid treatment, to treat breakthrough pain, not as a substitute for a patient's current opioid treatment.)

---

[47]  Apparently, visiting hospital rooms and instructing patients on how to titrate up was standard operating procedure for many Insys sales representatives.  CW7 reported that one visit ended in the death of the patient being titrated up.  The sales representative, named "Angela", was extremely shaken up and did not return to work for quite some time.

[48]  Once at the correct dose strength, patients were taught to wait 30 minutes before taking another dose, even if the pain continued, so as not to overdose.

205.    According to CW7, the sales representative had set up several Subsys speakers, who could be paid up to $3,000 per event, and could have multiple events during one month. CW7 believed that speakers could earn between $8,000 and $10,000 a month.  According to CW7, he/she had assisted by calling doctors and working out schedules for the speaker programs.

206.    According to CW7, he/she had attended a meeting with Horrocks and a physician assistant.  During the meeting, the physician assistant asked what he had to do to become a speaker and Horrocks said, "Give me 35 patients I will make you a speaker."

207.    CW7 stated that in April 2014, there was a mandatory compliance meeting in Phoenix for all of the sales representatives and ABLs.  According to CW7, VP of Sales Burlakoff led the training and told sales representatives and ABLs that they could no longer be doing what they had been trained to do.  Sales representatives were not to titrate patients' dosages nor send emails containing the names of patients or describing any problems the sales representative was having with doctors or patients.  Anyone violating the email rule would be fired.  Another big change was that sales representatives were told to focus on cancer patients.  However, just as the formal training of other confidential witnesses had been "by the book," with the one-on-one ride alongs being the place where the off-label sales message was communicated by senior employees, during ride-alongs after the April 2014 sales meeting, Horrocks indicated that he still expected CW7 and the sales representative to get one new script a day – even though CW7 stated there were simply not enough cancer patients to achieve that goal.  Horrocks refused to accept that response and repeatedly said to pitch that Subsys was good for any breakthrough pain and could be prescribed at a doctor's discretion.

208.     According to CW7, ABL Kourtney Gildner ("Gildner") spent all of her time in Dr. Gavin Awerbuch's office.  According to CW7, shortly after  Dr. Awerbuch was indicted, both Gildner and Awerbuch's sales representative, Brett Szymanski, were promoted.[49]

209.     According to CW7, one of the sales representatives was Dr. Larry Dillaha's good friend.  That sales representative told CW7 that Dr. Dillaha told her that he had to get out of Insys because of everything that was going on.  According to CW7, about a month after this conversation, Dr. Dillaha sold his stock and quit Insys.[50]

210.     According to CW7, he/she was once directed to dispose of Subsys improperly so that the sales representative would still get credit for the sale.  According to CW7, a patient had returned about 150 packets of Subsys, which was a 90-day supply plus enough to titrate up to a higher dosage.  However, Horrocks told CW7 not to send the Subsys back, but to take the Subsys packets home and to squirt the medication down the toilet.  According to CW7, Horrocks said he had done this as well, so that they still got credit for the sale.

**IV.     HAVING ESTABLISHED ITSELF IN THE MARKET, INSYS GOES PUBLIC**

211.     Although Insys had been primarily funded since its inception by its majority shareholder and founder, Executive Chairman Kapoor, the Company had been eager to go public since March 2011, when it filed its initial Form S-1 with the SEC.  At the time, neither of its products had been approved for sale and marketing by the FDA.  After a flurry of activity, during which time the Company responded to a series of comments by the SEC,[51] the Company halted the offering process in the fall of 2011.

---

[49] According to their public LinkedIn profiles, in June 2014, Gildner's title at Insys changed from Area Business Liaison to Administrative Assistant and Szymanski's title changed from Specialty Sales Representative to District Sales Manager.

[50] Dr. Dillaha left Insys in early April 2014.  Thus, Lead Plaintiff is informed and believes, and based thereon alleges, that the reference to "everything that was going on" was to the discussions at headquarters among senior management about the OIG and DEA speaking to doctors about Insys's sales practices and concerns about Dr. Awerbuch being shut down.

[51] One of the comments concerned the fact that while the midpoint of Insys's proposed offering range was $15, the same facts used to justify that price were not considered

212. Once defendants started on their new aggressive course of sales and marketing in late 2012, Subsys revenues began to skyrocket. With Subsys net revenues for Q1'14 exceeding Subsys net revenues for all of 2012 (approximately nine months of sales), the Company decided to offer its shares to the public once again.

213. On May 2, 2013, the SEC declared effective the Form S-1 that Insys filed on March 30, 2011, and repeatedly amended until on or about May 2, 2013, when the Company filed with the SEC the final Form S-1/A (collectively, the "Registration Statement") for its "IPO". Additionally on or around this day, the Company filed with the SEC its IPO Prospectus, which forms part of the Registration Statement, (collectively, the "Registration Statement").

## V.    MATERIAL MISREPRESENTATIONS AND OMISSIONS DURING THE CLASS PERIOD

214. On November 8, 2013, an analyst for Oppenheimer previewed Insys's results for Q3'13. The title of the report was "Highlight on Units Per Script." In the report, the analyst noted that while Symphony Health reported that the number of scripts was up 54% quarter-over-quarter, the number of units sold increased by 81%.[52]  For this reason, Oppenheimer predicted revenues would exceed consensus by $4-5 million. In addition, the analyst looked forward to Insys explaining the reason for a recent uptick in weekly Subsys prescriptions. Thus, as the Company's earnings report approached, investors were led to expect that Insys would have another record quarter.

215. On November 12, 2013, Insys filed a press release entitled, "Insys Therapeutics Reports Third Quarter 2013 Results." Therein, in relevant part, the Company stated:

---

important by Insys when it estimated the value of 31 million shares granted by option in March 2011 at $4.88. *See* SEC Correspondence dated July 11, 2011. In 2013, Insys had discussed pricing at $15-16 but ultimately priced at $8 per share.

[52] This is consistent with CW6's statement, at ¶ 189, that the PA Team would tell PBMs that a script had been written for three months when it had only been written for one month.

Insys Therapeutics, Inc. (Nasdaq: INSY), a specialty pharmaceutical company with focus on supportive care products for cancer patients, today announced its financial results for the three months ended September 30, 2013.

Highlights of the 2013 third quarter included:

- Total net revenue increased to $29.2 million in the third quarter of 2013 versus $4.8 million for the third quarter of 2012;
- Revenues from Subsys® (fentanyl sublingual spray) were $28.4 million, up 1,002% over third quarter of 2012 levels and up 53% as compared with the second quarter of 2013;
- Net income of $11.6 million and diluted earnings per share of $0.51, compared to a net loss of $4.3 million ($0.46 per share) for the third quarter of 2012; and,
- Listing of two U.S. Patents covering Subsys use and formulation in FDA's Orange Book.

*"Our strong results this quarter were driven by continued prescription growth of the Subsys franchise to alleviate breakthrough pain for cancer patients," said Michael L. Babich, President and Chief Executive Officer.* "The product, with its simple, one-step administration system, has captured over 30% share of the transmucosal immediate-release fentanyl (TIRF) market, and we aim to drive further growth through execution of our marketing strategy."

Sales and marketing expense was $8.0 million during the third quarter of 2013, compared to $2.9 million for the third quarter of 2012. The increase was a result of higher sales compensation expenses associated with the increase in sales of Subsys and increased marketing expenses during the third quarter of 2013.

(Emphasis supplied).

216. Also, on November 12, 2013, Insys held a conference call to discuss Q3'14 earnings with investors and analysts. CEO Babich and CFO Baker attended the call on behalf of Insys. During the conference call, CEO Babich stated:

Our strong financial results were driven by increased prescriptions written by medical professionals for Subsys. This proprietary single-unit dose device delivers an opioid analgesic for transmucosal absorption underneath the tongue. Subsys has the most rapid onset of action of any transmucosal immediate-release fentanyl, or TIRF product. Its rapid five-minute onset is an important

feature to the increasing number of opioid-tolerant cancer patients for whom Subys is prescribed to alleviate breakthrough pain.

217.    These two statements (the highlighted portion of the press release and the material from the conference call quoted in the previous paragraph) by CEO Babich are materially misleading because they indicate that Insys's strong results were based upon the popularity of Subsys among opioid-tolerant cancer patients because it is easy to use and the fastest acting TIRF drug on the market.  Instead, as set forth herein, Insys's "strong financial results" were driven by off-label prescriptions for Subsys, written at higher strengths than permitted by the FDA's TIRF REMS protocols, by doctors being paid kickbacks to write prescriptions to those suffering from various ailments other than breakthrough *cancer* pain – some of which diagnoses the black box label expressly states Subsys is contraindicated.

218.    As alleged herein, when Insys and CEO Babich made these statements, CEO Babich knew Subsys's strong sales were not driven by continued prescription growth "of the Subsys franchise to alleviate breakthrough pain for cancer patients," because:

a)    Real time prescription information from the TIRF REMS administrator, as well as other services, alerted CEO Babich and the Company to the fact that only a fraction of the doctors writing prescriptions were oncologists. THE NEW YORK TIMES placed the number of oncologists prescribing Subsys at 1%.  *See* ¶ 31;

b)    A Prior Authorization specialist stated that CEO Babich was told that the majority of prescriptions for which the PA Team sought to obtain third-party payor coverage were written for peripheral neuropathy caused by diabetes, lower back pain, and sciatica, in that order.  According to CW6, only 10% of the prescriptions for which coverage was sought reflected cancer as a diagnosis (¶ 193);

c)      CW7 saw records in 2014 indicating the number of Subsys patients who had a cancer diagnosis (at least in that group of records) was as low as 1% (¶ 202);

d)      At a September 19, 2012, national sales meeting, at which CEO Babich and other management attended, when a sales representative asked how to deal with a physician's question that 80% of Subsys sales were off-label, someone in management said that the answer was to explain that evidence showed that "breakthrough pain is the same as breakthrough cancer pain."  (¶ 130);

e)      A pain specialist, Dr. Xiulu Ruan told CEO Babich that if he hired Joe Rowan as a sales representative, Dr. Ruan would become the top Subsys subscribers (which, according to CW1 for a time, he was).  *See* ¶ 154. Dr. Ruan's website references cancer pain as only one of the many conditions his office treats;[53]

f)      CEO Babich was on the daily "SalesAll" email list which, among other things, circulated lists containing the names of the top Subsys subscribers and the identities of physicians who wrote scripts.  Therefore, CEO Babich was keenly aware of the medical specialty of the physicians prescribing Subsys.  For example, Dr. Awerbuch, who wrote 20% of all Subsys prescriptions covered by Medicare, is a neurologist.  Indeed, the Awerbuch Complaint described in detail how Dr. Awerbuch's prescribed Subsys to persons who did not have cancer.  *See* ¶¶ 140-142;

g)      Several former sales employees noted that management did not want the sales force to focus sales efforts on oncologists, but rather doctors

---

[53] In a part of Dr. Ruan's website listing "the most common conditions treated at our offices," cancer pain is nowhere to be found.  It is on another page, with a list of a dozen "Other Chronic Pains."  *See* http://www.ppsa-pc.com/.

1    who prescribed pain medicine to non-cancer patients because they would live

2    longer and become repeat users.  *See* ¶¶ 109, 116, 148; and

3             h)     The primary endpoint for which Subsys was approved was

4    efficacy, not rapid onset of action.  *See* ¶ 178 & n. 42.  At a meeting attended

5    by Executive Chairman Kapoor, CEO Babich, the former Vice Presidents of

6    Sales and Marketing, and the Regional Sales Managers, when CW5 stated that

7    rapid onset was not a primary endpoint on which FDA approval was based,

8    Executive Chairman Kapoor responded, "I don't give a damn about the

9    primary endpoint, this is how we are going to sell it".

10        219.    On November 12, 2013, Insys filed its Quarterly Report with the SEC on Form

11   10-Q for the 2013 fiscal third quarter.  The Company's Form 10-Q was signed by

12   Defendants Babich and Baker, and reaffirmed the Company's statements previously

13   announced that day.

14        220.    The Form 10-Q also stated, at p. 15: "Generally, repeat Subsys patients receive

15   significantly higher doses of Subsys on average than first-time patients as patients are titrated

16   from a starter dose of Subsys to their effective dose in accordance with the TIRF REMS

17   protocol."  This statement was materially false or misleading when made, and made with

18   scienter, because senior management, including Executive Chairman Kapoor, decided by the

19   fall of 2012 that doctors should be dissuaded from starting patients on Subsys at the 100 mcg

20   FDA-mandated "starter" dose, and to instead start patients on 400 mcg because it was more

21   profitable to the Company.  (In fact, although the 100 mcg starter dose was the most

22   common dose prescribed and sold to patients in 2012, in 2013 and Q1'14, the 100 mcg dose

23   was less than 10% of all Subsys sales, even though it was the FDA-mandated starter dose for

24   all new patients, including those switching from other TIRFs (other than Actiq) or fentanyl

25   products.  *See* ¶ 106.)  This message, which is completely contrary to commencing Subsys

26   use with the FDA-mandated "starter dose," was communicated to the sales force on a

27   number of occasions and in a number of ways, including:

28

AMENDED CLASS ACTION COMPLAINT
Lead Case No. CV-14-01043-GMS
81

a)      An email from CEO Babich and VP of Marketing Napoletano to the sales force on September 13, 2012, stating that the company adopted a new dosing message that would be communicated at the sales meeting next week (¶ 127);

b)      An email from VP of Sales Burlakoff to Southeast Regional representatives on September 13, 2012, copied to CEO Babich and Executive Chairman Kapoor, indicating that each time a prescription was written for less than the 400 mcg, the sales representatives would have to follow up with the doctor and then explain why.  The email also stated that 100 mcg and 200 mcg doses would not work and it was better to let the competition get the sale and try to convince the doctor to write an "effective dose" at a later date (¶ 128).  A similar letter went from VP of Sales Burlakoff to the entire sales staff several days later, on September 17, 2012, copied to CEO Babich and VP of Marketing Napoletano, letting sales representatives know that they will have to explain every prescription written for 100 mcg and 200 mcg;

c)      At the sales meeting on September 19, 2012, CEO Babich told sales representatives to tell doctors that while they are supposed to start patients at 100 mcg, that they heard that other doctors were starting patients taking 800 mcg of Actiq at 400 mcg of Subsys.  (¶ 131).  The FDA-mandated conversion dose for someone taking 800 mcg of Actiq is 200 mcg of Subsys. (¶ 65);

d)      CW1 witnessed VP of Sales Burlakoff telling doctors to start patients at 400 mcg and to titrate up to 800 mcg or 1600 mcg as soon as possible (¶ 151) and recalled receiving the same or substantially similar emails as the Relator with respect to the Company's new "effective dosing" message (¶ 150); and

e)      CW3 was told by VP of Sales Burlakoff to tell physicians that if a patient is switched to Subsys from another fentanyl product at the starter dose of 100 mcg, the patient could suffer a pain crisis.  (¶ 165).

221.    The Form 10-Q contained required Sarbanes-Oxley Certification in which both CEO Babich and CFO Baker certified, in exhibits 31-1 and 31-2 respectively, that:

1.    I have reviewed this quarterly report on Form 10-Q of Insys Therapeutics, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis supplied).

222.    Additionally, in the Certification pursuant to 18 U.S.C. Section 1350, and adopted by the Sarbanes-Oxley Act, CEO Babich and CFO Baker certified, in Exhibits 32-1 and 32-2 respectively, with the only difference being the name and title of the declarant, that:

In connection with the Quarterly Report of Insys Therapeutics, Inc. (the "Company") on Form 10-Q for the period ended September 30, 2013 as filed with the Securities and Exchange Commission on the date hereof (the "Periodic Report"), I, Michael L. Babich, President and Chief Executive Officer of the Company, certify, to my knowledge that:

(1) The Periodic Report, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Periodic Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

223.    These SOX certifications were false when made and made with scienter for the reasons set forth in ¶¶ 218 and 220, above.

224.    The Company's impressive results for Q3'13 beat analysts' consensus for revenues and earnings, yet again. Although there was some concern about a slight delay in submission of a filing with the FDA for oral dronabinol, analyst coverage with respect to

Subsys was quite positive.  As a result, on November 13, 2013, Insys closed at $29.54, up $2.29 on heavy trading volume.

225.   On December 12, 2013, after the market close, the Company issued a press release entitled, "Insys Therapeutics Receives Subpoena From Office of Inspector General." Therein, the Company, in relevant part, stated:

> Insys Therapeutics, Inc. (Nasdaq: INSY) announced today that it has received a subpoena from the Office of Inspector General of the Department of Health and Human Services ("HHS") in connection with an investigation of potential violations involving HHS programs. The subpoena requests documents regarding Subsys®, including Insys' sales and marketing practices relating to this product. Insys intends to cooperate with the investigation.

226.   On this news, shares of the Company's stock declined $4.70 per share, nearly 16%, to close at $25.37 per share on December 13, 2013, on unusually heavy trading volume.

227.   On January 13, 2014, after the market close, a press release entitled "Insys Announces Details of Product Development Pipeline" was released by the Company. Therein, Insys, in relevant part, stated:

> Insys Therapeutics, Inc. (NASDAQ: INSY) today unveiled details of its portfolio pipeline, focused on innovative supportive care and therapy products. The Company intends to file one New Drug Application (NDA) and at least three Investigational New Drug (IND) applications with the Food and Drug Administration (FDA) in 2014.
>
> "We are advancing a robust pipeline of product candidates leveraging our sublingual spray technology, our expertise in working with cannabinoids, and potential label expansions for SUBSYS, our flagship product for breakthrough pain in opioid-tolerant cancer patients. Each of these projects aligns with our goal of commercializing innovative pharmaceutical therapies that will provide pain relief and other benefits to patients via our proprietary drug delivery platform," said Michael L. Babich, President and Chief Executive Officer.
>
> Dronabinol Oral Solution
> Insys expects to file an NDA for its proprietary Dronabinol Oral Solution by the second half of 2014. The Company believes that this product, if approved, may offer advantages including more consistent bioavailability, faster onset of

action and more flexible dose titration as compared with currently available dronabinol product.

Sublingual Spray Products

Insys is currently completing preclinical work on three products that utilize its proprietary spray technology platform and will expand its supportive care franchise:

- Buprenorphine (semi-synthetic opioid to treat moderate and acute chronic pain)
- Buprenorphine/Naloxone (opioid antagonist to treat addiction)
- Ondansetron (serotonin 5-HT3 receptor antagonist used mainly as an antiemetic to treat nausea and vomiting following chemotherapy)

Initial proof-of-concept studies suggest that sublingual spray delivery of these known chemical entities will offer a desirable pharmacokinetic profile for the intended patient populations. The Company expects to file INDs for these product candidates in the second half of 2014.

Insys has initiated preclinical development of three additional sublingual spray candidates:

- Sildenafil (the active ingredient in Viagra)
- Diclofenac (a non-steroidal anti-inflammatory drug (NSAID) taken or applied to reduce inflammation and as an analgesic reducing pain)
- Ketorolac (for short-term management of moderate to moderately severe pain requiring analgesia at the opioid level)

Potential SUBSYS Label Expansion

The Company also intends to initiate Phase IV studies of SUBSYS® (fentanyl sublingual spray), **which is currently indicated to manage breakthrough pain in opioid-tolerant adult cancer patients, to explore its potential utility in the following additional indications and applications**:

- **Dyspnea (incidental shortness of breath)**
- **Pain procedures in office setting**
- **Emergency room situations in hospitals**
- **Emergency room for oncology patients**
- **Burn patients**
- **Pediatric use**

(Emphasis supplied).

228.    Additionally, on January 16, 2014, CEO Babich and CFO Baker made a presentation at the 32nd Annual J.P. Morgan Health Conference.  The slides used at this presentation, in relevant part, stated:

**Investment Highlights**
- Commercial-stage specialty pharmaceutical company focused on innovative supportive care products
  - **Subsys®:** Proprietary sublingual fentanyl spray for breakthrough pain in cancer patients
    - Launched in March 2012 through Insys sales force
    - Over 30% market share
  - **Proprietary, oral dronabinol solution:** clinical dossier complete for planned NDA submission
  - **Pipeline:** Multiple future applications of spray technology in development
    - Well-defined markets lacking innovation with significant patient needs
    - Known molecules – 505(b)(2) pathway
- Three consecutive quarters of increasing profitability
  - Q3 2013 revenues: $29.2 M
- Strong balance sheet: $32.1 M in cash, cash equivalents & restricted cash + debt-free

*        *        *        *

**Cost-Efficient Commercialization**
- Incentive-based sales force focused on supportive care market
- Compensation weighted towards performance-based bonus
- Targeting concentrated prescriber base
- Well-defined message
- Strategy
  - Build NRx
  - Titrate repeat patients to effective dose

*        *        *        *

**Subsys – Sublingual Fentanyl Spray**
- Profitable within one year of Subsys launch
- Indicated for breakthrough pain in opioid-tolerant cancer patients
- Total 2012 TIRF U.S. Sales of $388 million
- Launched March 2012

---

- Achieved 32.4% TIRF market share as of Nov 2013 (Rx basis)
  - Largest branded product in TIRF market
- 5 minute onset of action
- Seven doses from 100 to 1,600mcg
- Simple one-step administration process takes <1 minute

\*      \*      \*      \*

**Successful Execution of the Subsys Launch Strategy**
- ~1,680 physicians write 90% of TIRF prescriptions
- Top 118 physicians write 30% of TIRF prescriptions – 81% have written a Subsys prescription
- Profitable within one year of Subsys launch





¹ Based upon net revenue exceeding total operating expense within first year of launch
² Based on unit level data from May 2012 – April 2013 – post REMS (Source Healthcare Analytics)
³ Unit level data for December 2012 and November 2013 (Source Healthcare Analytics)

Taken from Slide numbered 11, available at http://www.insysrx.com/wp-content/uploads/2014/01/INSYS012014.pdf

229.    On all of this news, Insys's shares rose 24.4%, from a closing price of $28.83 on Friday, January 10, 2014, to a closing price of $35.87 on Friday, January 17, 2014.

230.    During this week, with Insys's price rising sharply on good news, CFO Baker exercised options and purchased 30,000 shares which he immediately sold for a net profit of nearly $1.25 million.  Before and after these transactions, CFO Baker held only 3,125 shares of Insys.  Although the sales were purported to have been made pursuant to a Rule 10b5-1 trading plan, the plan was adopted during the class period and the sales do not appear to have

been part of an automatic sales program, as they were the only sales executed from the time the plan was adopted to date.

231.    On March 4, 2014, Insys filed a press release entitled, "Insys Therapeutics Reports Fourth Quarter and Year End 2013 Results," which stated, in relevant part:

> **Record Quarterly Revenue of $40.2 Million Driven by Continued Growth in Subsys Net Revenue**
>
> **Board of Directors Approves Three-for-Two Stock Split of Its Common Stock to Be Effected Through a Stock Dividend**
>
> Insys Therapeutics, Inc. (Nasdaq: INSY), a specialty pharmaceutical company with a focus on supportive care products for cancer patients, today announced its financial *results* for the three- and twelve- month periods ended December 31, 2013. Fourth quarter 2013 highlights include:
>
> - Total net revenue increased to $40.2 million versus $5.2 million for the fourth quarter of 2012;
>
> - Revenues from Subsys® (fentanyl sublingual spray) were $39.2 million, up 719% over fourth quarter of 2012 levels and up 38% as compared with $28.4 million in the third quarter of 2013;
>
> - Net income of $24.1 million, or $1.01 per diluted share, compared to a net loss of $7.1 million, or ($0.76) per basic and diluted share, for the fourth quarter of 2012. The 2013 period includes the impact of a $9.7 million income tax benefit due to the reversal of deferred tax asset valuation allowance;
>
> - Non-GAAP adjusted net income, which excludes the $9.7 million income tax benefit, was $17.1 million, or $0.71 per diluted share; and,
>
> - Advanced a robust pipeline focused on innovative supportive care and therapy products; Insys expects to file at least one New Drug Application (NDA) and at least four Investigational New Drug (IND) applications in 2014.
>
> **"Our solid results for the quarter and year were driven by strong growth in Subsys prescriptions to alleviate breakthrough pain for cancer patients," said Michael L. Babich, President and Chief Executive Officer.** "In December 2013, Subsys was the most prescribed branded transmucosal immediate-release fentanyl (TIRF) product. We believe that its simple, one-

step administration system and rapid onset will enable further growth of our market share for and net revenue from this unique product."

**Fourth Quarter 2013 Financial Results**

Total net revenue for the fourth quarter of 2013 was $40.2 million, an increase of $35.0 million as compared to $5.2 million for the fourth quarter of 2012. On a sequential basis, fourth quarter 2013 net revenue increased by $11.0 million from third quarter 2013 net revenue of $29.2 million.

(Emphasis supplied.)

232.     The highlighted portion of CEO Babich's statement was materially false and misleading because Insys's "solid results" for Q4'13 and FY'13 were not "driven by strong growth in Subsys prescriptions to alleviate breakthrough pain for cancer patients," as cancer patients only represented a small fraction of Subsys users. Instead, as set forth in ¶ 217, Subsys sales were driven by improper and/or illegal conduct. The misstatement was made with scienter for the reasons set forth in ¶ 218, *supra* and ¶ 242, *infra*.

233.     Also on March 4, 2014, Insys held a conference call with investors and analysts to discuss Q4'13 and FY'13 results. CEO Babich and CFO Baker conducted the call on behalf of Insys. CEO Babich made several materially false and misleading statements during the call.

234.     During the call CEO Babich stated: "Subsys has the most rapid onset of action of any transmucosal immediate-release fenatanyl, or TIRF, product. Its rapid five-minute onset is an important feature to an increasing number of opioid-tolerant cancer patients for whom Subsys is prescribed to alleviate their breakthrough pain." For the reasons stated in ¶ 218, this statement is materially false and misleading because only a fraction of Subsys patients have cancer. The statement was made with scienter for the reasons set forth in ¶ 218, *supra* and ¶ 242, *infra*.

235.     Also during the call CEO Babich stated: "We also intend to explore the use of Subsys in a variety of controlled, highly-monitored settings with the ultimate goal of improving pain management for patients beyond its current label indication to manage

breakthrough pain in opioid-tolerant cancer patients." CEO Babich then described approval of a clinical study to evaluate Subsys in a pre-procedural setting, in lieu of IV or intramuscular fentanyl, and other potential uses of Subsys to control pain in emergency rooms and in burn patients, and for pediatric use.

236.    While it may well be true, especially with senior management's knowledge by March 2014 that the OIG and DEA were closing in on Insys and Dr. Awerbuch, that the only way to continue the Subsys franchise was to obtain FDA approval for additional indications, this statement is materially false and misleading because: (1) it implies that Subsys was currently being used only by cancer patients and (2) reference to "controlled, highly-monitored settings" implies that defendants took Subsys's black box warning seriously, recognized the drug's lethality, and would not sanction off label use outside of a monitored, clinical setting.  For the reasons stated in ¶¶ 218, 220, *supra*, and ¶ 242, *infra*, CEO Babich made the materially misleading statement with scienter.  Additionally, the fact that VP of Sales Burlakoff stated, in the April 2014 national sales meeting, that sales representatives and ABLs were no longer to personally titrate patients (¶ 207) indicates that until that date, senior management was well aware of the fact that these non-medical professionals were assisting patients in administering potentially-lethal drugs to themselves.  *See* ¶ 204.  Because CEO Babich knew about these activities, this is an additional fact that demonstrates that CEO Babich's misleading statements about carefully testing Subsys in controlled clinical settings to expand its indicated uses in the future were made with scienter.

237.    During the March 4, 2014 call, CEO Babich also touted the Company's unique compensation system:

> As a reminder, we used its [sic] incentive-based model that employs a pay structure where a significant component of compensation is in bonuses based on [sales force members'] performance.  We believe this is an effective way to motivate our sales team.

The over 38% revenue growth from Q3 to Q4 is a strong testimony to the success of this approach, our sales force's high motivation and the market's highly-positive response to our product.

238.    CEO Babich's statement crediting 38% revenue growth to "high motivation" is materially misleading because it implies that Subsys's stunning success was due to nose-to-the-grindstone hard work by professional pharmaceutical sales representatives searching out new opioid-tolerant cancer patients on 24/7 pain treatment who also suffer from breakthrough pain to start on 100 mcg doses of Subsys.  As set forth herein, defendants knew that nothing could be further from the truth and CEO Babich made this misleading statement with scienter for, *inter alia*, the following reasons:

a)    Based upon not-yet-complete records posted online by the FDA pursuant to the ACA's Sunshine Act, in the last five months of 2013, Insys paid doctors more than $2,357,000 as incentives to write Subsys scripts (¶ 119), the most significant components of which were "speaker fees."  As VP of Sales Burlakoff stated "speaker programs would be the key to their success" and that "the purpose of the speaker programs was to get money in the doctor's pocket."  Of course, Burlakoff was very clear that speakers fees were to be used as a *quid pro quo* for scripts and those who did not write enough scripts could no longer participate in the program (¶¶ 122-123, 125).  Thus, sales were spurred by kickbacks, not by the sales force simply being highly motivated;

b)    The Company failed to follow FDA-mandated dosing requirements and instead put heavy pressure on the sales force to pitch to physicians that an effective dose strength is 400 mcg at a minimum and to press for higher doses than FDA-mandated for patients switching from Actiq.  *See* ¶¶ 151, 220.  As the charts in ¶¶ 100 and 106 demonstrate, sales of the higher-strength dosages rose as sales of the "starter" dosage of 100 mcg dropped by more than half in 2013 – due to the simple reason that Insys earned much more money on the higher-dosage strengths of Subsys.  Similarly,

because Subsys spray bottles, unlike widgets, were not interchangeable, sales representatives were not incentivized to merely sell Subsys in volume; rather, sales representatives sought to be the most profitable by selling the highest-strength dosages of Subys (¶ 161).  The revenue surge was thus not spurred on by a motivated campaign on the part of the sales force to locate new cancer patients but, instead, by application of one sales representative's description of senior management's message: "start them high and hope they don't die;"

c)      Certain sales representatives serviced a single doctor, *e.g.* Joe Rowan (Dr. Ruan) and Brett Syzmanski (Dr. Awerbuch) and could make six- or seven-figure annual bonuses without beating the bushes to find new cancer patients.  ¶¶ 163, 173; and

d)      As CEO Babich admitted and salary surveys confirmed, most pharmaceutical sales representatives in the industry earned $80,000-90,000 in based pay and a bonus of $30,000-$40,000, with more experienced representatives earning higher salaries, while for Insys sales representatives, the inverse was true.  ¶¶ 14 & n. 6, 162, 170.[54]  Because Insys was so outside the compensation scale and its representatives were mostly inexperienced recent college graduates and/or extremely attractive potential models – CEO Babich even stated he preferred those with no pharmaceutical experience – who were not even trained to comply with the TIRF REMS protocols from the outset (¶¶ 90-92, 146, 147, 157), sales representatives pressured doctors to prescribe the higher, more-lucrative dosage strengths without fully understanding the potentially-lethal consequences of their actions.

---

[54] Even PA Team members – who were trained to lie about being from doctors' offices and about the drugs the patients purportedly tried without success in alleviating pain – were extraordinarily-well compensated if they were successful in obtaining coverage for Subsys prescriptions. ¶ 184.

239.    Investors and analysts were impressed by Insys's strong earnings report, its pipeline update, and the planned 3-for-2 stock split that would take place at the end of the month.  Shares skyrocketed nearly $10 in a single day, from $45.66 at the close on March 3, 2014, to $55.58 at the close on March 4, 2014, on heavy trading volume.

240.    On March 5, 2014, Insys filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year.  The Company's Form 10-K was signed by CEO Babich, CFO Baker, and Executive Chairman Kapoor.  The FY'13 Form 10-K reaffirmed the Company's financial results previously announced on March 4, 2013.  The FY'13 Form 10-K also contained a number of materially false and misleading statements.

241.    Defendants gave investors the false impression that the Company's revenues were earned, and would continue to be earned, by improving the lives of the growing population of Americans suffering from cancer:

The National Cancer Institute estimates that, as of January 1, 2009, there were approximately 12.5 million people in the United States who had been diagnosed or were living with cancer. According to the American Cancer Society, the number of patients with cancer continues to increase ... Cancer patients often suffer from symptoms such as pain, nausea, vomiting, fatigue, weight loss and anemia as a result of their cancer or radiation and chemotherapy treatments intended to eradicate or inhibit the growth of cancerous cells and tumors. Pain is a widely prevalent symptom of cancer patients, an estimated 50% to 90% of whom also suffer from BTCP. We believe that the acute pain episodes of BTCP patients are not adequately managed by oncologists and pain specialists, creating an opportunity for us to educate these medical professionals and promote effective BTCP management using Subsys. According to a 2004 study by the American Society of Clinical Oncology, it is estimated that 60% to 80% of all cancer patients who receive chemotherapy experience nausea and vomiting associated with their therapy. We believe current therapies do not adequately address the needs of many of these patients. Supportive care is an important component in the treatment of cancer patients, as suggested by an August 2010 article in the *New England Journal of Medicine* indicating that improved supportive care in cancer patients prolonged median survival by over two months. By focusing on supportive care products, we believe we can contribute to the improvement of cancer patient outcomes and survival rates.

242.    Selling Subsys to millions of cancer patients, thus improving their quality of life, and perhaps even extending it, was not the Company's business plan. Former employees described Executive Chairman Kapoor, CEO Babich, and VP of Sales Burlakoff as persons who were only interested in driving sales and making money from Subsys sales to any and every kind of patient.  Since September 2012, Insys, CEO Babich and Executive Chairman Kapoor, as well as VP of Sales Burlakoff and then-VP of Marketing Napoletano, were pushing a potentially-lethal drug on persons suffering from chronic or acute pain – CW6 indicated the most common diagnoses for which the PA Team sought to obtain coverage were peripheral neuropathy, lower back pain, and sciatica – as to whom Subsys is expressly contraindicated.  *See* ¶ 6 (Subsys black box label).  In addition to the facts alleged in ¶¶ 218 and 220, above the following facts demonstrate that the representation that Subsys's business

model was to generate revenues while easing the suffering or extending the lives of millions of cancer patients was materially false and misleading and made with scienter:

a)    The *qui tam* complaint alleged that oncologists were low priority sales targets (¶ 116);

b)    CW1 stated that cancer patients were not profitable to the Company because they would soon die and that patients with chronic pain and pain drug addicts (who were often visited in atypical offices by doctors driving in from out-of-state) were the target customers; (¶¶ 148-149);

c)    Although it was requested, CW2 was not provided with assistance from his/her Regional Sales Manager to obtain access to speak to doctors at a prominent cancer facility; (¶ 163);

d)    CW4 created lists of the "top ten" and the "top twenty" doctors based upon the number of prescriptions written.  All doctors were ranked in deciles based upon how many prescriptions they had written, not categorized by specialty; (¶171);

e)    CW6 said that only 10% of the patients for whom the Prior Authorization team worked to obtain third-party payor approval for Subsys costs were cancer patients.  It was so rare that the PA Team was "stoked" when they actually saw a diagnosis was for a cancer patient.  CW6 stated that CEO Babich knew this was the case (¶193);

f)    CW7 saw records in which the diagnosis of cancer for a Subsys user occurred less than 1% of the time.  Indeed, in April 2014 – only *after* doctors and the government subpoena made senior management aware of the scrutiny of Insys's sales practices by the OIG and DEA, and defendants began to worry about Dr. Awerbuch's Subsys script-writing spree being uncovered – were sales representatives and ABLs called to a national sales meeting where they were told to focus their sales efforts on cancer patients (¶¶ 202, 208); and

g)     Many cancer patients suffer from a symptom called mucositis, which is characterized by redness, inflammation, soreness or ulceration of the mucus membrane.  The condition is made worse by alcohol, which is an ingredient in Subsys spray.  In fact, Subsys is contraindicated for cancer patients suffering from Grade 2 mucositis.[55]

243.   The 2013 Form 10-K also stated:  "Our field sales force promotes Subsys primarily to oncologists, pain management specialists and centers that cater to supportive care in the United States."

244.   For the reasons set forth in ¶¶ 218, 220, 238 and 242, *supra*, this statement, which places oncologists first among the list of targeted physicians, is materially misleading and made with scienter because sales representatives were told by both senior management and even members of the Board of Directors (¶ 179) to target the largest TIRF prescribers *not* oncologists (who were low on the target lists (¶ 116)); as a result, the number of oncologists prescribing Subsys and the number of cancer patients using it were the exception rather than the rule.

245.   The 2013 Form 10-K stated, as the Q3'13 Form 10-Q substantially did in the excerpt quoted in ¶ 220, that patients were required to commence Subsys use at the 100 mcg dose strength, which might be inadequate to alleviate pain, and, also, that third-party payors may not want to pay for a branded product:

> In accordance with the risk evaluation mitigation strategy, or REMS, protocol for all TIRF products, physicians are advised to begin patients at the lowest dose available for the applicable TIRF product, which for Subsys is 100 mcg. If patients do not experience pain relief at initial low-dose prescriptions of Subsys, they or their physicians may conclude that Subsys is ineffective in general and may discontinue use of Subsys before titrating to an effective dose. In addition, many third-party payors require usage and failure on cheaper generic versions of Actiq prior to providing reimbursement for Subsys and other branded TIRF products, which limits Subsys' use as a first-line treatment option.

---

[55] *See* http://www.drugs.com/dosage/subsys.html

246.   Both of these statements are framed as risk warnings, to wit, reasons that Subsys may not gain market approval: Because patients must titrate up from 100 mcg, they will start with the first dose strength, and, if it fails, switch drugs; because patients must try less expensive or generic drugs first, Subsys may be too expensive to be covered by third-party payors.  However, these statements are materially misleading because they imply that Insys was playing by the rules, and building its business honestly and responsibly, when it most certainly was not.

247.   For the reasons stated in ¶ 220, the false statement about starting patients at 100 mcg was made with scienter.  The sales pitch to doctors since September 2012 was that dosage strengths under 400 mcg will not work or that the sales representative had heard that other doctors had started patients at higher doses; in fact, sales representatives would be chastised if doctors wrote scripts for 100 mcg and 200 mcg.  *See* ¶¶ 128-129, 131, 150-151, 165.  However, the reason for trying to get patients quickly titrated up to higher dosage strengths was pure greed.  ¶¶ 150-151, 179-180.

248.   The statement that Subsys might not gain widespread approval with third-party payors was materially false and misleading because Insys engaged in illegal and/or improper conduct to successfully obtain coverage.  Members of Insys's Prior Authorization team were given "cheat sheets" with respect to various third-party payors to enable the PA Team member to obtain a new diagnosis code from the doctor, if necessary, that would result in coverage by that payor.  PA Team members – who were pretending to be employed at a doctor's office – falsely stated that a patient had tried but failed to obtain relief with other drugs so as to avoid "step edit" substitution and to ensure approval of Subsys.  *See* ¶¶ 186-188.

249.   The 2013 Form 10-K contained several risk warnings concerning misconduct by employees.  Again, materially misleading investors that Insys conducts its business within applicable laws and regulations, the Company warned that it could be subjected to fines and

sanctions should rogue employees, who are not following the Company's Code of Business Conduct and Ethics, violate FDA regulations:

> We are exposed to the risk of employee fraud or other misconduct. Misconduct by employees could include intentional failures to comply with FDA regulations, provide accurate information to the FDA … comply with federal and state healthcare fraud and abuse laws and regulations, … or disclose unauthorized activities to us. ***In particular, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices. These laws and regulations may restrict or prohibit a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements. Employee misconduct could also involve … illegal promotion of a drug product for off-label use, which could result in regulatory sanctions and serious harm to our reputation***. We have adopted a Code of Business Conduct and Ethics, but it is not always possible to identify and deter employee misconduct, and the precautions we take to detect and prevent this activity may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to be in compliance with such laws or regulations. If any such actions are instituted against us … those actions could have a significant impact on our business, including the imposition of significant fines or other sanctions.

(Emphasis supplied.)   A similar warning, concerning FDA regulation of off-label sales stated:

> Even after we achieve U.S. regulatory approval for a product, the FDA may still impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval.
>
> \*       \*       \*       \*
>
> In addition, our product labeling, advertising and promotion are subject to regulatory requirements and continuing regulatory review. The FDA strictly regulates the promotional claims that may be made about prescription drug products. In particular, a drug product may not be promoted for uses that are not approved by the FDA as reflected in the product's approved labeling, although the FDA does not regulate the prescribing practices of physicians. The FDA and other agencies actively enforce the laws and regulations

prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability, including substantial monetary penalties and criminal prosecution. For example, we received a subpoena dated December 9, 2013 from the U.S. Department of Health and Human Services, Office of Inspector General. The subpoena primarily requests documents relating to the marketing of Subsys.

Yet another warning, concerning additional statutory prohibitions, stated:

In addition to FDA restrictions on marketing of pharmaceutical products, several other types of state and federal laws have been applied to restrict certain marketing practices in the pharmaceutical industry in recent years. These laws include anti-kickback and false claims statutes. ***The federal Anti-Kickback Statute prohibits, among other things, knowingly and willfully offering, paying, soliciting or receiving remuneration to induce or in return for purchasing, leasing, ordering or arranging for the purchase, lease or order of any healthcare item or service reimbursable under Medicare, Medicaid or other federally financed healthcare programs.*** The term "remuneration" has been broadly interpreted … to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers, purchasers and formulary managers on the other … ***Practices that involve remuneration that may be alleged to be intended to induce prescribing, purchases, or recommendations may be subject to scrutiny*** … [I]f any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated. The reach of the Anti-Kickback Statute was also broadened [by legislation enacted in 2010] such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it in order to have committed a violation …

The federal False Claims Act prohibits any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government, or knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim to the federal government. As a result of a modification made by the Fraud Enforcement and Recovery Act of 2009, a claim includes "any request or demand" for money or property presented to the U.S. government. Recently, several pharmaceutical and other healthcare companies have been prosecuted under these laws for allegedly inflating drug prices they report to pricing services, which in turn were used by the government to set Medicare and Medicaid reimbursement rates, and for allegedly providing free product to customers with the expectation that the customers would bill federal healthcare programs for the product. ***In addition, certain marketing practices, including off-label promotion, may also lead to violations of the False Claims Act. Many states also have statutes or regulations similar to the federal Anti-Kickback Statute***

1
2
3
4
5
6

***and False Claims Act, which state laws apply to items and services reimbursed under Medicaid and other state programs, or, in several states, apply regardless of the payor. Also, the federal Health Insurance Portability and Accountability Act of 1996 created new federal criminal statutes that prohibit knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payers and knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services.***

7

(Emphasis supplied).

8       250.    For the reasons set forth in ¶¶ 218, 220, 232, 238, 242, 247, and 248, *supra*, in

9   the substantive allegations concerning the *qui tam* complaint (¶¶ 110-131), and in the

10  accounts of the former Insys employees (¶¶ 144-210), the three risk warnings quoted in the

11  preceding paragraph are materially false and misleading and made with scienter because,

12  after an initial short period of sales conducted in accordance with FDA rules and restrictions,

13  senior management – including Executive Chairman Kapoor, CEO Babich, then-VP of

14  Marketing Napoletano, and VP of Sales Burlakoff – set a course for the Company whereby

15  employees were pressured to violate off-label selling prohibitions and FDA-mandated

16  dosage restrictions, and to "put money into the pockets" of doctors willing to write a large

17  enough number of Subsys prescriptions.  Not only did CEO Babich know and encourage the

18  PA Team to pretend to be calling third-party payors from doctors offices to obtain coverage

19  for off-label prescriptions for Subsys – 90% of the time – for chronic conditions such as

20  neuropathy, lower back pain, and sciatica (¶¶ 193-194), but the Company eventually paid or

21  attempted to hire employees at doctors' offices or pain clinics, including Dr. Awerbuch's

22  office, a second salary to promote Subsys prescriptions by physicians at their offices; sales

23  representatives  even reviewed patient files to try to switch those on other pain medications

24  to Subsys. ¶¶ 197, 200, 208.

25       251.    When management began to worry that Dr. Awerbuch would be shut down

26  and that the OIG and DEA had been talking to doctors about Insys's sales practices, VP of

27
28

1   Sales Burlakoff suddenly told sales representatives at a April 2014 national sales meeting to

2   focus on attracting cancer patients, that sales representatives and ABLs could no longer

3   titrate patients, and that anyone who put a patient's name or discussed problems with patients

4   or doctors in email would be fired.  ¶ 207.

5   252.   These new rules constitute an implicit acknowledgement that Company sales

6   practices violated a variety of laws and regulations and is strong evidence that defendants

7   knew that any fines or sanctions the Company may be required to pay as a result of, *inter*

8   *alia*: (a) off-label promotion, (b) violation of TIRF REMS dosage protocols, (c) paying

9   kickbacks to doctors, (d) lying to third-party payors (including governmental entities) to

10  ensure coverage for Subsys, and (e) violating patient privacy by rifling through physicians'

11  files to find candidates for Subsys, were fines and sanctions that could be levied *because of*

12  their insistence that employees violate the law  – not *in spite of* defendants' purported efforts

13  to prevent off-label promotion, the payment of kickbacks, and Medicare/Medicaid fraud.

14  253.   As CEO Babich did during the March 4, 2014, conference call, the 2013 Form

15  10-K touts Insys's method of paying its sales representatives as "cost-efficient":

16  > Key members of our management and board have extensive experience in
17  > building and implementing cost-efficient, incentive-based commercial
>    organizations  … [W]e currently market Subsys in the United States through
18  > our commercial organization. We have built this commercial organization
>    utilizing an incentive-based model similar to that employed by Sciele Pharma
19  > and other companies previously led by members of our board, including our
>    founder, Executive Chairman and principal stockholder. This model employs a
20  > pay structure where a significant component of the compensation paid to sales
>    representatives comes in the form of potential bonuses based on sales
21  > performance. Our product detailing efforts focus primarily on oncologists,
22  > pain specialists and centers that cater to supportive care.

23  For the reasons set forth in ¶¶ 236, 238, this statement is materially misleading and made

24  with scienter because it implies that the sales force was incentivized to work hard, within the

25  bounds of the law, to acquire new cancer patients.  In fact, the opposite was true: by paying

26  various kickbacks to doctors in exchange for scripts and even paying employees of doctors'

27

28

offices to promote Subsys, and by having sales representatives review patient files to find candidates to switch to Subsys, sales representatives could work with a single doctor and receive a quarterly bonus in the six-figure range. This is not what an investor would characterize as a "performance" bonus.

254. The 2013 Form 10-K also explained the existence of and reviewed the important goals of the TIRF REMS Access program:

Risk Evaluation and Mitigation Strategies (REMS)

On December 29, 2011, the FDA approved a single shared REMS for TIRF products. TIRF products, which include the brand-name drugs Abstral, Actiq, Fentora, Lazanda, Onsolis and Subsys, are narcotic pain medicines called opioids used to manage pain in adults with cancer who routinely take other opioid pain medicines around-the-clock. The program officially began in March 2012.

The goals of the TIRF REMS Access Program are to ensure patient access to important medications and mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors by:

• prescribing and dispensing TIRF products only to appropriate patients, including use only in opioid-tolerant patients;

• preventing inappropriate conversion between fentanyl products;

• preventing accidental exposure to children and others for whom TIRF products were not prescribed; and

• educating prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose.

255. By discussing Subsys's inclusion in the TIRF REMS Access Program and setting forth its life-saving goals, defendants falsely implied that Insys complied with the highly-detailed requirements of the Program, as set forth in ¶¶ 63-72 *supra*, for the reasons set forth in ¶¶ 218, 220, 232, 238, 242, 246,247 250, and 252, this materially misleading statement was made with scienter.

256. The Company's Form 10-K also included Sarbanes-Oxley required certifications, signed by CEO Babich and CFO Baker, substantially similar to the

certifications described in ¶¶ 221 and 222, *supra*.  For the reasons set forth in ¶¶ 218, 220, 232, 238, 242, 246, 250, and 252, the SOX certifications were both false when made and made with scienter.

## VI.    THE TRUTH BEGINS TO EMERGE

257.    In less than a week's time, Insys was rocked by two pieces of devastating news which, despite defendants' injection of strong Q2'14 revenue guidance in the interim, had the effect of driving the Company's share price down from $39.57 on May 7, 2014, to just $23.01 on May 14, 2014.

258.    On May 8, 2014, a local Michigan news source published an article entitled, "Michigan neurologist under federal Medicare fraud investigation."  The article, in relevant part, described the charges contained in a criminal complaint against Dr. Gavin Awerbuch:

> Medicare paid Awerbuch $6.9 million from Jan. 1, 2009, through Feb. 6, 2014, for Subsys he prescribed. The next highest amount a U.S. prescriber received was $1.6 million.

> "Awerbuch is responsible for approximately 20.3 percent of the Subsys prescribed to Medicare beneficiaries nationwide during this time," the affidavit stated.

> He wrote 1,283 prescriptions for the drug in five years, while the next closest prescriber wrote 203 prescriptions, the complaint stated.

259.    On this news, shares of the Company's stock declined $6.63 per share, over 17%, to close at $32.68 per share on Friday, May 9, 2014, on unusually heavy trading volume.

260.    On Monday, May 12, 2014, Insys shares opened nearly three dollars lower and continued to slide.  Shortly before the market closed, at approximately 3:30 p.m., the Company issued a press release entitled, "Insys Therapeutics Issues Clarifying Statement." Therein, in relevant part, the Company stated:

> Insys Therapeutics, Inc. (NASDAQ: INSY) today issued a clarifying statement regarding its Subsys® (fentanyl sublingual spray) product.

Insys takes patient safety very seriously and we are committed to working with physicians to help ensure the proper prescribing and use of our products.

In terms of our business, we have continually expanded our commercial organization since launch due to the success of Subsys in treating break through cancer pain in opioid tolerant cancer patients who are 18 years or older. As such, we have expanded our prescriber base and for 2014 year-to-date, no single physician has written more than 5% of total Subsys prescriptions.

Based on recent activity, we feel it is appropriate to summarize and address some of the important items regarding Subsys. Subsys is governed by the Transmucosal Immediate Release Fentanyl ("TIRF") Risk Evaluation and Mitigation Strategy ("REMS") Access program, which was approved and launched by the FDA in March 2012. Insys began commercializing Subsys on March 26, 2012 after the implementation of this TIRF-REMS program.

This TIRF-REMS program is designed to ensure informed risk-benefit decisions before initiating treatment and appropriate use of TIRF medicines.

The purpose of the TIRF-REMS program is to mitigate the risk of misuse, abuse, addiction, overdose and serious complications due to medication errors with the use of TIRF medicines. Subsys can only be prescribed after physicians have undergone training on the risks and benefits of such products and products can only be dispensed via pharmacies who are REMS enrolled. Additionally, all patients and physicians are required to sign a prescriber patient agreement form as part of this process. Insys continues to support the TIRF-REMS program that was co-developed with other participant companies. More information regarding the TIRF-REMS program can be found at www.tirfremsaccess.com.

Insys does not sell directly to physicians. Insys only sells Subsys through DEA approved wholesalers who monitor and track prescribing activity for this TIRF class of drugs and all opioids. Insys remains committed to our compliance program and protocols in place that are designed to ensure our sales and marketing practices comply with applicable laws.

261.    By issuing this statement, Insys tried to assure investors that Subsys's success is based upon treating breakthrough cancer pain by selling Subsys under the auspices of a heavily-regulated program, which would not allow rampant prescription fraud and off label use as described in the Awerbuch Complaint.  Insys tried to downplay the relationship

between itself and the doctors who most often prescribe Subsys by stating both that it does not sell directly to doctors and, in any event, Dr. Awerbuch was responsible for less than 5% of Subsys sales. What the Company did not do, however, was to forcefully deny any wrongdoing with respect to Dr. Awerbuch or to denounce as wholly improper the off label use of Subsys to treat chronic pain as described in the Awerbuch Complaint. Despite defendants' "clarification" efforts, Insys shares closed at $27.63, down another $5.05 on extremely heavy trading.

262. The next day, May 13, 2014, Insys issued a press release to report its results of operations for Q1'14, which stated, in relevant part:

> Insys Therapeutics, Inc. (NASDAQ: INSY), today announced its financial results for the three-month period ended March 31, 2014. First quarter 2014 highlights include:
>
> - Total net revenue increased to $41.6 million versus $11.1 million for the first quarter of 2013;
>
> - Revenues from Subsys® (fentanyl sublingual spray) were $40.7 million, up 319% compared with first quarter 2013 sales of $9.7 million;
>
>   - Prescriptions for Subsys were strong, increasing 15.3% from Q4 2013 to Q1 2014, according to IMS data
>
>   - The company expects Subsys net revenue in excess of $52 million in the second quarter of 2014
>
> - Net income of $7.7 million, or $0.23 per basic and $0.21 per diluted share, compared to a net income of $143 thousand, or $0.01 per basic and diluted share, for the first quarter of 2013;
>
> - Completed a three-for-two stock split through a stockholder dividend, thereby increasing shareholder liquidity to 34.2 million shares outstanding;
>
> - Insys is on track to file one New Drug Application (NDA) and at least four Investigational New Drug (IND) applications with the Food and Drug Administration (FDA) in 2014.

"Our fifth consecutive quarter of top line growth was driven by continued market penetration of Subsys, our market-leading sublingual spray used to alleviate breakthrough pain for cancer patients. Our expanded sales and marketing efforts led to increased market share for Subsys, solidifying its position as the most prescribed transmucosal immediate-release fentanyl (TIRF) product on the market today," said Michael L. Babich, President and Chief Executive Officer. "We continue to aggressively execute our strategy to develop our pipeline of pharmaceutical cannabinoids and other innovative products candidates with the goal of further increasing shareholder value while meeting underserved medical needs."

263.    Despite another record quarter, Insys fell short of both consensus revenues and earnings.   However, based upon the receipt of real-time information concerning prescriptions, defendants saw an increase in demand and projected revenues of more than $52 million for Q2'14.

264.    Later that day, the Company held its Q1'14 earnings conference call with investors and analysts.  After a brief summary of revenue and earnings per share ("EPS") growth and a reference to the completion of the 3-for-2 stock split, CEO Babich turned the floor over to CFO Baker, who gave greater details concerning the Company's financial performance.  Because Insys missed both consensus earnings and revenue figures, CFO Baker explained that it could have been due, in part, to a recent change in the timing of the Company's recognition of revenues. CEO Babich then described the three drivers of Insys's growth: the spectacular success of Subsys, plans to file an NDA for Dronabinol Oral Solution in the second half of 2014, and the Company's strong product pipeline.  CEO Babich concluded his prepared remarks discussing both expanded applications for Subsys and the Company's hope to make broader use of its patented spray delivery system.

265.    During the Question and Answer portion of the call, CEO Babich was asked, by Jason Butler of JMP Securities:

Q:    Mike, can you just talk about the recent debate around the physician in Michigan? Can you tell us exactly what you know about the criminal complaint and exactly what Insys's involvement or relevance to Insys the complaint has?

A:      … Insys's involvement in terms of anything related to Medicare fraud that is alleged from this physician is zero. We've had – if you see the court affidavit, the Medicare fraud is related to the reimbursement of procedures. Subsys is mentioned in there as the doctor was a prescriber of Subsys, but in no way, shape, or form was there any allegations against Insys, any of its employees or affiliates related to the fraud itself.

266.    This statement was not entirely true. While neither Insys nor any of its employees were named in the criminal complaint, the government alleged that because none of the patients or undercover agents for whom Subsys prescriptions were written suffered from breakthrough cancer pain, the Subsys prescriptions were "outside the scope of legitimate medical practice and for no legitimate medical purpose" and accused Dr. Awerbuch of fraud for filing false claims with Medicare and private insurers. Moreover, given defendants' relationship with Dr. Awerbuch, including the fact that VP of Sales Burlakoff met with him to offer him kickbacks, it is unlikely that defendants had zero involvement with Dr. Awerbuch's Medicare reimbursement fraud pertaining to Subsys. ¶ 196.

267.    The next questioner, Michael Faerm of Wells Fargo, used the situation with Dr. Awerbuch to ask CEO Babich a more general question:

Q:      Do you have any sense from your REMS tracking, or other records, what just the overall levels of use are for the labeled indication versus other uses?

A:      We do not have any data on that. However … the REMS was put in place prior to the launch of our product. So Insys calls on these REMS doctors …

So companies do not have clarity around the usage of the product.

268.    Again, CEO Babich's response had only a kernel of truth to it. While it is accurate to state that the REMS program started and doctors were already registered a few months before Insys was first marketed, that fact does not, alone, give Insys a free pass to market Subsys to these physicians and assume they only treat patients with breakthrough

cancer pain.  More important, while it may be true that the TIRF REMS Access Program may not, itself, provide express breakdowns of which patients use Subsys to relieve cancer pain and which are prescribed Subsys off label, CEO Babich was asked if the Company had "other records" which would provide the answer to that question.

269.     CEO Babich's statement that Insys "does not have any data" and that TIRF sellers "do not have any clarity" concerning indicated usage as opposed to off label usage was untrue when made and made with scienter because the facts alleged at ¶¶ 218, 242, and 244, *supra*, demonstrate that CEO Babich was well aware that only a small fraction of Subsys users were cancer patients with breakthrough pain.

270.     When asked by Robert Sussman of Bentley Capital: "Do you see any evidence that there could be other doctors doing the same thing as the doctor in Michigan,"  CEO Babich falsely replied "No, we do not believe that's the case."  This statement was false when made and made with scienter because, as the facts alleged at ¶¶ 218, 242, and 244, *supra*, demonstrate, about 90% of users did not have cancer and the top TIRF prescribers Insys focused its sales efforts on were not oncologists.  CEO Babich knew, and in fact arranged, for Joe Rowan to become the sales representative for Dr. Ruan, a pain doctor and top Subsys prescriber.  (¶ 154).  Similarly, Insys hired officer workers at multi-physician pain clinics to work also for Insys at the same time, to promote Subsys use to doctors at  the pain clinics.  *See* ¶ 197.

271.     When asked by Sussman "[W]hat's the company doing to ensure that your sales force does not market for off label use, that there is no abuse on the part of your sales force," CEO Babich responded:  "From a sales force perspective, our intense training classes that we have for our sales reps ensure that they fully comply with all the REMS programs that are out there."

272.     CEO Babich's statement is false and materially misleading and made with scienter because initial training did not always cover the TIRF REMS Access Program (¶ 157) and, in any event, while many aspects of formal training were by the book, most one-

1    on-one and field training, as endorsed and/or directed by CEO Babich, Executive Chairman

2    Kapoor, and VP of Sales Burlakoff, taught sales representatives to sell off label or to pitch

3    senior management's message concerning an "effective dose" of Subsys (400 mcg or

4    greater) and a higher conversion dose strength from Actiq to Subsys than permitted by FDA-

5    mandated protocol.  ¶¶ 151, 158, 165165, 194, 207, 220.

6    273.    Although Insys missed consensus estimates for Q1'14, defendants guaranteed

7    $52 million in revenue in Q2'14, more than $10 million above Q1'14 net revenues.  Also,

8    CEO Babich misled investors and analysts into believing that Dr. Awerbuch was a rogue

9    doctor and that Insys sales representatives were carefully trained to comply with TIRF

10   REMS Access Program protocols.  As a result, Insys shares barely moved on this mixed

11   news, shedding only $0.33 on May 13, 2014.

12   274.    After the close of trading, on May 13, 2014, Insys filed its Form 10-Q for

13   Q1'14 with the SEC.  For the reasons set forth in ¶¶ 219-223, the Form 10-Q contained false

14   or materially misleading statements that were made with scienter and CEO Babich's and

15   CFO Baker's SOX certifications were also false and made with scienter.

16   275.    Also after the close of trade on May 13, 2014, THE NEW YORK TIMES

17   published an article on its website entitled, "Doubts Raised About Off-Label Use of Subsys,

18   a Strong Painkiller."  The article, in relevant part, stated:

19
20    Almost overnight, a powerful new painkiller has become a $100 million
      business and a hot Wall Street story.

21    But nearly as quickly, questions are emerging about how the drug is being
22    sold, and to whom.

23    The drug, Subsys, is a form of fentanyl, a narcotic that is often used when
24    painkillers like morphine fail to provide relief. The product was approved in
      2012 for a relatively small number of people — cancer patients — but has
25    since become an outsize moneymaker for the obscure company that makes it,
      Insys Therapeutics. In the last year, the company's sales have soared and its
26    share price has jumped nearly 270 percent.

27

28

Behind that business success is an unusual marketing machine that may have pushed Subsys far beyond the use envisioned by the Food and Drug Administration. The F.D.A. approved Subsys only for cancer patients who are already using round-the-clock painkillers, and warned that it should be prescribed only by oncologists and pain specialists. But just 1 percent of prescriptions are written by oncologists, according to data provided by Symphony Health, which analyzes drug trends. About half of the prescriptions were written by pain specialists, and a wide range of doctors prescribed the rest, including general practice physicians, neurologists and even dentists and podiatrists.

Interviews with several former Insys sales representatives suggest the company, based in Chandler, Ariz., has aggressively marketed the painkiller, including to physicians who did not treat many cancer patients and by paying its sales force higher commissions for selling higher doses of the drug.

Under F.D.A. rules, manufacturers may market prescription drugs only for approved uses. But doctors may prescribe drugs as they see fit. Over the last decade, pharmaceutical companies have paid billions of dollars to settle claims that they encouraged doctors to use drugs for nonapproved treatments, or so-called off-label uses, to increase sales and profits.

Drug-safety experts said the range of medical professionals who appeared to be prescribing Subsys was troubling, particularly given concerns about the widespread use — and abuse — of narcotic painkillers. In December, Insys disclosed that it had received a subpoena from the federal health department's Office of the Inspector General for documents related to its sales and marketing practices. The company has said it is cooperating with the investigation.

Medicine aside, Subsys is, much as anything, a Wall Street story. The explosive growth of Insys was fanned first by Wall Street investors betting the company's sales and share price would rise. Now, other investors are betting the stock will decline. Over the last week, shares of Insys have lost roughly a third of their value, after the arrest on federal fraud charges of a Michigan neurologist who was a top prescriber of Subsys. In a statement, Insys said it took patient safety seriously and was committed to working with doctors to ensure its products were used properly.

Drug-safety experts said it was crucial that products like Subsys be marketed responsibly because the drugs are powerful, and powerfully addictive.

"You're essentially spreading the accessibility to a very potent, rapid-onset narcotic to a large number of people, and a number of them may get addicted,"

said Dr. Sidney M. Wolfe, founder and senior adviser to the Public Citizen Health Research Group, a consumer organization.

Oral fentanyl products like Subsys have a history of being broadly prescribed. In 2008, the drug company Cephalon pleaded guilty to a criminal charge and paid $425 million in fines for inappropriate marketing of its products, including Actiq, a fentanyl lollipop, which federal officials said was being promoted for a range of unapproved uses, including treatment of migraines.

In 2007, Cephalon sought approval from the F.D.A. to market a newer fentanyl product, a dissolving pill called Fentora, for use in people without cancer. At the time, F.D.A. officials cited data showing the product was already being widely used by noncancer patients and they later denied the company's application. Cephalon was acquired by Teva Pharmaceutical Industries in 2011.

Dr. Margaret A. Hamburg, the F.D.A. commissioner, said the agency did not regulate how doctors practice medicine. Still, she acknowledged that the widespread prescribing of oral fentanyl products for off-label uses was troubling, especially given the agency's efforts to restrict the use of fentanyl and other opioids in the face of painkiller abuse. In the case of products like Subsys, prescribers must undergo training about the drug's risks, pass a test and register in a national database. Patients must sign an agreement with their doctor before being prescribed the drug.

"It is frustrating, and we are in a process of continually assessing how our approaches are unfolding in the real world," Dr. Hamburg said.

Several doctors said products like Subsys, which is sprayed under the tongue, fill an important role for seriously ill cancer patients, who may need the drug if their condition worsens or if their standard painkiller regimen occasionally fails to work.

"You want it to work as quickly as possible," said Dr. Joshua R. Wellington, a pain specialist at Indiana University Health University Hospital. He is a paid speaker for Insys and said he prescribed it only to cancer patients. "In my mind, that's what sets it apart."

***Still, Subsys has sold surprisingly well given the drug is approved only for cancer pain, and given that only a small number of oncologists, who are typically responsible for treating their patients' pain, appear to be prescribing it.*** In addition to pain specialists and anesthesiologists, who together made up about half of all prescriptions, a significant number were

written by neurologists and physical medicine and rehabilitation specialists, who often treat patients with a variety of pain conditions.

*The former sales employees said that while the company targeted some oncologists, it placed more focus on high prescribers of competing products like Actiq and Fentora, regardless of whether those doctors treated cancer patients. They also said they were trained to mention the restriction to cancer pain at the beginning of the sales pitch and then to move on to a more general discussion of "breakthrough pain" in the doctors' other patients.*

Dr. Wellington said while he did not prescribe the drug off-label, he understood why some colleagues did. "Cancer pain is not a unique pain syndrome," he said. "Pain is pain."

Others disagreed.

Dr. Lewis S. Nelson, a medical toxicologist at the New York University School of Medicine, said such drugs might be appropriate for a terminally ill cancer patient, but fentanyl, like other opiates, carries a high risk of dependency. It can also cause respiratory distress — and death — if it is taken by people who are not using painkillers regularly.

"If you're waiting to die, you should die in comfort and dignity," Dr. Nelson said. "It's very different than if you're attempting to have a functional life, because these drugs are relatively incompatible with having a functional life."

At least part of Insys's business strategy appears to rely on the assumption that patients will eventually need more of the drug, along with higher doses. Higher doses are more expensive than lower doses.

Comments from a Wall Street analyst underscore that view. "As Subsys grows more mature, we expect the number of experienced patients to grow," Michael E. Faerm, an analyst for Wells Fargo, wrote last year in a note to investors. "As the experienced patients titrate higher, the average dose per prescription should increase."

*The former Insys sales representatives said they were paid more for selling higher doses.*

Pratap Khedkar, who oversees the pharmaceutical practice at ZS Associates, a global sales and marketing firm, said such a practice was highly unusual because "most companies feel that is the doctor's decision because it is very patient-specific."

AMENDED CLASS ACTION COMPLAINT
Lead Case No. CV-14-01043-GMS
113

294458.1 INSYS

*Many of the sales representatives were new to the pharmaceutical industry and were paid low base salaries, about $40,000 a year, compared with the industry standard of about $80,000, as an added incentive to rack up higher sales commissions, they said. Some said they were told they could make hundreds of thousands by selling aggressively.*

Michael L. Babich, the chief executive of Insys, has attributed his company's sales to its ambitious compensation structure. "We believe this is the most effective way to motivate our sales team," he told analysts during an earnings call last fall.

On Tuesday, the company reported that Subsys sales continued to grow in the first quarter of this year, to $40.7 million, from $9.7 million a year ago.

Meanwhile, the company's plans for Subsys are only just getting underway: Earlier this year, Insys announced that it intended to seek approval to market the product for a broader range of uses, including for children and burn patients, and to treat acute pain in emergency rooms.

(Emphasis supplied).

276.   On May 14, 2014, THE NEW YORK TIMES published a print version of the online article on page B1 of the Business section of the New York edition.

277.   On this news, shares of the Company's stock declined $4.29 per share, nearly 16%, to close at $23.01 per share on May 14, 2014, on unusually heavy trading volume.

278.   On September 12, 2014, Insys announced the receipt of a second government subpoena, from the Unites States Attorney's office in Boston, Massachusetts, also seeking documents concerning Insys's sales and marketing of Subsys.

279.   As of yet, neither investigation has been resolved.

**VII.   ADDITIONAL SCIENTER ALLEGATIONS**

280.   Further evidencing a strong inference of scienter are the considerable proceeds, over $34.1 million, reaped by CEO Babich, CFO Baker, and Dr. Dillaha through the sale of Insys's common stock during the Class Period, as set forth in the Form 4 filings for Insys directors and officers.

281.   As of March 4, 2014, the day upon which the price of Insys common stock reached its all-time high, CEO Babich owned 81,862 shares of Insys.  On March 5, 2014, the

day following this extraordinary share price increase, CEO Babich exercised options to purchase 212,125 shares at a price of $3.54 (for 1,167 shares) and $1.83 (for the remainder).

282.    Immediately upon exercising these options to purchase Insys common stock, CEO Babich executed a series of trades to sell 288,432 shares at prices ranging from $72.65 to $84.72 per share for a total of $21,512,111.84.  On this single day of multiple transactions, CEO Babich netted a profit of $21,121,927.52.  This sale accounted for around 98% of CEO Babich's total holdings of Insys at the time.

283.    CEO Babich's trading during this six-month Class Period is distinctly different from his trading practices both after the end of the Class Period, and from the time of Insys's IPO to the beginning of the Class Period, in which CEO Babich only acquired Insys common stock, through either direct purchases or exercising options.

284.    Furthermore, the timing of CEO Babich's sales are highly suspicious, as he sold substantially all his Insys common stock one day after the price of Insys common stock reached an all-time high – having first driven the price up nearly $10 in a single day by issuing a very positive earnings report and an announcement of a 3-for-2 stock split to occur at the end of March 2014.

285.    CMO Dillaha also took full advantage of Insys common stock's all-time high by selling nearly all his stock on March 5, 2014, in a similar fashion to CEO Babich.  As of March 4, 2014, CMO Dillaha owned 3,125 shares of Insys.  On March 5, 2014, CMO Dillaha exercised options to purchase 149,932 shares at a price of $10.89 (for 18,750 shares), $3.54 (for 19,056 shares) and $1.83 (for the remainder).

286.    Immediately upon exercising these options to purchase Insys common stock, CMO Dillaha executed a number of transactions to sell these 149,932 shares at prices ranging from $72.65 to $84.72 per share for a total of $11,179,764.26.  On this single day of multiple transactions, CMO Dillaha netted a profit of $10,702,927.94.  This sale accounted for around 98% of CMO Dillaha's total holdings of Insys at the time.

287.     CMO Dillaha's trading pattern during this six-month period was distinctly different from his trading practice prior to that period, as he made no other sales of Insys common stock since Insys's IPO in May, 2013.

288.     Moreover, the circumstances regarding this single day of trading are highly suspicious.  CMO Dillaha sold substantially all his Insys common stock one day after the price of Insys common stock reached an all-time high, and less than one month prior to CMO Dillaha's departure from the Company.  One of the sales representatives, CMO Dillaha's good friend, told another employee that about a month before his departure, CMO Dillaha told her that he had to get out of Insys because of everything that was going on.  ¶ 209.  (In fact, the sales occurred at a time that senior management had begun having daily conversations about Dr. Awerbuch.  ¶¶ 173-174).  He abruptly moved across the country to take a newly-created executive position at New Haven Pharmaceuticals, the CEO of which is on the Insys Board of Directors.

289.     As of January 12, 2013, CFO Baker owned 3,125 shares of Insys.  Over the course of four days, from January 13, 2014, to January 16, 2014, CFO Baker exercised and immediately sold over 30,000 shares of Insys stock.  CFO Baker exercised options to purchase these 30,000 shares at a price of $3.54 per share over this four-day period.

290.     Upon exercising these options to purchase Insys common stock on each of these four days, CFO Baker immediately sold the same amount exercised, totaling a sale of 30,000 shares at prices ranging from $45.25 to $50.17 per share for a total of $1,427,894.10.  On this single day of transactions, CFO Baker netted a profit of $1,248,194.10.  These sales accounted for around 90% of CFO Baker's total holdings of Insys at the time.

291.     CFO Baker's trading during this six-month Class Period is distinctly different from his trading practices both after the end of the Class Period, and from the time of Insys's IPO to the beginning of the Class Period, in which Defendant Baker only acquired Insys common stock through exercising options. Although the Form 4's indicate that the sales

were made pursuant to a Rule 10b5-1 trading plan, the plan was adopted during the class period and there have been no other sales under the plan.

292.     Furthermore, the timing of CFO Baker's sales are highly suspicious. CFO Baker sold substantially all his Insys common stock over the course of one week, in which Insys saw a dramatic stock increase and, which corresponded with Insys's announcement of positive news concerning its pipeline both through a press release and an investor conference relaying the success of Subsys during the prior year.

293.     As can be seen in the following table, CEO Babich's, Dr. Dillaha's, and CFO Baker's sales of Insys stock over the Class Period, netted them a profit of over $31.8 million. A detailed list of trades is attached as Exh. E.

| Name | Title | Date | Shares Sold | Price Range | Gross Proceeds | Net Proceeds |
|---|---|---|---|---|---|---|
| Michael L. Babich | CEO | 3/5/14 | 288,432 | $72.65-$84.72 | $21,512,111.84 | $21,121,927.52 |
| Darryl S. Baker | CFO | 1/13/14-1/16/14 | 30,000 | $45.25-$50.17 | $1,427,894.10 | $1,248,194.10 |
| Larry Dillaha | CMO | 3/5/14 | 149,932 | $72.65-$84.72 | $11,179,764.26 | $10,702,927.94 |
| **Total** | | | | | **$34,119,770.20** | **$31,824,855.46** |

## VIII.   CLASS ACTION ALLEGATIONS

294.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Insys common stock between November 12, 2013, and May 14, 2014, inclusive (the "Class Period") and who were damaged thereby (the "Class").   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

295.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Insys's common stock was actively traded on the NASDAQ Stock Market ("NASDAQ").  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Insys shares were traded publicly during the Class Period on the NASDAQ.  As of May 2, 2014, Insys had 34,229,383 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Insys or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

296.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

297.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

298.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Insys; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

299.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## IX.   LOSS CAUSATION

300.   During the class period, defendants materially misled the investing public, thereby inflating the price of Insys's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and/or misleading.   Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Insys's operations, manner of doing business, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

301.   Lead Plaintiff and the class were damaged when the price of the Company's shares significantly declined when the materially misleading statements and misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, began to be revealed, causing investors' losses.

302.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

303.    At all relevant times, the market for Insys's common stock was an efficient market for the following reasons, among others:

(a)    Insys stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Insys filed periodic public reports with the SEC and/or the NASDAQ;

(c)    Insys regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Insys was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

304.    As a result of the foregoing, the market for Insys's common stock promptly digested current information regarding Insys from all publicly available sources and reflected such information in Insys's share price. Under these circumstances, all purchasers of Insys's common stock during the class period suffered similar injury through their purchase of Insys's common stock at artificially inflated prices and a presumption of reliance applies.

305.    As a result of the materially false and/or misleading statements and/or failures to disclose alleged herein, Insys's common stock traded at artificially inflated prices during the class period.   On March 4, 2014, the Company's stock closed at a class period high of $55.58 per share.  Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Insys's common stock and market information relating to Insys, and have been damaged thereby.

# XI.    NO SAFE HARBOR

306.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Insys who knew that the statement was false when made.

# XII.   COUNTS

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendant Insys and the Individual Defendants

307.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

308.    During the class period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the class period, did: (i) deceive the investing public, including Lead Plaintiff and other class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the class to purchase Insys's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

309.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Insys's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

310.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Insys's business operations, financial well-being and prospects, as specified herein.

311.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Insys's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Insys and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the class period.

312.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was

1   privy to and participated in the creation, development and reporting of the Company's

2   internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed

3   significant personal contact and familiarity with the other defendants and was advised of, and

4   had access to, other members of the Company's management team, internal reports and other

5   data and information about the Company's finances, operations, and sales at all relevant

6   times; and (iv) each of these defendants was aware of the Company's dissemination of

7   information to the investing public which they knew and/or recklessly disregarded was

8   materially false and misleading.

9       313.   The defendants had actual knowledge of the misrepresentations and/or

10  omissions of material facts set forth herein, or acted with reckless disregard for the truth in

11  that they failed to ascertain and to disclose such facts, even though such facts were available

12  to them. Such defendants' material misrepresentations and/or omissions were done

13  knowingly or recklessly and for the purpose and effect of concealing Insys's business

14  operations, financial well-being and prospects from the investing public and supporting the

15  artificially inflated price of its securities.  As demonstrated by defendants' materially

16  misleading statements and misrepresentations of the Company's business operations,

17  financial well-being, and prospects throughout the Class Period, defendants, if they did not

18  have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in

19  failing to obtain such knowledge by deliberately refraining from taking those steps necessary

20  to discover whether those statements were false or misleading.

21      314.   As a result of the dissemination of the materially false and/or misleading

22  information and/or failure to disclose material facts, as set forth above, the market price of

23  Insys's common stock was artificially inflated during the class period.  In ignorance of the

24  fact that market prices of the Company's shares were artificially inflated, and relying directly

25  or indirectly on the false and misleading statements made by defendants, or upon the

26  integrity of the market in which the securities trades, and/or in the absence of material

27  adverse information that was known to or recklessly disregarded by defendants, but not

28

disclosed in public statements by defendants during the class period, Lead Plaintiff and the other members of the Class acquired Insys's shares during the Class Period at artificially high prices.

315.     At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the class and the marketplace known the truth regarding, among other things, the manner in which Insys marketed and sold Subsys, facts which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Insys shares, or, if they had acquired such stock during the class period, they would not have done so at the artificially inflated prices which they paid.

316.     As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the class period when the true facts with respect to defendants' material misrepresentations, misleading statements and/or omissions, began to be revealed and Insys's stock price declined as a result of these revelations.

317.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

318.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

319.     The CEO Babich, CFO Baker, and Executive Chairman Kapoor acted as controlling persons of Insys within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual

rights,[56] participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and materially misleading statements filed by the Company with the SEC and disseminated to the investing public, CEO Babich, CFO Baker, and Executive Chairman Kapoor had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  CEO Babich, CFO Baker, and Executive Chairman Kapoor  were provided with or had unlimited access to: (i) copies of real-time prescription data from the administrator of the TIRF REMS Access Program as well as similar information from companies such as Symphony Health, IMS Health, and Wolters Kluwer Health; (ii) Company reports, including those described in ¶¶ 169, 171, and 173; and (iii) press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

---

[56] In addition to Executive Chairman Kapoor's active daily role in Company meetings and his involvement in crafting the sales message for Subsys, a Risk Warning in the Registration Statement expressly stated:

> ***Our founder, Executive Chairman and principal stockholder can individually control our direction and policies, and his interests may be adverse to the interests of our stockholders***.
>
> … Upon the closing of this offering, assuming no exercise of the underwriters' over-allotment option, Dr. Kapoor will beneficially own approximately 68% of our outstanding shares of common stock. By virtue of his holdings, Dr. Kapoor can and will continue to be able to effectively control the election of the members of our board of directors, our management and our affairs …
>
> *          *          *
>
> … As of March 31, 2013, we owed $59.0 million in debt and accrued interest to trusts controlled by or affiliated with Dr. Kapoor. While this outstanding debt will convert into shares of our common stock upon completion of this offering, we may in the future issue additional debt to entities controlled by or affiliated with Dr. Kapoor and Dr. Kapoor's interest as a holder of our debt may conflict with your interest as a holder of our common stock.

320.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

321.     As set forth above, Insys, CEO Babich, CFO Baker, and Executive Chairman Kapoor each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, CEO Babich, CFO Baker, and Executive Chairman Kapoor  are liable pursuant to Section 20(a) of the Exchange Act for Insys's Section 10(b) and Rule 10b-5 violations.  As a direct and proximate result of these defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the class period.

### THIRD CLAIM
**Violation of Section 20A of The Exchange Act**
**Against Defendants Babich and Dillaha**

322.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

323.     While Insys securities traded at artificially inflated prices, defendants CEO Babich and CMO Dillaha personally profited by selling 438,364 shares of their holdings in Insys securities while in possession of adverse, material non-public information about Insys, pocketing over  $32,691,876.10 in illegal insider trading gross proceeds, as detailed above in ¶¶ 280-293.

324.     CEO Babich and CMO Dillaha had an obligation to either disclose the truth or refrain from trading in Insys shares.  Because of the large number of shares CEO Babich and CMO Dillaha planned to sell on March 5, 2014, by no later than March 4, 2014, they needed to have a plan in place to execute the transactions in a series of multiple trades so as to not detrimentally affect Insys's share price.  Therefore, no later than March 4, 2014, CEO

Babich and CMO Dillaha should have disclosed the true facts which had been concealed from the public to date or refrained from trading in Insys shares the next day.

325. Lead Plaintiff and members of the Class traded contemporaneously with defendants CEO Babich and CMO Dillaha by purchasing Insys securities at artificially inflated prices on March 4, 2014, and March 5, 2014, and were damaged thereby.

326. As a result of the wrongful conduct alleged herein, Lead Plaintiff and other members of the Class have suffered damages.

327. As set forth above, defendants CEO Babich and CMO Dillaha violated Section 20A of the Exchange Act and are liable to Lead Plaintiff and other members of the class. Specifically, Lead Plaintiff and members of the class are entitled to disgorgement of defendant CEO Babich's and CMO Dillaha's profits in connection with their contemporaneous trades.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

328. Lead Plaintiff hereby demands a trial by jury.

Dated: October 27, 2014          GLANCY BINKOW & GOLDBERG LLP

By:  *s/ Lionel Z. Glancy*
Lionel Z. Glancy
Leanne E. Heine
Elaine Chang
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

-and-

Robin Bronzaft Howald
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone:  (212) 682-5340
Facsimile:   (212) 884-0988

*Attorneys for Lead Plaintiff and Lead Counsel*

TIFFANY & BOSCO, P.A.
Richard G. Himelrick (004738)
J. James Christian (023614)
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, AZ 85016
Telephone: (602) 255-6000
Facsimile:   (602) 255-0103

*Attorneys for Lead Plaintiff and Liaison Counsel*

LAW OFFICES OF HOWARD G. SMITH
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Lead Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

   _/s/ Lionel Z. Glancy_
Lionel Z. Glancy

294458.1 INSYS

# Mailing Information for a Case 2:14-cv-01043-GMS Larson v. Insys Therapeutics Incorporated et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Peter M Adams**
  padams@cooley.com,maraujo@cooley.com

- **Donald Wayne Bivens**
  dbivens@swlaw.com,sstanley@swlaw.com,docket@swlaw.com

- **Elaine Chang**
  echang@glancylaw.com,info@glancylaw.com

- **Jeremy James Christian**
  jjc@tblaw.com,sab@tblaw.com

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com,mzehel@pomlaw.com

- **Koji F Fukumura**
  kfukumura@cooley.com,cdeatrick@cooley.com,chourani@cooley.com

- **Lionel Zevi Glancy**
  info@glancylaw.com

- **Michael M Goldberg**
  mgoldberg@glancylaw.com

- **Leanne E Heine**
  lheine@glancylaw.com

- **Richard Glenn Himelrick**
  rgh@tblaw.com,sab@tblaw.com

- **Robin Bronzaft Howald**
  rhowald@glancylaw.com,treiss@glancylaw.com,hobbit99@aol.com

- **Jennifer Lynn Kroll**
  jkroll@martinbonnett.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com

- **Susan Joan Martin**
  smartin@martinbonnett.com,tmahabir@martinbonnett.com,mblawfirm@aol.com

- **Francis P McConville**
  fmcconville@pomlaw.com,abarbosa@pomlaw.com

- **Robert V Prongay**
  rprongay@glancylaw.com,info@glancylaw.com

- **Nicole Elizabeth Sornsin**
  nsornsin@swlaw.com,jthomes@swlaw.com,docket@swlaw.com

- **Kara M Wolke**
  kwolke@glancylaw.com

- **Blake Zollar**
  bzollar@cooley.com,bdanziger@cooley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)